# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

SUPERCOOLER TECHNOLOGIES, INC.,

               PLAINTIFF,

v.

THE COCA-COLA COMPANY,

               DEFENDANT.

Case No.: ___23-187_____

**JURY TRIAL DEMANDED**

**DECLARATORY RELIEF REQUESTED**

## <u>COMPLAINT</u>

Bradley J. Bondi (lead counsel) (FBN 162396)
Michael B. Weiss
  (*Pro hac vice* motion forthcoming)
Michael D. Wheatley
  (*Pro hac vice* motion forthcoming)
Vitaliy Kats (FBN 118748)
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, New York 10005
Telephone: 212.701.3000
bbondi@cahill.com
vkats@cahill.com

Paul Thanasides (FBN 103039)
**MCINTYRE THANASIDES BRINGGOLD ELLIOTT GRIMALDI GUITO & MATTHEWS, P.A.**
500 E. Kennedy Blvd., Suite 200
Tampa, FL 33602
(813) 223-0000
paul@mcintyrefirm.com

*Attorneys for Plaintiff SuperCooler Technologies, Inc.*

Plaintiff SuperCooler Technologies, Inc. ("SuperCooler"), by its undersigned counsel, for its complaint against Defendant The Coca-Cola Company ("Coke"), alleges the following, based upon personal knowledge as to its own acts and upon information and belief as to all other matters. SuperCooler's information and belief with regard to such matters is based on the investigation conducted by its attorneys, which investigation included a review of confidential and public materials, communications between SuperCooler and Coke, press releases, media reports, and other publicly disclosed information about Coke. SuperCooler believes that substantial additional evidence exists to support the allegations, which shall be uncovered after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is an action for breach of contract (including the breach of an express and implied covenant to use diligent  efforts to exploit and commercialize the technologies and patents exclusively licensed to Coke), breach of fiduciary duties (including, without limitation, those owed to SuperCooler from a confidential/trust relationship and as a *de facto* partnership or joint venture), trade secret misappropriation, fraud (including fraud in the inducement), promissory estoppel, and unjust enrichment and declaratory relief.

2.      Doug Shuntich is an aerospace engineer and SuperCooler's founder. Mr. Shuntich was previously employed by a prime contractor for NASA and worked exclusively with NASA's Space Shuttle program at the Kennedy Space Center in Cape Canaveral, Florida. Mr. Shuntich was part of an elite engineering team that ensured the liquid oxygen system used in the Space Shuttle's main engines maintained the required precision cold temperatures throughout the countdown to launch for 32 Space Shuttle launches.

3.     After founding SuperCooler, Mr. Shuntich used his expertise in cooling and precision temperature control to develop and patent groundbreaking technologies that have significant and lucrative commercial applications for many different industries, including the beverage industry.

4.     The first technology, known as Super Chill, cools beverages to a precise temperature below freezing in a liquid state and then, using a patented device known as a Nucleator, instantly turns the beverage into a desirable slush while it remains in its sealed container, a feat that Coke had been attempting to achieve for decades without success until SuperCooler perfected it.

5.     The second technology, known as Rapid Chill, cools room-temperature canned or bottled beverages to precise temperatures near or below freezing in a matter of seconds, thereby reducing the need for retail stores to rely on energy-consuming glass door coolers.  Rapid Chill has tremendous potential to lower the carbon footprint associated with the energy inefficient coolers used by soft-drink bottlers and drink distributors.

6.     SuperCooler did not have the resources to bring its technologies to market on its own, so it actively sought out commercial partners.  After receiving interest from several large companies (including PepsiCo, Starbucks, and Viking), SuperCooler presented its technologies to Coke.  Coke was impressed by SuperCooler and quickly recognized the significant value SuperCooler's technologies could add to Coke's global beverage empire and its efforts to reduce its carbon footprint from the energy required to keep drinks cold for point-of-sale consumption.

7.     Coke's Board of Directors and CEO all acknowledged that SuperCooler's technologies have the potential to transform the way millions of people around the world consume beverages.  Indeed, Coke's CEO publicly touted SuperCooler's technology during an on-camera

interview on national television.  Coke's CEO referred to Mr. Shuntich when he said that a "NASA scientist" had helped Coke develop supercooling and rapid chilling technology to take advantage of the "global phenomenon" of consumers wanting the super-chilled beverages that SuperCooler's technologies produce.

8.     Over the course of approximately four years, Coke developed an ever-deepening relationship with SuperCooler—as a partner—to bring SuperCooler's technologies to market. Coke and SuperCooler memorialized this relationship in a series of agreements, including a Master Services Agreement, statements of work, and an exclusive license agreement.

9.     Having secured a contract with one of the world's largest beverage companies, SuperCooler was eager to move forward with testing and production.  Mr. Shuntich and his SuperCooler team officially were registered and invited as visitors at Coke's Atlanta headquarters campus more than 40 times to demonstrate SuperCooler's technologies, present ideation sessions, deliver and test production prototypes, meet with executives, and train Coke personnel on all aspects of SuperCooler's technologies.

10.     From at least 2014, Coke induced SuperCooler to: (a) disclose valuable confidential and proprietary information, methods, and materials (including its trade secret information); (b) terminate SuperCooler's ongoing relationship with Coke's competitor and other potential commercial partners; (c) expend SuperCooler's scarce resources; and (d) rely on Coke's representations that the relationship between SuperCooler and Coke would be one of confidence and trust—in essence, a "partnership."  Coke made representations and acted in a manner that induced SuperCooler to reasonably believe that Coke owed duties to SuperCooler because they were "partners" in bringing SuperCooler's products to market.  Indeed, representatives of Coke

often emphasized that Coke was a "partner" with SuperCooler in numerous communications both public and private, verbal and written.

11.     But when the time arrived to actually produce the devices that embodied SuperCooler's technologies, Coke engaged in a series of dishonest and deceptive practices.  Coke fraudulently induced SuperCooler to enter into unfavorable license and loan agreements while misrepresenting to SuperCooler that it eventually would have a large role in producing the Super Chill, Rapid Chill, and Nucleator.  Coke then minimized SuperCooler's involvement in design and production, reduced the amount of money payable to SuperCooler, and hobbled SuperCooler's ability to attract capital from other sources to develop and produce SuperCooler's technologies.  These deliberate actions violated Coke's obligations, explicit and implicit, to use at least commercially reasonable efforts to develop and exploit SuperCooler's technologies.  These actions also violated the duties of care and loyalty Coke owed to SuperCooler as a fiduciary and "partner."

12.     Based on the reasonable assumption that Coke was a fiduciary, Supercooler disclosed to Coke specific proprietary and confidential information, including trade secrets such as: (a) airflow and fluid-flow analysis, (b) supercooling temperatures, (c) details concerning nucleation devices, and (d) vortex liquid-immersion rapid chilling.

13.     SuperCooler provided Coke with, among other things, schematics, computational methods, temperature sensing concepts, and cooling mediums and techniques.  SuperCooler also had extensive discussions with Coke employees, officers, and agents relating to these trade secrets and provided multiple devices embodying this proprietary and confidential information.

14.     Coke misappropriated SuperCooler's trade secrets by using them for its own benefit, without SuperCooler's consent or full knowledge, including by incorporating some of them into its own patent applications, working secretly with third parties to reverse-engineer and

commercialize them, and by devaluing that technology by unsuccessfully implementing it without the full assistance and input of SuperCooler.

15.     Coke also breached its agreements with SuperCooler by acting contrary to its own Code of Business Conduct.

16.     As a result of Coke's actions, SuperCooler has suffered damages in excess of one hundred million dollars, has been saddled with millions of dollars of debt, and has been unable to attract outside investment because of the cloud of uncertainty caused by Coke asserting inventorship and ownership over SuperCooler's technologies.

**PARTIES**

**A.      Plaintiff**

17.     Plaintiff SuperCooler is a domestic corporation organized under the laws of Florida with its principal place of business in Maitland, Florida, which is in the Middle District of Florida.

**B.      Defendant**

18.     Defendant Coke is a Delaware corporation with its principal place of business at One Coca-Cola Plaza in Atlanta, Georgia.  Coke operates extensively within the Middle District of Florida.

**C.      Related Nonparties**

19.     MetalFrio Solutions S.A., is a corporation ("Sociedade Anônima") organized under the laws of the Federative Republic of Brazil.

20.     Sanmina Corporation is a Delaware Corporation with its principal place of business in San Jose, California.

**JURISDICTION AND VENUE**

21.     The Court has subject matter jurisdiction over SuperCooler's federal trade secret claim pursuant to 18 U.S.C. §§ 1836–39 (Defend Trade Secrets Act) and 28 U.S.C. § 1331 (federal

question jurisdiction).   The Court also has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

22.   The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

23.   Venue is proper under 28 U.S.C. § 1391(b) because SuperCooler resides in the Middle District of Florida.  In addition, a substantial part of the events giving rise to the claims alleged in the complaint occurred in the Middle District of Florida, including development of SuperCooler's technologies and visits by Coke personnel to SuperCooler's headquarters in the Middle District of Florida.  Coke also operates extensively within the Middle District of Florida and made communications to SuperCooler in the Middle District of Florida.

## FACTUAL ALLEGATIONS

### I.   Coke's Background

24.   Coke is a multibillion dollar international beverage company with headquarters in Atlanta, Georgia.  Coke makes its beverages available to consumers worldwide through its network of independent bottling partners, distributors, wholesalers, and retailers.  As of December 2021, beverages bearing trademarks owned by or licensed to Coke account for 2.1 billion of the approximately 63 billion servings of all beverages consumed worldwide every day.  Coke operates extensively within the Middle District of Florida.  For example, on information and belief, machines incorporating SuperCooler's technologies are in operation at Disney and Universal Studios theme parks in this district in Orlando, Florida.

### II.   SuperCooler's Background

25.   Mr. Shuntich is an aerospace engineer, entrepreneur, and small business owner. Before founding SuperCooler, Mr. Shuntich was employed by United Space Alliance, a primary

contractor for the NASA Space Shuttle program.  He worked as a software and launch systems engineer at NASA's Kennedy Space Center at Cape Canaveral.  Mr. Shuntich was responsible for keeping the Space Shuttle's liquid oxygen fuel cooled to a precise temperature before launch.  His expertise is in achieving and maintaining precise cold temperatures.

26.     Mr. Shuntich founded SuperCooler in 2012.  Under his direction, SuperCooler developed and patented two cutting-edge, breakthrough technologies for cooling beverages for point-of-sale consumption: Super Chill and Rapid Chill.

27.     Super Chill encompasses methods and devices  for a refrigerated cooler, also known as a glass-door merchandiser, which chills beverages in bottles and cans to a precise temperature below freezing and then uses a SuperCooler-patented device known as a Nucleator to transform the super chilled beverages into a delicious slush in a matter of seconds.  Super Chill has extensive commercial and residential uses.

28.     The Super Chill technology is covered by one or more patents, including U.S. Patent No. 10,959,446, which issued from the United States Patent Office on March 30, 2021.  *See* Supercooled  Beverage  Crystallization  Slush  Device  with  Illumination,  U.S.  Patent  No. 10,959,446.  It claims priority to three U.S. Provisional Patent Applications, two filed in February and August of 2014 and one in February of 2015.  This patent claims, among other things, systems for forming slush inside of closed beverage containers with liquid inside.  But like other patents owned by SuperCooler, it does not disclose certain proprietary and confidential information, including trade secret information, developed by SuperCooler.

29.     Rapid Chill is a device that chills room-temperature beverages in bottles and cans to a precise, consumer-ready temperature in seconds by rapidly rotating the bottle or can in a patented aqueous cooling liquid that SuperCooler developed.  Rapid Chill is a transformative

technology for beverage companies because it has the potential to reduce or eliminate the need for energy-consuming beverage refrigerators in retail outlets.  More specifically, Rapid Chill has the potential to reduce significantly—on a global scale—the electricity and carbon footprint currently required to keep beverages cold until consumers purchase them.

30.     SuperCooler applied for a patent on its Rapid Chill technology on June 6, 2014, with a provisional application filed February 18, 2014.  SuperCooler received a patent for its Rapid Chill technology on December 19, 2017.  *See* Rapid Spinning Liquid Immersion Beverage Supercooler, U.S. Patent No. 9,845,988 (filed June 6, 2014).

31.     SuperCooler applied for a patent on its Rapid Chill aqueous solution on January 24, 2014.  SuperCooler received a patent for its Rapid Chill aqueous solution on April 25, 2017.  *See* Ice-Accelerator Aqueous Solution, U.S. Patent No. 9,631,856 (filed Jan. 24, 2014).  This patent was issued based upon an earlier provisional patent application.  It covers systems and methods for cooling beverages and desserts using a combination of loose ice and an aqueous ice-melting compositing with specific salinity.  This patent was innovative, in part, because of the nature of the solution, a critical component of later systems (the specifics of which would be disclosed as confidential and proprietary information, including trade secrets, to Coke).

32.     SuperCooler applied for a patent on its Nucleator on June 5, 2015.  SuperCooler received a patent for its Nucleator on December 11, 2018.  *See* Supercooled Beverage Crystallization Slush Device With Illumination, U.S. Patent No. 10,149,487 (filed June 5, 2015).

33.     SuperCooler's technologies have wide-ranging commercial and residential applications.  In 2014, SuperCooler met with several large companies to discuss commercial applications of its technologies, including Viking refrigeration, Anheuser-Busch InBev SA/NV, Starbucks Corp., Nestlé S.A., and Coke's largest competitor, PepsiCo, Inc.  These companies were

interested in partnering with SuperCooler to bring its technologies to market.

34.     Unfortunately, the potential of SuperCooler's technology has not been realized. Coke's deceptive and dishonest practices, as described in this complaint, have hindered the manufacture, production, and commercialization of SuperCooler's transformative technologies.

## III.     SuperCooler's Relationship with Coke

### A.     SuperCooler Makes its First Contact with Coke.

35.     SuperCooler's relationship with Coke began in or around July 2014, when Dan Cook, a SuperCooler employee, contacted a member of Coke's innovations group in Palo Alto, California to see if Coke would be interested in partnering with SuperCooler.  Coke personnel, including personnel in its Atlanta headquarters, agreed to listen to SuperCooler give a WebEx presentation from Orlando.  The WebEx presentation was a success.  Coke was impressed with SuperCooler's Super Chill and Rapid Chill technologies and SuperCooler's aqueous solution. Coke indicated that the next step would be a face-to-face meeting and demonstration at Coke's headquarters in Atlanta.

36.     In August 2014, Coke and SuperCooler entered into a one-way nondisclosure agreement which Coke demanded prior to SuperCooler entering Coke headquarters.  Later that month, Mr. Shuntich and his team traveled to Atlanta for a demonstration meeting at Coke's headquarters.  During the 3.5 hour meeting, Coke personnel tested and drank multiple beverages that had been supercooled and nucleated (or slushed) using SuperCooler's technology.  Coke expressed that it was convinced of SuperCooler's capabilities and the significant benefits to Coke. Coke was so impressed with SuperCooler's technology and team that it proposed a subsequent meeting to discuss a contract between SuperCooler and Coke.

**B.** **SuperCooler Makes the First Super Chill Prototypes for Coke, and Trains Coke's Engineers.**

37.     In October 2014, Coke and SuperCooler entered into their first of many agreements for SuperCooler's technologies, which included an explicit two-way confidentiality agreement regarding intellectual property in any form.  SuperCooler was not represented by counsel in these contract negotiations.  Pursuant to a statement of work ("SOW"), Coke purchased two Super Chill cooler prototypes, each capable of supercooling over 130 bottled beverages and each equipped with a nucleator-slush creating device for internal testing and demonstrating purposes. SuperCooler built these machines and components at its shops in the greater Orlando area. SuperCooler delivered the prototypes, known as B-25 C-1 and C-2, to Coke on or around December 31, 2014.

38.     From approximately January 12, 2015 to February 6, 2015 Mr. Shuntich and other SuperCooler personnel traveled regularly to Coke's Atlanta headquarters at Coke's request to fine-tune, test, and demonstrate the Super Chill prototypes.  During this time, SuperCooler personnel (including Mr. Shuntich) worked in Coke's engineering development center ("Engineering Center"), which is part of Coke's headquarters campus to test the machines.  The machines worked as SuperCooler and Coke expected.  Mr. Shuntich and his team successfully supercooled hundreds of Coke beverages and brands, including Coke, Diet Coke, Sprite, Sprite Zero, Honest Tea, Core Power, Minute Maid and Simply brand juices, Fuze, Powerade, Powerade Zero, Mello Yellow, and Dasani water.   During this time, Coke personnel made several representations to the SuperCooler team and led SuperCooler to believe that Coke envisioned SuperCooler as a long-term partner.  For example, Tom Howell (Coke's principal engineer for cold-drink equipment) told Mr. Shuntich that he envisioned SuperCooler being the lead experts on airflow patterns, control software, fan layouts, and nucleation devices.  Kirk Dahlberg (a Coke Research and Development

engineer and a colleague of Mr. Howell) suggested that his superiors might be interested in Coke becoming a minority owner of SuperCooler.

39.     While SuperCooler was working on the prototypes within Coke's Engineering Center and helping Coke make several internal presentations about SuperCooler's products (discussed further below), from January through September of 2015, SuperCooler also intensively trained Coke's engineers on how to use its technology, control temperatures for specific beverage products, and access real-time cooler data.  Multiple engineers that SuperCooler trained would be listed later as "inventors" on Coke's copycat patents of SuperCooler's technology.   These engineers include Kirk Dahlberg, Tom Howell, Clayton Burnett, Alan Hawkins, David Slagley, Miyoko Sekita, Tom North, Pranav Goldbole, Clarke Monroe, and Ryan Livingston.  The Georgia Institute of Technology ("Georgia Tech") also was listed as an inventor on Coke's copycat patents.

40.     Overall, Coke was pleased with the Super Chill prototypes.  Mr. Dahlberg, who was on-site at the Engineering Center, told Mr. Shuntich that senior Coke executives wanted to see a demonstration of the Super Chill prototypes.  Mr. Dahlberg also asked Mr. Shuntich about SuperCooler's other technology: Rapid Chill.  Mr. Shuntich offered to bring a Rapid Chill prototype machine to Atlanta for Coke to inspect.  In or around February 2015, SuperCooler demonstrated the Rapid Chill technology to Coke.

41.     In or around April 2015, Coke asked that SuperCooler work exclusively with Coke to develop commercial applications of Rapid Chill and represented to Mr. Shuntich that Coke would provide SuperCooler with another SOW for over $150,000.   At Coke's insistence, SuperCooler cut off its discussions with PepsiCo, which were in the final stages of technical and financial specifications regarding Rapid-Chill prototypes, in order to work exclusively with Coke. SuperCooler was not represented by counsel during these negotiations.

**C.** **SuperCooler Provides Confidential Trade Secret Information to Coke in Reliance on Promises of a Long-Term Partnership, Exclusive Manufacturing Rights, and Royalties.**

42.     In or around May 12, 2015, as Coke and SuperCooler were finalizing their second SOW, Mr. Dahlberg of Coke sent an email to Mr. Shuntich requesting that SuperCooler send Coke all of SuperCooler's confidential, unpublished patent applications.  Mr. Dahlberg represented that Coke's "legal department" needed to see these applications to make "decisions internally regarding the joint-development agreements."

43.     Mr. Shuntich was hesitant to provide the confidential information to Coke, but Mr. Dahlberg assured Mr. Shuntich that Coke was interested only in assessing the potential value of the patents and that Coke intended to further its relationship with SuperCooler by moving forward with another SOW.  Mr. Dahlberg also assured Mr. Shuntich that Coke would not reverse-engineer SuperCooler's technology or apply for its own patents with the information provided—promises that Coke later breached.  In reliance on Coke's representations, SuperCooler sent the patent applications to Coke in or around May 2015 with the understanding that the confidentiality of the information in the applications would be covered by the two-way nondisclosure agreement signed by Coke and SuperCooler as part of the October 2014 SOW, and that the same nondisclosure arrangement would apply to subsequent SOWs.  Mr. Dahlberg then asked for a copy of SuperCooler's patent application for the Nucleator.  SuperCooler was not represented by counsel during the discussions about providing its unpublished patent applications to Coke.

44.     In or around May 2015, Shell Huang (Coke's Senior Director of External Technology Acquisition) represented to Mr. Shuntich that Coke was prepared to discuss an equity investment in SuperCooler if field testing of the SuperCooler products was successful.

45.     In or around July 2015, SuperCooler and Coke executed a Master Services Agreement ("MSA") that governed all SOWs going forward.  The MSA granted Coke "a

worldwide, royalty-bearing exclusive or non-exclusive license" to certain SuperCooler background intellectual property. SuperCooler was not represented by counsel during the negotiations of the MSA and relied on Coke to act in good faith consistent with the duties arising out of the parties' confidential relationship.

46.     Article III of the MSA imposed confidentiality obligations and use restrictions on the parties. According to Article III, the sole purpose of the parties' disclosure of confidential information "will be for the parties to use the information to determine whether they will work together and to actually work together for any fully executed SOWs." Article III further states, "[e]ach party receiving Confidential Information will . . . only use the Confidential Information for the purposes of this Agreement."

47.     Article XVIII of the MSA described the standards by which Coke would conduct itself in its relationship with SuperCooler during the performance of the MSA and any SOW. Article XVIII incorporates Coke's then-current Code of Business Conduct into the agreement and included a link:  http://www.thecoca-colacompany.com/ourcompany/business_conduct.html.

48.     The link to the Code of Business Conduct is no longer active, but, on information and belief, versions of the Code of Business Conduct that applied during Coke's relationship with SuperCooler stated that "[i]ntegrity is fundamental to The Coca-Cola Company," and the word "integrity" appears 27 times in the document. Additionally, the Code of Business Conduct requires Coke personnel to "act with integrity and honesty in all matters." With respect to suppliers, the Code of Business Conduct requires Coke personnel to "[a]lways deal fairly with . . . suppliers, treating them honestly and with respect." The Code of Business Conduct also prohibits unfair, deceptive, and misleading practices and requires Coke personnel to respect the nonpublic information of other companies.

49.     In or around July 2015, Mr. Dahlberg demonstrated SuperCooler's Rapid Chill prototype to a group of Coke vice presidents after receiving training from Mr. Shuntich.  Mr. Dahlberg told Mr. Shuntich that the demonstration was well-received, and that Coke's mergers and acquisitions group probably would be contacting SuperCooler in the next 1-2 months.  During this time, Coke induced SuperCooler to rely on Coke to commercialize SuperCooler's technologies by discouraging Mr. Shuntich from seeking other commercial opportunities.  Coke personnel repeatedly told Mr. Shuntich not to commit to any "as seen on TV" company regarding the Super Chill coolers until he had spoken with Coke's venture capital arm.

50.     In a July 16, 2015 email, Mr. Dahlberg told Mr. Shuntich that the Rapid Chill technology worked perfectly during a Coke demonstration.

51.     In August 2015, SuperCooler met with Matthew Mitchell (director of Coke's venture capital division) to discuss a partnership and minority ownership stake between Coke and SuperCooler in the amount of approximately $30 million.  Mr. Dahlberg and Theron Foley (Coke's Director of Cold Drink Equipment R&D) also were present at the meeting.  During and after the meeting, Mr. Dahlberg, Mr. Foley, and other Coke representatives assured the SuperCooler team that SuperCooler would be the primary manufacturer of the Super Chill coolers, the exclusive manufacturer of the Nucleators, and, at a minimum, a primary partner in manufacturing Rapid Chill machines worldwide.

52.     On August 26, 2015, Mr. Dahlberg again demonstrated the Super Chill and Rapid Chill technologies to Coke vice presidents and VIPs at Coke's annual Innovation Day.  Mr. Dahlberg said that the VIPs were beyond excited about SuperCooler's technologies. SuperCooler's technologies were such a hit that Coke's President of North American Operations told Mr. Dahlberg that he wanted to take the extraordinary step of presenting the Rapid Chill

prototype to Coke's board of directors that fall.  In preparation for the board meeting, SuperCooler accelerated its prototype production, testing, and preparation of presentation materials.

53.     In the meantime, Coke continued to make representations to SuperCooler about Coke's plans to deploy tens of thousands (and possibly many more) of SuperCooler's products annually.   Coke executives projected *annual* placements of at least 50,000 Super Chill merchandisers (with Nucleators) and potentially larger numbers of Rapid Chill machines.  Relying on Coke's representations about future manufacturing and production plans, SuperCooler declined opportunities to work with PepsiCo, Nestlé, and others.

54.     In October 2015, Mr. Howell and Mr. Dahlberg of Coke demonstrated the Rapid Chill and Super Chill products to Coke's board of directors, including Muhtar Kent (CEO and Chairman of the Board) Howard G. Buffett (son of Warren Buffett) and Sam Nunn (former Senator from Georgia).  SuperCooler's personnel were not allowed in the demonstration room and were not allowed to interact in any way with members of the board.  The SuperCooler team was kept in a small adjacent room and told to be available on text message to answer any questions from Mr. Dahlberg, Mr. Howell, or Ms. Huang as they conducted the demonstration to the board members. The presentation to the board was a total success.   Each board member tried at least one superchilled beverage and several board members tried more than one.   As part of this demonstration to Coke's board of directors, a Coke-created informational placard posted beside the Rapid Chill machine indicated that Coke estimated *10 million* total placements of SuperCooler's Rapid Chill devices.  Mr. Dahlberg reported that the feedback from the presentation was overwhelmingly positive, particularly with respect to the potential that superchilled beverages had for Coke.   After the meeting, Coke reemphasized its partnership relationship with SuperCooler.  Mr. Dahlberg sent Mr. Shuntich an email thanking him for SuperCooler's "ongoing

- 15 -

dedication to both projects we are partnering on."  Ms. Huang likewise wrote to Mr. Shuntich that she was "looking forward to our continued *partnership*." (Emphasis added.)

> **D.**  **While SuperCooler Continues Developing its Technology for Coke, Coke Begins Parallel Efforts To Reverse-Engineer SuperCooler's Technology.**

55.     From fall 2015 through summer 2016, SuperCooler continued to fulfill multiple SOWs for Coke.  All the while, Coke personnel continually led SuperCooler to believe that Coke imminently was planning to invest between $3-6 million in SuperCooler, either in the form of a direct equity stake or a convertible loan.

56.     In reality, and in breach of its confidentiality obligations and use limitations, Coke was working to reverse-engineer SuperCooler's technology by enlisting third parties.  For example, throughout 2016 and 2017, Coke enlisted multiple teams of undergraduate engineering students at Georgia Tech to work around SuperCooler's intellectual property.  To help the students and their faculty advisors reverse-engineer SuperCooler's products, Coke provided Georgia Tech with access to SuperCooler's trade secrets in breach of the MSA.

57.     Although the MSA gave Coke the limited ability to share SuperCooler's trade secrets with any parent companies and majority-owned subsidiaries (defined in the MSA as "Related Companies"), Georgia Tech is not a parent company or subsidiary of Coke.

> **E.**  **Coke Successfully Tests SuperCooler's Products in the Field.**

58.     The transformative potential of SuperCooler's products was evident in field testing Coke conducted.  In summer 2016, Coke deployed SuperCooler's "Super Chill" refrigeration units and Nucleators, which Coke renamed "Arctic Coke," for a six-month field test.  The field test took place across 20 Speedway convenience stores in and around Indianapolis.  The results were a dramatic success.  The "Arctic Coke" machines increased Coke's soft drink product sales by an average of 15–20% at each location.

**F.    In Desperate Need of Capital and Trusting Coke's Promises, SuperCooler Agrees to the 2016 Licensing Agreement, Note Purchase Agreement, and Exclusive License on Highly Unfavorable Terms.**

59.    In December 2016, Coke and SuperCooler entered into a licensing agreement whereby SuperCooler agreed to provide specification documents and instructions to a single Coke-approved original equipment manufacturer ("OEM") vendor capable of manufacturing the Nucleator.  The agreement provided that the OEM would purchase smart boards and software from SuperCooler and follow SuperCooler's installation and testing procedures.  In return, Coke agreed to pay SuperCooler $55 per Nucleator produced by the OEM and the OEM agreed to purchase smart boards and software from SuperCooler for $55 per board and software bundle.  SuperCooler was not represented by counsel during these negotiations and relied on Coke to act in good faith.

60.    In February 2017, after years of delay, Coke finally extended SuperCooler a $3 million loan, memorialized in a Note Purchase Agreement.  The terms of the loan prohibited SuperCooler from using the loan proceeds to work with any other company in the nonalcoholic beverage industry without Coke's consent.  The Note Purchase Agreement required Coke to use SuperCooler in the production of SuperChill coolers and Nucleators.  Schedule A of the February 2017 Note Purchase Agreement states that "upon agreement by the parties, in order to achieve the milestones, the cooler and Nucleators may be supplied by SCTI or an alternate source **with support by SCTI to apply SCTI IP**."  (Emphasis added.)  Coke was supposed to disburse the loan proceeds in installments:  SuperCooler would receive $1.5 million up front, and the remaining $1.5 million would be paid in increments when SuperCooler met certain production milestones enumerated in the Note.

61.    Coke made the milestones deliberately difficult to achieve and stymied SuperCooler's completion of them.  The ultimate effect of the Note was to make SuperCooler indebted to, and therefore dependent on, working with Coke.  Paying off the Note severely

hampered SuperCooler's ability to negotiate favorable terms with Coke because SuperCooler needed some kind of revenue to pay off Coke's loan.  Most of the meager revenue SuperCooler received from Coke was reinvested in trying to achieve the near-impossible milestones and building the company infrastructure to support Coke's repeated assessment of tens of thousands of Arctic Coke (i.e. Super Chill) machines distributed worldwide.

62.     Coke used the Note Purchase Agreement and the prospect of a lucrative partnership in the future as leverage to force SuperCooler to agree to an amendment of the MSA (the "First MSA Amendment").  The First MSA Amendment explicitly states that Coke's license to SuperCooler's products is exclusive, sublicensable, and worldwide.  The First MSA Amendment also explicitly mentions the possibility that a third party—not SuperCooler—could manufacture the Super Chill under Coke's exclusive license.  Finally, the First MSA Amendment gave Coke a three-year right of first refusal to SuperCooler's intellectual property for the Rapid Chill, effectively creating a *de facto* exclusive license on the Rapid Chill.

63.     SuperCooler was disappointed that it had to make these concessions in the 2016 licensing agreement, the Note Purchase Agreement, and the First MSA Amendment.  But Coke offered assurances that SuperCooler would continue to be an integral partner in the production and commercialization of SuperCooler's technologies.  SuperCooler needed the capital provided by the Note Purchase Agreement to continue paying its employees, building its corporate infrastructure, and developing its technologies.  Coke also consistently gave the impression that it would develop the Rapid Chill cooperatively with SuperCooler at the later date.  In fact, the loan amount in the Note Purchase Agreement was originally supposed to include additional funds for that purchase.  SuperCooler was not represented by counsel when it executed the 2016 licensing

agreement, the Note Purchase Agreement, the underlying Note, or the First MSA Amendment, and SuperCooler relied on Coke to act in good faith

64. On the day that the Note Purchase Agreement was executed, Chris Vallette (Coke's VP of R&D) emailed Mr. Shuntich and wrote, "I'm excited we are now officially partners in changing how consumers enjoy our beverages."

65. Nancy Quan (Coke's Chief Technology Officer) signed the Note Purchase Agreement on Coke's behalf. When Mr. Shuntich requested a photo with Ms. Quan at the contract signing, he was warned that any external use of the photos would be a breach of the MSA's publicity clause. Upon information and belief, Coke's resistance to SuperCooler publicizing the photo was motivated by Coke's desire to conceal SuperCooler's principal role in developing the Super Chill, Rapid Chill, and Nucleator technologies.

66. Coke pushed aside SuperCooler in favor of foreign manufacturers and backed out of promises to apply SuperCooler intellectual property with SuperCooler support. Without SuperCooler's support, Coke failed to produce a machine that could replicate the highly successful results of the Indianapolis field testing.

G. **Breaking Its Promises, Coke Informs SuperCooler that it Would Be Using MetalFrio To Manufacture the Super Chill and Would Relegate SuperCooler To Manufacturing Nucleator Smart Boards.**

67. In or around March 2017, Coke informed Mr. Shuntich that—contrary to Coke's earlier representations—the first 1,000 Super Chill units would be manufactured by MetalFrio, and the first 1,000 Nucleators would be produced by Sanmina. SuperCooler would be relegated to producing only the smart-board controllers for the Super Chill cooler, despite Coke demanding that SuperCooler meet production milestones for 1,000 complete Nucleator assemblies. This reduced production role left SuperCooler on the hook for prepayments for parts, production, molds, supplies, full-time staff, and certifications for complete assemblies that Coke had no

intention of ever buying from SuperCooler.  Coke explained that this sudden about-face was because SuperCooler was not an "authorized supplier" in the Coke network, and achieving this status would take time.  To make things worse, Coke had not permitted SuperCooler the rights to sell to anyone else.  Furthermore, Coke only agreed to pay royalties of $55 per Nucleator and remained silent as to whether it would pay any royalties on the Super Chill cooler.  SuperCooler had expected $55 royalties on each Nucleator and $75 royalties on each Super Chill cooler.

68.    Nevertheless, Coke expressed willingness to shift all (or a majority of) the production of Super Chill coolers and Nucleators to SuperCooler after first 1,000 units (which would be produced by MetalFrio and Sanmina).  With this understanding, SuperCooler drew down the second half of its $3 million loan to ramp up for eventually taking over production of substantially all coolers and Nucleators, to provide SuperCooler smart boards to Sanmina, and to supervise MetalFrio's production of the first 1,000 units by making sure they were built, tested, and performing to SuperCooler's specifications and standards.

69.    Upon information and belief, Coke's prior representations during the negotiations of the December 2016 Licensing Agreement and February 2017 Note Purchase Agreement regarding Coke's commitment to purchase SuperCooler-produced products were a ruse designed fraudulently to induce SuperCooler to enter into an exclusive license and to continue providing Coke access to SuperCooler's intellectual property, engineering, and manufacturing know-how.  Upon information and belief, during the negotiations leading up to the signing of the February 2017 Note Purchase Agreement, Coke already had decided to rely on MetalFrio and Sanmina to manufacture the Super Chill coolers and Nucleators.  Upon information and belief, Coke provided SuperCooler's confidential trade secret information to MetalFrio and Sanmina in violation of Coke's confidentiality obligations and restrictions on use in the MSA.

70.     Coke's decision not to buy any Super Chill units or Nucleators from SuperCooler immediately created a negative impression with SuperCooler's investors.  Just three months before Coke informed SuperCooler of its decision to rely on MetalFrio for manufacturing, SuperCooler signed a $3 million term sheet with a foreign investor and received a $300,000 down payment. This investor backed out of the deal and requested a refund of the down payment after it learned that Coke had decided not to buy any Super Chill coolers or Nucleators from SuperCooler and that Coke had demanded a reduction in royalties in exchange for placing a 1-inch by 1-inch SuperCooler sticker on the MetalFrio/Sanmina-produced units for the United States market.

71.     In or around May 2017, Mr. Shuntich attempted to raise his concerns regarding the reduced production and royalties with Chris Vallette (Coke's VP of Research and Development). At an in-person meeting, Mr. Shuntich handed Mr. Vallette a letter describing Mr. Shuntich's grievances with the way Coke had behaved toward SuperCooler.  The letter cited Coke's decision not to buy Super Chill coolers or Nucleators from SuperCooler for the 1,000 unit rollout, which Coke did not communicate to SuperCooler during the October 2016-February 2017 negotiations for the Note Purchase Agreement.  The letter also cited Coke's refusal to sign any document confirming that SuperCooler had the right to lease its equipment to non-beverage companies and refusal to sign any document confirming that SuperCooler could sell units directly to alcoholic beverage companies.  Finally, the letter cited Coke's demand for a royalty reduction in exchange for the placement of the 1-inch by 1-inch sticker on the machines built by MetalFrio and Sanmina.

72.     Mr. Vallette reviewed the letter and said that if Mr. Shuntich emailed him any written complaints on the subject, Coke's relationship with SuperCooler would be "done."  Mr. Vallette assured Mr. Shuntich that he would resolve Mr. Shuntich's concerns, and that SuperCooler would oversee all production and testing and be the primary manufacturer of

machines in the future.  Mr. Vallette continued through his words and deeds to lull SuperCooler into believing that Coke would right the wrongs that SuperCooler experienced at the hands of Coke and that Coke would continue to develop and deploy SuperCooler's technologies and give SuperCooler preeminent exposure as the inventive partner with Coke for the Arctic Coke (i.e., Super Chill) program.

73.     Meanwhile, in November 2017, Coke CEO James Quincey appeared on national television to demonstrate SuperCooler's Super Chill technology (which Coke had renamed "Arctic Coke").  In the CNBC appearance, Mr. Quincey explained how the SuperCooler Rapid Chill prototype improved on "Arctic Coke" by not requiring an "ice machine."  Mr. Quincey acknowledged that a NASA "scientist" (Mr. Shuntich) "helped" Coke develop Arctic Coke and indicated that there were 1,000 "Arctic Coke" machines in U.S. stores already.  Mr. Quincey did not mention SuperCooler, its partnership with Coke, or Mr. Shuntich by name.

74.     Despite earlier setbacks in the relationship, the fact that the CEO went on national television to tout the enormous opportunity that Coke saw in SuperCooler's technologies led SuperCooler to believe that its partnership with Coke was going to continue.

75.     A mere month after Mr. Quincey credited Arctic Coke's development to a NASA scientist (Mr. Shuntich), a December 2017 MetalFrio business presentation claimed that "MetalFrio has led the global development of the Coke Arctic Cooler."  The presentation credited MetalFrio with being "incredibly proactive in both their technical development, customer service, program logistics and performance capability to meet [Coke's] aggressive market timing."  MetalFrio also claimed credit for delivering "game-changing technology" for Coke and a new way for Coke's customers to enjoy its products.  MetalFrio's business presentation does not mention SuperCooler.

76.     MetalFrio's 2017 business presentation also contains a Coke-branded slide that copies—often verbatim—the words from an internal "sell sheet" that Jeff Busch (Director, Equipment Commercialization at Coke), Kim Drucker (Coke North America's Director of Platform Innovation), and Mr. Dahlberg (Research and Development Engineer at Coke) provided to SuperCooler in 2015.  The 2015 SuperCooler sell sheet and the 2017 MetalFrio presentation clearly describe the same products, but they are attributed to different manufacturers:

| 2015 SuperCooler Sell Sheet | 2017 MetalFrio Presentation |
|---|---|
| "Simply select a drink and press the button!" | "Simply select a drink and press the button!" |
| "Unique beverage offering providing ice/slushy effect to beverages" | "Unique beverage offering providing ice/slushy effect to beverages" |
| "Superbright LED lighting with motion sensors" | "Back lit LED panel allows consumers to watch ice being formed in PET containers"; "Internal and external LED lighting" |
| "Indicator lights to inform consumers when product is ready" | "LED indicator lights to inform consumers when product is ready" |
| "Automatic 'door open' alarm after 10 seconds" | "Automatic 'door open' alarm after 10 seconds" |
| "Customer overnight 'safe temperature mode' to prevent freezing of products during low activity periods" | "Overnight 'safe temperature mode' to prevent freezing of products during low activity periods" |
| "Coca-Cola Bottle/Can Equipment" | "Coca-Cola Bottle/Can Equipment" |
| "Increase customer satisfaction by offering the high quality, **ice cold** Coca-Cola immediate consumption beverages your guests expect." | "Increase customer satisfaction by offering the high quality, **ice cold** Coca-Cola immediate consumption beverages your guests expect." |
| "**MANUFACTURER**: SCTI [i.e., SuperCooler]" | "**MANUFACTURER**: METALFRIO" |

77.     The 2017 MetalFrio presentation also states that the Arctic Coke coolers were field tested from "August – October, 2016 with [a] major [convenience] retailer" and that the test "[d]rove incremental sales."  On information and belief, the field testing referred to in MetalFrio's presentation refers to the Indianapolis field testing of SuperCooler's machines, not MetalFrio's.

78.     On information and belief, the coolers referred to in the MetalFrio presentation are SuperCooler's products, which MetalFrio and Coke misappropriated.

**H.     Shortly After SuperCooler Negotiates a Slight Raise in Royalties, Coke Suddenly Stops Ordering the Super Chill.**

79.     In early 2018, Coke began ordering smart boards for the Super Chill from SuperCooler.  The royalty arrangement between the parties at that time was still limited to SuperCooler being paid $55 per Nucleator, with no agreed-upon royalties for the Super Chill cooler.  In March 2018, Mr. Shuntich met with Mr. Vallette to discuss the inadequacy of the Super Chill royalties.

80.     At the meeting, far from "fixing everything" as he had represented to Mr. Shuntich in May 2017, Mr. Vallette informed Mr. Shuntich and SuperCooler that Coke "had a room full of lawyers" who were convinced that the MetalFrio cooler had been carefully engineered to not make use of SuperCooler's intellectual property and therefore Coke would not be paying royalties to SuperCooler on the merchandiser cooler.   Mr. Shuntich reminded Mr. Vallette that the SuperCooler team had taught Coke everything they knew regarding relevant temperatures, data, designs, airflow, and ready lights.  Mr. Shuntich stated that it was not fair for Coke to lead SuperCooler to believe that it would be paid royalties or that Coke would purchase coolers directly from SuperCooler when, in fact, Coke was reverse-engineering SuperCooler's devices and tip-toeing around SuperCooler's intellectual property to avoid paying royalties.   After tense negotiation, Coke begrudgingly agreed to give SuperCooler another $55 royalty for each Super Chill cooler sold.  This agreement was memorialized in a revised licensing agreement that stated the additional $55 royalty was "compensation for prior consulting services offered by SuperCooler."  The revised licensing agreement provided that SuperCooler would "partner with

[Coca-Cola North America Technical Innovation & Stewardship]" to help manufacture the Super Chill with MetalFrio.

81.     Despite the persistent friction caused by Coke's underhanded and less-than-forthcoming negotiations regarding royalties, licensing, and future production, Coke was still holding itself out to the public as SuperCooler's partner.  A February 12, 2018 news article reported, "[t]he company [i.e., Coke] said Coca-Cola R&D had been working on the Arctic Coke project for decades before partnering with SuperCooler Technologies Inc. in 2015."

82.     As 2018 progressed, SuperCooler shipped several thousand smart boards to Coke, and Coke instructed SuperCooler to prepare to ship 6,000 more.  However, in June 2018, MetalFrio abruptly told SuperCooler that Coke was cancelling all orders.  Coke's sudden stop caused SuperCooler to issue a temporary suspension of pay to its employees.  The explanation given to SuperCooler at the time was that there was a "nationwide bottler restructuring" that resulted in dramatically reduced purchases of cooling equipment by North American bottlers.  Upon information and belief, the sudden termination was due to MetalFrio's inability to accurately replicate SuperCooler's technology, due, at least in part, to Coke's and MetalFrio's failure to involve SuperCooler in the production, testing, and validation processes in violation of the December 2016 licensing agreement and February 2017 Note Purchase Agreement.  These agreements required Coke and MetalFrio to follow SuperCooler's installation and testing procedures and to rely upon SuperCooler's support to apply SuperCooler's intellectual property. SuperCooler offered to fix the issues in exchange for a capital infusion and forgiveness of the $3 million loan, but Coke ignored its request.

I.      **SuperCooler Discovers Coke's Copycat Patents of Technology that Coke Obtained from SuperCooler.**

83.     In late 2019, SuperCooler learned for the first time that Coke secretly had filed several patent applications beginning as early as November 2016, including at least PCT/US2017/063748, PCT/US2018/055930, PCT/US2019/050010, U.S. Pat. App. 62/428,519, and U.S. Pat. App. 62/586,454.[1]  In these patent applications, Coke claimed ownership of some of SuperCooler's trade secrets and other information that SuperCooler had provided to Coke in confidence pursuant to non-disclosure agreements. In the patent applications, Coke named as inventors personnel whose knowledge of the technology came from training that Mr. Shuntich and other SuperCooler personnel provided to Coke.  SuperCooler provided this training to Coke in confidence pursuant to non-disclosure agreements solely and exclusively for Coke to evaluate the technical and commercial feasibility of SuperCooler's technologies.  Georgia Tech was also listed as an inventor.  Coke did not list Mr. Shuntich as an inventor on the patent applications.

84.     Among the many SuperCooler trade secrets included in Coke's patents and published applications were:

> a.  *SuperCooler's Air Drying System*:  This system moves a can or bottle that has been chilled in SuperCooler's Rapid Chill liquid immersion system through an air drying system to clean the beverage container of any immersion liquid.  This concept was explained to Coke's engineers by email and demonstrated to them in person in 2015.  Coke presented aspects of this system as its own in patent applications (*See* System and Method for Rapid Cooling of Packaged Food Products, U.S. Patent

---

[1]      *See also* W02020204909A1 (Waterless ice crystal nucleator with convex ultrasonic transmitter) (Application filed by The Coca-Cola Company on April 2, 2019); CN113923997A (Anhydrous ice crystal nucleator with convex ultrasonic emitter) (Application filed by The Coca-Cola Company on April 2, 2019).

Application No. US2018/055930 (published on May 23, 2019 as Int'l Patent Application No. WO2019/099135)); On-Demand Processing of Chilled Food Product, U.S. Patent Application No. US2017/063748 (published on June 6, 2018 as Int'l Patent Application No. WO2018/102434)).  The system is Background IP under the terms of the MSA and covered by the MSA's confidentiality provision.

b.  *SuperCooler's Integrated Nucleation System*:  This system integrates SuperCooler's Rapid Chill cooling system with a nucleation device capable of achieving rapid phase or state change from fluid state to frozen state at the end of the chilling process in a manner that would be visible.  The integrated nucleation system was discussed with Coke engineers in 2015.  Coke presented aspects of this system as its own in patent applications (*See* System and Method for Rapid Cooling of Packaged Food Products, U.S. Patent Application No. US2018/055930 (published on May 23, 2019 as Int'l Patent Application No. WO2019/099135); On-Demand Processing of Chilled Food Product, U.S. Patent Application No. US2017/063748 (published on June 6, 2018 as Int'l Patent Application No. WO2018/102434)).  The system is Background IP under the MSA, covered by the MSA's confidentiality provision.

c.  *Supercooling Temperatures and Metastable States*: This trade secret information was the product of SuperCooler's research regarding temperatures to be used for supercooling for different beverage types (*e.g.*, sparkling (sugared soda, diet soda, zero soda) and still (milk shakes, smoothies, juices, Power Ade, tea, Vitamin Water, Zero Still)).  SuperCooler provided this information to Coke as an attachment to a "Beverage Supercooling Temperatures Guide" on February 6, 2015.  Coke

presented some of this information as its own and published it in patent applications (*See* System and Method for Rapid Cooling of Packaged Food Products, U.S. Patent Application No. US2018/055930 (published on May 23, 2019 as Int'l Patent Application No. WO2019/099135)).  This trade secret information is covered by the MSA's confidentiality provision.

d.  <u>*Spin Profiles*</u>:  This trade secret information consists of the specific setting for accelerations, peak rotations per minute ("RPM"), total spin time, and stop time between forward and reverse spin for different beverages and beverage containers when used with the Rapid Chill.  The spin profiles were disclosed to Coke personnel during several demos and training sessions from February 2015 to August 2015.  This trade secret information is covered by the MSA's confidentiality provision.  Coke presented some of this information as its own in patent applications (*See* System and Method for Rapid Cooling of Packaged Food Products, U.S. Patent Application No. US2018/055930 (published on May 23, 2019 as Int'l Patent Application No. WO2019/099135)).  This trade secret information is covered by the MSA's confidentiality provision.

e.  <u>*Source Code and Algorithms*</u>: Both Super Chill and Rapid Chill operated based on source code copyrighted by SuperCooler.  This code and the algorithms it expresses enabled Super Chill and Rapid Chill machines to perform the basic tasks for which they were designed.  SuperCooler's source code operated: (i) the Go/No-Go ready light on the Super Chill; (ii) the "door open" timing algorithms for resetting the Go/No-Go light; (iii) the internal fans in the Super Chill; (iv) the timing of the Super Chill's glass-door heater; (v) algorithms to set spinning speed and spin profile of

items placed in the Rapid Chill; and (vi) algorithms to determine total time to reach desired cooling temperatures in Rapid Chill.  Upon information and belief, some of SuperCooler's copyrighted source code was used in the Arctic Coke coolers constructed by MetalFrio and Sanmina.

85.     In 2019, Coke filed a patent application for nucleator technology that was published in March 2022, titled Supercooled Beverage Nucleation and Ice Crystal Formation Using a High-Pressure Gas, U.S. Patent Application No. US2019/050010 (published on March 12, 2020 as Int'l Patent Application No. WO2020/051491).  Coke then received a search request from the European Patent Office that cited all of Coke's preexisting patent applications as well as SuperCooler's Nucleator patents from 2015.  In response, Coke amended its patent application in December 13, 2022 and referenced SuperCooler's 2015 Nucleator patent.

86.     The mere existence of Coke's copycat patents has prevented SuperCooler from finding another partner to commercialize its inventions to this day.  Although SuperCooler's technology remains as promising as ever, Coke's patent applications cast doubt on SuperCooler's and Mr. Shuntich's ownership of the background intellectual property and discourage other potential partners and investors from working with SuperCooler.

**J.      Coke Believed the Arctic Coke Machines Would Be Successful and Continued To Deploy Them in the United States and in Foreign Countries.**

87.     After the successful 2016 field test in and around Indianapolis, Coke expanded its testing of the Arctic Coke.

88.     In his November 2017 appearance on CNBC, Mr. Quincey demonstrated the Rapid Chill and Arctic Coke products and emphasized the "global phenomenon" of consumers wanting slushy beverages.  He said there were already over 1,000 Arctic Coke machines in U.S. stores.

- 29 -

Regarding Rapid Chill, he said the technology would be a "win-win" because it produced slushy beverages rapidly while eliminating the need for the store to have an ice machine.

89.     Coke expanded testing of the Arctic Coke machines to 800 convenience stores in the United States.  In a February 2018 article, Ms. Drucker (Coke North America's Director of Platform Innovation) spoke positively about the expanded testing and said that she and her team were exploring additional channels for Arctic Coke beyond convenience stores.

90.     Coke's expansion continued into the next year. In a June 2018 tweet, Coke announced: "Good news! Not only will there be [Arctic Coke] locations in Indianapolis **but also in many other cities**.  If you [direct message] us with some cities/state you are in or will be traveling to, we can let you know where the Arctic Coke Machines will be!" (emphasis added).

91.     In a Q3 2019 Investor Overview presentation, Coke described the growth potential of the Arctic Cooler as "exponential," ranking higher than even Coke's "transformational" freestyle machines.



92.     On information and belief, Coke has deployed and continues to deploy SuperCooler's Super Chill and Nucleator technologies in the United States and around the world, as evidenced by videos uploaded to the internet by various people enjoying supercooled nucleated beverages as recently as March 2022.[2]  As recently as June 24, 2022, a trade publication for convenience retailers published an article describing Arctic Coke machines at 7-Eleven stores in Singapore.  The article provides, "With the Arctic Coke machine, customers choose a bottle of Coca-Cola, put it into the machine and press a button, and the machine creates a Coke slushie."

93.     On information and belief, Coke took steps to conceal its breaches and fraudulent actions by lulling SuperCooler into believing that Coke was otherwise complying with its contractual obligations and duties as a partner.  Because of Coke's deliberate concealment and continued assertions that no misappropriations have occurred (which persist to this day), SuperCooler's discovery of Coke's misappropriations was delayed, and SuperCooler could not have discovered the misappropriation earlier with the exercise of due diligence.

94.     On information and belief, Coke's misappropriation of SuperCooler's trade secret information continue to the present day, and Coke has continued to breach its contractual obligations, all within the relevant limitations periods.

## COUNT I
## BREACH OF CONTRACT

95.     SuperCooler repeats, incorporates, and realleges each and every allegation set forth at Paragraphs 1 through 94 as if fully set forth herein.

---

[2]     *See, e.g.*, https://www.youtube.com/watch?v=30SYaRuBkHE (Aug. 23, 2018 video); https://www.youtube.com/watch?v=iQTv40lr__o (January 8, 2022 video); https://www.youtube.com/watch?v=vEXRdYPyQNc (March 20, 2022 video)

96.     SuperCooler and Coke entered into valid agreements, including the July 2015 Master Services Agreement ("July 2015 MSA") and the April 2018 N-1 D-3 Nucleator License Agreement.

*Breach of the July 2015 MSA*

97.     Article XV of the MSA states that the agreement is governed by New York law.

98.     Article III of the MSA permitted Coke to disclose and use SuperCooler's confidential information only "for the purposes of this Agreement."  In reliance on this use restriction, SuperCooler disclosed valuable confidential information and trade secrets to Coke related to Rapid Chill, Super Chill, and the Nucleators.

99.     Article XV of the MSA provides that, notwithstanding anything contrary in the agreement, the parties always may apply to a court of competent jurisdiction for "legal or equitable relief in regards to a violation of the confidentiality, intellectual property license, or limited use provisions" of the MSA.

100.    Coke materially breached Article III of the July 2015 MSA by including some of SuperCooler's trade secret information in its own patent applications, which it filed without SuperCooler's knowledge or permission.  Coke also breached the July 2015 MSA by disclosing SuperCooler's trade secret information to third parties to exploit SuperCooler's technology in a manner beyond the permitted scope of use in the MSA.

101.    Article XVIII of the July 2015 MSA required Coke to comply with the standards set out in its Code of Business Conduct.  Under the Code of Business Conduct, Coke was required, among other things, to "act with integrity and honesty in all matters" and to "[a]lways deal fairly with . . . suppliers, treating them honestly and with respect."

102.    Coke materially breached Article XVIII by fraudulently inducing SuperCooler to enter into a contractual relationship with Coke, misappropriating SuperCooler's trade secret information, and disseminating it to third parties.  Coke's apparent ultimate goal was to cut SuperCooler out of the manufacturing process in favor of parties such as MetalFrio and Sanmina.

*Breach of the April 2018 N-1 D-3 Nucleator License Agreement*

103.    Page 4 of the April 2018 N-1 D-3 Nucleator License Agreement states that Georgia law applies.

104.    The April 2018 N-1 D-3 Nucleator License Agreement required Coke to pay a $55 licensing fee for up to 1,000 Nucleators provided by Coke, and a $55 fee for each bundle of smart-controller boards and their corresponding software provided by Coke.

105.    Coke materially breached the April 2018 N-1 D-3 Nucleator License Agreement by accepting the Nucleators and controller board/software bundles without paying the agreed-upon fees.  Coke also breached the Nucleator License Agreement by cutting SuperCooler out of the manufacturing process, despite the Agreement stating that SuperCooler would partner with [Coca-Cola North America Technical Innovation & Stewardship]" to help manufacture the Super Chill with MetalFrio.

106.    As a direct and proximate result of Coke's material breaches, SuperCooler has sustained actual damages in an amount to be proven at trial.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

107.    SuperCooler incorporates the allegations set forth at Paragraphs 1 through 94 as if fully set forth herein.

108.   SuperCooler and Coke entered into an exclusive license agreement in the First MSA Amendment for the Super Chill and Nucleator, and a *de facto* exclusive license in the First MSA Agreement for the Rapid Chill.

109.   Coke, by virtue of being the exclusive licensee of SuperCooler's Nucleator, Super Chill, and Rapid Chill was obligated and expected to use its best efforts to exploit the subject matter of the license.

110.   Coke's failure to use its best efforts directly and proximately caused SuperCooler's losses.

111.   Coke's conduct was not consistent with SuperCooler's reasonable expectations under the exclusive license agreement.

112.   As a direct and proximate result of Coke's failure to use best efforts to exploit the subject matter of the license,  SuperCooler has suffered losses and is entitled to damages in an amount to be determined at trial.

<u>**COUNT III**</u>
<u>**BREACH OF FIDUCIARY DUTIES OWED TO A PARTNER**</u>

113.   SuperCooler incorporates the allegations set forth at Paragraphs 1 through 94 as if fully set forth herein.

114.   The circumstances surrounding SuperCooler's and Coke's dealings created a fiduciary relationship.  Coke and SuperCooler entered into a confidential relationship, and Coke led SuperCooler to believe that the parties were engaged in an exclusive partnership in which Coke would comply with its duty of care and loyalty in its dealings with SuperCooler.  Coke's misrepresentations induced SuperCooler to enter into an exclusive development arrangement with Coke and to grant Coke an exclusive license to its technology.

115.    To facilitate this arrangement, SuperCooler—a small business—depended on Coke—a large, multinational corporation—to protect its trade secrets and to offer SuperCooler crucial assistance in commercializing its technology.  SuperCooler placed its trust and confidence in Coke to safeguard SuperCooler's interests.

116.    Coke recognized and accepted its fiduciary duties to SuperCooler by holding itself out to SuperCooler as a partner and by holding itself out to the public as SuperCooler's partner.

117.    Coke had an obligation to carry out its fiduciary duties with respect to SuperCooler with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and with the experience and familiarity with SuperCooler's technologies would use in a similar situation.

118.    Coke breached its fiduciary duties to SuperCooler by (1) failing, as the exclusive licensee, to commercialize SuperCooler's technologies, (2) misappropriating SuperCooler's trade secrets, sharing them with third parties, and seeking to have third parties develop SuperCooler's Rapid Chill and Super Chill technologies, (3) fraudulently inducing SuperCooler to enter into contracts, and (4) presenting business opportunities that naturally should have been presented to SuperCooler, as partner, to third parties instead.

119.    As a direct and proximate result of Coke's actions, SuperCooler has sustained actual damages in an amount to be proven at trial.

### COUNT IV
### VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. §§ 1836–39)

120.    SuperCooler incorporates the allegations set forth at Paragraphs 1 through 94 as if fully set forth herein.

121.    SuperCooler's technical information, designs, and other "knowhow" related to its Super Chill and Rapid Chill technologies constitute trade secrets under the Defend Trade Secrets

Act (18 U.S.C. §§ 1836–39).  SuperCooler owns and possesses certain trade secret information, as alleged above.  Multiple SuperCooler trade secrets are reflected in Coke's patent applications, the physical components of the Arctic Coke glass door cooler, and the programming of the Arctic Coke glass-door cooler.  Examples of these trade secrets include:

    a.  various aspects of Coke's patent applications, including the SuperCooler Air Drying System, the Integrated Nucleation System, the SuperCooling Temperatures and Metastable States, and the Spin Profiles, which were not included in SuperCooler's public patent applications and patents.

    b.  various aspects of the Arctic Coke glass door cooler, including the placement of the Nucleator on the left side of the glass door, the Go/No-Go ready light on the glass door, and the specifications for temperature settings in the coolers to create acceptable slush levels during nucleation with minimal premature freezing.

    c.  various aspects of Coke's programming for the Arctic Coke glass door cooler, including the code that operates the Go/No-Go ready light, the code that operates the timing algorithms for resetting the Go/No-Go ready light, and the code that turns off the internal fans when the cooler door is open.

122.    None of these trade secrets is disclosed in SuperCooler's patents or patent applications.

123.    SuperCooler has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue.  These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

124.    SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information. The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

      a.   Coke's willingness to loan SuperCooler money so that SuperCooler could develop the technology for Coke while under an exclusive license agreement and ultimately provide Coke with a competitive advantage;

      b.   the significantly increased product sales generated by the Arctic Coke machines in Coke's field testing; and

      c.   the multibillion-dollar market for commercial refrigeration equipment, which would be disrupted by widespread adoption of SuperCooler's trade secrets.

125.    Coke knowingly misappropriated SuperCooler's trade secrets.  Coke either acquired the trade secrets through the misrepresentations and breaches of confidentiality described herein or had reason to know that the trade secrets were acquired through those same misrepresentations and breaches of duty.

126.    SuperCooler's trade secret information relates to products and services used in, or intended for use in, interstate or foreign commerce.

127.    As a direct and proximate result of Coke's misappropriation, SuperCooler has incurred, and will continue to incur, actual damages in an amount to be proven at trial.  Also as a result of the misappropriation, Coke was, and will continue to be, unjustly enriched in an amount to be proven at trial.

128.    The aforementioned acts of Coke were willful and malicious.  SuperCooler is therefore entitled to exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C).

129.    As a direct and proximate result of Coke's misappropriation, SuperCooler will suffer injuries of a continuing nature for which SuperCooler has no adequate remedy at law.  Unless enjoined by order of this Court, Coke will gain an irreversible competitive advantage by being the first to commercialize SuperCooler's trade secret information and reap the profits.  These actions will irreparably diminish the value of the trade secret information to SuperCooler and prevent SuperCooler from developing its technology with other partners.  SuperCooler is entitled to an order of injunction that: (1) enjoins Coke from misappropriating SuperCooler's trade secrets, and (2) directs Coke to return all trade secret information to SuperCooler.

## COUNT V
### VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT
### (FLA. STATUTES § 688.001 *et seq.*)

130.    SuperCooler incorporates the allegations set forth in Paragraphs 1 through 94 as if fully set forth herein.

131.    SuperCooler's technical information, designs, and other "knowhow" related to its Super Chill and Rapid Chill technologies constitute trade secrets under Florida's Uniform Trade Secrets Act.  SuperCooler owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  Multiple SuperCooler trade secrets are reflected in Coke's patent applications, the physical components of the Arctic Coke glass door cooler, and the programming of the Arctic Coke glass door cooler.  Examples of these trade secrets include:

a.   various aspects of Coke's patent applications, including the SuperCooler Air Drying System, the Integrated Nucleation System, the SuperCooling Temperatures

and Metastable States, and the Spin Profiles, which were not included in SuperCooler's public patent applications and patents.

    b.   various aspects of the Arctic Coke glass-door cooler, including the placement of the Nucleator on the left side of the glass door, the Go/No-Go ready light on the glass door, and the specifications for temperature settings in the coolers to create acceptable slush levels during nucleation with minimal premature freezing.

    c.   various aspects of Coke's programming for the Arctic Coke glass-door cooler, including the code that operates the Go/No-Go ready light, the code that operates the timing algorithms for resetting the Go/No-Go ready light, and the code that turns off the internal fans when the cooler door is open.

132.   None of these trade secrets is disclosed in SuperCooler's patents or patent applications.

133.   SuperCooler has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue. These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

134.   SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information. The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

    a.   Coke's willingness to loan SuperCooler money so that SuperCooler could develop the technology for Coke while under an exclusive license agreement and ultimately provide Coke with a competitive advantage;

    b.   the significantly increased product sales generated by the Arctic Coke machines in Coke's field testing; and

    c.   the multibillion-dollar market for commercial refrigeration equipment, which would be disrupted by widespread adoption of SuperCooler's trade secrets.

135.    Coke knowingly misappropriated SuperCooler's trade secrets.  Coke either acquired the trade secrets through the misrepresentations and breaches of duty to maintain secrecy described herein or had reason to know that the trade secrets were acquired through those same misrepresentations and breaches of duty.

136.    As a direct and proximate result of Coke's misappropriation, SuperCooler has incurred, and will continue to incur, actual damages in an amount to be proven at trial.  Also as a result of the misappropriation, Coke was, and will continue to be, unjustly enriched in an amount to be proven at trial.

137.    The aforementioned acts of Coke were willful and malicious.  SuperCooler is therefore entitled to exemplary damages under Florida Statute § 688.004(2) and an award of attorneys' fees under Florida Statute § 688.005.

138.    As a direct and proximate result of Coke's misappropriation, SuperCooler will suffer injuries of a continuing nature for which SuperCooler has no adequate remedy at law. Unless enjoined by order of this Court, Coke will gain an irreversible competitive advantage by being the first to commercialize SuperCooler's trade secret information and reap the profits.  These actions irreparably diminish the value of the trade secret information to SuperCooler and prevent

SuperCooler from developing its technology with other partners.  Pursuant to Florida Statute § 688.003, SuperCooler is entitled to an order of injunction that: (1) enjoins Coke from misappropriating SuperCooler's trade secrets, and (2) directs Coke to return all trade secret information to SuperCooler.

**COUNT VI**
**FRAUD IN THE INDUCEMENT**

139.    SuperCooler incorporates the allegations set forth at Paragraphs 1 through 94 as if fully set forth herein.

140.    As set forth more particularly above, Coke made statements that intentionally led SuperCooler to believe that SuperCooler would be the exclusive manufacturer of Nucleators and coolers for Coke.  Coke instructed SuperCooler to prepare for mass manufacturing and rollout of SuperCooler's Nucleators and coolers, represented to SuperCooler in negotiations that SuperCooler would be the "end-to-end" supplier of Nucleators, and listed SuperCooler as the manufacturer on internal documents.

141.    More specifically, Coke induced SuperCooler to enter into at least two agreements. First, Coke's actions and representations induced SuperCooler to enter into the July 2015 MSA. These actions and representations include, among others:

a.  Mr. Howell represented to Mr. Shuntich that SuperCooler would be the lead on airflow patterns, control software, and fan layouts for all of Coke's refrigeration manufacturers.

b.  Mr. Dahlberg represented Coke might be interested in becoming a minority owner of SuperCooler.

c.  Coke induced SuperCooler to work exclusively with Coke to develop commercial applications of Rapid Chill and to cut off its discussions with PepsiCo in order to

work exclusively with Coke.  Coke induced SuperCooler not to commit to any "as seen on TV" company regarding the Super Chill coolers before speaking with Coke's venture capital arm.

d.  Mr. Dahlberg induced Mr. Shuntich to send SuperCooler all of its confidential, unpublished patent applications by representing that Coke's "legal department" needed to see them to make "decisions internally" regarding the July 2015 MSA. Mr. Dahlberg assured Mr. Shuntich that Coke was interested only in assessing the potential value of the patents, and that Coke would not reverse-engineer SuperCooler's technology.

e.  Ms. Huang represented to Mr. Shuntich that Coke was prepared to discuss an equity investment in SuperCooler if field testing of the SuperCooler products was successful.

142.    Second, Coke's representations induced SuperCooler to enter into the 2018 N1-D3 Nucleator Licensing Agreement.  In particular, the agreement provided that SuperCooler would "partner with [Coca-Cola North America Technical Innovation & Stewardship]" to help manufacture the Super Chill with MetalFrio.  In other words, Coke promised SuperCooler that it would be a partner in producing the Super Chill with MetalFrio.  Ultimately, this statement was not true.  Coke cut SuperCooler out of producing the Super Chill and the Nucleator in favor of MetalFrio and Sanmina.

143.    At the time Coke made such statements and omitted such information, Coke knew that its statements were false and that its omissions were misleading.  Coke made such statements and omitted such information with the intent to induce SuperCooler to enter into agreements with

Coke so that Coke could obtain favorable terms and use third parties to manufacture Nucleators and other critical components.

144.    SuperCooler justifiably relied upon Coke's statements and omissions in deciding to enter into agreements and in incurring costs of preparing to be the exclusive or primary manufacturer of Rapid Chill, Super Chill, and the Nucleators.  The prospect of being Coke's sole or primary supplier was material to SuperCooler's decision to enter into agreements with Coke. SuperCooler placed its trust and confidence in Coke as a long-term exclusive partner based on the parties' contractual arrangement and other representations made by Coke.

145.    As the direct and proximate result of Coke's fraud in the inducement, SuperCooler has sustained actual damages in an amount to be proven at trial.

**COUNT VII**
**UNJUST ENRICHMENT**

146.    SuperCooler repeats, incorporates, and realleges each and every allegation set forth at Paragraphs 1 through 94 as if fully set forth herein.

147.    SuperCooler directly conferred several highly valuable benefits to Coke in the course of the parties' partnership, including: (a) valuable trade secret information about the Super Chill, Rapid Chill, and Nucleator; (b) services in the form of developing fully functioning Super Chill prototypes and Nucleators, and (c) the fully functioning Super Chill prototypes themselves which, upon information and belief, continue to operate in the present day.

148.    SuperCooler's conferral of these benefits was induced by Coke's promises that SuperCooler would be the exclusive manufacturer of Nucleators and coolers for Coke.

149.    In addition, Coke has profited from the revenue of the Arctic Coke machines currently in service around the world.

150.    Coke voluntarily and knowingly accepted the benefits that SuperCooler conferred and continues to retain them without adequately compensating SuperCooler.

151.    The circumstances are such that it would be inequitable for Coke to retain the benefits conferred by SuperCooler without paying SuperCooler the reasonable market value of those benefits, which will be proven at trial.

## COUNT VIII
## PROMISSORY ESTOPPEL

152.    SuperCooler repeats, incorporates, and realleges each and every allegation set forth at Paragraphs 1 through 94 as if fully set forth herein.

153.    Coke clearly and unambiguously promised SuperCooler that SuperCooler would be the exclusive manufacturer of Nucleators and coolers for Coke.  Coke instructed SuperCooler to prepare for mass manufacturing and rollout of SuperCooler's Nucleators and coolers, represented to SuperCooler in negotiations that SuperCooler would be the "end-to-end" supplier of Nucleators, and listed SuperCooler as the manufacturer on internal documents.

154.    Coke reasonably should have expected these promises to induce action or forbearance by SuperCooler.

155.    SuperCooler did, in fact, take action due to its reliance on Coke's promises. SuperCooler expended its limited capital to ramp up for anticipated production of thousands of coolers and made arrangements with a factory in China.  Coke's promises left SuperCooler on the hook for prepayments for parts, production, molds, supplies and certifications for complete assemblies that Coke had no intention of ever buying from SuperCooler.

156.    Coke's promises also induced forbearance by SuperCooler.  Due to Coke's promises, SuperCooler refrained from seeking out another business partner to help commercialize its technology because SuperCooler believed it had a reliable partner in Coke.

157.     Injustice can be avoided only by enforcement of Coke's promises because, as a result of its reliance on Coke's promises, SuperCooler changed its position to its detriment by surrendering, forgoing, or rendering a valuable right.

158.     SuperCooler is entitled to recover the amount necessary to restore it to the position it would have occupied if Coke's promises had not been made, and that amount will be proven at trial.

**COUNT IX**
**DECLARATORY RELIEF (28 U.S.C. § 2201)**

159.     SuperCooler repeats, incorporates, and realleges each and every allegation set forth at Paragraphs 1 through 94 as if fully set forth herein.

160.     "[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.

161.     A real and substantial controversy exists between SuperChill and Coke regarding: (a) whether SuperCooler was in possession of trade secrets, which it disclosed to Coke in trust and confidence; (b) whether those trade secrets were background IP under the terms of the MSA; (c) whether Coke breached the terms of the MSA and its fiduciary duties to SuperCooler by misappropriating SuperCooler's trade secrets and attempting to reverse-engineer SuperCooler's technology; (d) Coke ultimately claiming SuperCooler's technology as its own.

162.     This controversy is definite and concrete and touches on the legal relations of SuperCooler and Coke—namely, the parties' contractual and fiduciary relationships and the ownership of the Super Chill, Rapid Chill, and Nucleator technology.

163.     The harm caused by Coke's misappropriation and assertion of ownership over SuperCooler's technology is ongoing and will continue into the foreseeable future.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons set forth herein, SuperCooler respectfully requests the Court enter judgment in their favor and against Coke as follows:

a. Award SuperCooler actual damages resulting from Coke's breach of contract and direct specific performance for Coke to discharge its contractual obligations;

b. Award SuperCooler actual damages and equitable relief (including disgorgement and restitution) arising from Coke's breach of fiduciary duty;

c. Award SuperCooler actual damages, exemplary damages, and attorneys' fees arising from Coke's violation of the federal Defend Trade Secrets Act;

d. Award SuperCooler actual damages, exemplary damages, and attorneys' fees arising from Coke's violation of the Florida Uniform Trade Secrets Act;

e. Award SuperCooler actual damages and punitive damages resulting from Coke's fraud in the inducement;

f. Award SuperCooler the reasonable market value of the benefit from which Coke was unjustly enriched;

g. Award SuperCooler damages based on its detrimental reliance on Coke's promises;

h. Enter a declaratory judgment declaring that SuperCooler is the rightful owner and inventor of SuperChill, Rapid Chill, and related technologies;

i. Enter an injunction order that: (1) enjoins Coke from misappropriating SuperCooler's trade secrets, and (2) directs Coke to return all trade secret information to SuperCooler;

j. Award pre- and post-judgment interest to SuperCooler to the maximum extent permitted by law; and

k.  Grant any such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff SuperCooler demands a trial by jury as to all issues so triable.

Dated: February 1, 2023

/s/ Bradley J. Bondi
Bradley J. Bondi (lead counsel) (FBN 162396)
Michael B. Weiss
   (*Pro hac vice* motion forthcoming)
Michael D. Wheatley
   (*Pro hac vice* motion forthcoming)
Vitaliy Kats (FBN 118748)
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, New York 10005
Telephone: 212.701.3000
bbondi@cahill.com
vkats@cahill.com

Paul Thanasides (FBN 103039)
**MCINTYRE THANASIDES BRINGGOLD ELLIOTT GRIMALDI GUITO & MATTHEWS, P.A.**
500 E. Kennedy Blvd., Suite 200
Tampa, FL 33602
(813) 223-0000
paul@mcintyrefirm.com

*Attorneys for Plaintiff SuperCooler Technologies, Inc.*

- 47 -