# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| SUPERCOOLER TECHNOLOGIES, INC., <br><br> PLAINTIFF, <br><br> v. <br><br> THE COCA-COLA COMPANY, METALFRIO SOLUTIONS INC., METALFRIO SOLUTIONS, S.A., COFCO COCA-COLA BEVERAGES (BEIJING) LTD., HISENSE CO., LTD., QINGDAO HISENSE COMMERCIAL COLD CHAIN CO., LTD., HISENSE RONGSHENG (GUANGDONG) FREEZER CO., LTD., HISENSE RONGSHENG (GUANGDONG) REFRIGERATOR CO., LTD., HISENSE USA CORPORATION, SWIRE COCA-COLA LTD, SWIRE COCA-COLA HK LTD., SWIRE GUANGDONG COCA-COLA ZHANJIANG LTD, AND SWIRE PACIFIC HOLDINGS, INC. D/B/A SWIRE COCA-COLA, USA. <br><br> DEFENDANTS. | Case No: 6:23-cv-00187-CEM-RMN <br><br> **JURY TRIAL DEMANDED** <br><br> **DECLARATORY RELIEF REQUESTED** |

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff SuperCooler Technologies, Inc. ("SuperCooler"), by its undersigned

counsel, files this action against The Coca-Cola Company ("Coke"); COFCO Coca-

Cola Beverages (Beijing) Ltd. ("COFCO Coke"); MetalFrio Solutions, Inc., and

MetalFrio Solutions, S.A. (collectively, "MetalFrio"); Hisense Co., Ltd. ("Hisense

Co."), Qingdao Hisense Commercial Cold Chain Co., Ltd. ("Hisense Cold Chain"),

Hisense Rongsheng (Guangdong) Freezer Co., Ltd. ("Hisense Freezer"), Hisense

Rongsheng (Guangdong) Refrigerator Co., Ltd. ("Hisense Refrigerator"), and

Hisense USA Corporation ("Hisense USA") (five preceding collectively, the

"Hisense Defendants"); Swire Coca-Cola Ltd. ("Swire Coke Ltd."), Swire Coca-

Cola HK Ltd. ("Swire Coke HK"), Swire Guangdong Coca-Cola Zhanjiang Ltd.

("Swire Guangdong Coke"), and Swire Pacific Holdings Inc., (d/b/a Swire Coca-

Cola USA) ("Swire Coke USA") (four preceding collectively, the "Swire Coke

Defendants") (all preceding collectively, the "Defendants") and alleges the

following:

## NATURE OF THE ACTION

1.      SuperCooler invented and developed, *inter alia*, three transformative

cooling technologies that are relevant to this case:  the Super Chill, the Nucleator,

and the Rapid Chill, and related technologies.  SuperChill is a beverage cooler

technology that chills beverages below their freezing temperature while keeping

them in liquid form.  This chilling process is known as supercooling.  The Nucleator

is a technology that uses ultrasonic pulses to turn supercooled beverages in sealed

beverage containers into slushies at the touch of a button through a process known

as nucleation.  Coke refers to the combination of the Super Chill and Nucleator

technologies as "Arctic Coke."  Rapid Chill is a technology that cools room

temperature beverages to below their freezing temperature in less than a minute by

spinning the beverage in a proprietary cold bath in a way that maximizes heat

transfer.  Rapid Chill also can be used in combination with a Nucleator to make a slushy beverage.

2.     Coke partnered with SuperCooler to commercialize these technologies, and SuperCooler shared them with Coke subject to explicit confidentiality, intellectual property license, and limited use restrictions.

3.     Coke saw enormous potential for SuperCooler's technologies.  Coke's leadership told its Board of Directors and investors that the technologies would generate "exponential growth" and that Coke expected to deploy "10MM+" machines incorporating SuperCooler's technologies in North America alone.  Based on the information and technologies presented by management and demonstrated to the Board of Directors, the Board approved Coke's work with SuperCooler.  Coke's bullishness with respect to these technologies has remained consistent through two different CEOs—Muhtar Kent and James Quincey—and continues through today.  Indeed, Coke CEO James Quincey touted SuperCooler's technologies during a live demonstration on national television and alluded to the founder of SuperCooler.  As recently as Q4 2022 and Q1 2023, Coke has indicated publicly to investors that machines incorporating SuperCooler's technologies are part of Coke's "defined strategy" for revenue growth.  Coke recently has employed a new manufacturer, the Hisense Defendants, to produce machines incorporating SuperCooler's technologies in a massive rollout in Asia.

4.     This case is about Coke misappropriating SuperCooler's valuable trade secrets, egregiously breaching confidentiality and limited use contractual obligations, inducing SuperCooler to enter into a lopsided loan agreement through fraud, and otherwise violating the trust placed in Coke by SuperCooler.

5.     Instead of honoring its commitment to protect and partner with SuperCooler, Coke (i) wrongfully disclosed SuperCooler's sensitive nucleation and rapid cooling technologies to others, including foreign companies, without authorization; (ii) filed copycat patents without SuperCooler's permission, which publicized several of SuperCooler's trade secrets, and falsely claimed Coke invented them; (iii) maliciously hid those patent filings from SuperCooler, which hindered SuperCooler's ability to protect several of its trade secrets from competitors; (iv) worked secretly and in conspiracy with, at least, MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants to usurp SuperCooler's opportunity to manufacture and distribute machines using SuperCooler's technologies or to license SuperCooler's technologies to others; and (v) is working and conspiring currently with MetalFrio, the Hisense Defendants, COFCO Coke, the Swire Coke Defendants, and others to manufacture and distribute machines using SuperCooler's technologies without SuperCooler's approval and to deploy the machines around the world.

6.     As a direct result of Coke's breaches and tortious conduct, SuperCooler has suffered hundreds of millions of dollars in damages, has been saddled with

millions of dollars of debt, and has been unable to attract outside investment and business opportunities because of the uncertainty regarding inventorship and ownership of SuperCooler's technologies resulting from Coke's untrue assertion of inventorship and ownership.

7.    An agreement executed by SuperCooler and Coke—the "MSA"— expressly permits claims asserting violations of its confidentiality, intellectual property license, and limited use obligations to be brought in court, while claims asserting violations of other provisions of the MSA should be arbitrated. SuperCooler is *not* attempting to bring herein any claims that are required to be arbitrated.  The causes of action brought herein that require reference to the MSA all include violations of the MSA's confidentiality, intellectual property license, or limited use obligations.  SuperCooler contracted for such claims to be resolved in court and is entitled to proceed forward in this Court.

## PARTIES

### A.    Plaintiff

8.    Plaintiff SuperCooler is a Florida corporation with its principal place of business in Maitland, Florida, which is in the Middle District of Florida.

### B.    Defendants

9.    Defendant Coke is a Delaware corporation with its principal place of business at One Coca-Cola Plaza in Atlanta, Georgia.  Coke operates and transacts

business extensively within the Middle District of Florida, including, but not limited to, with SuperCooler relating to the facts of this case.

10. Defendant MetalFrio Solutions, Inc. is a Texas corporation. It is a wholly owned subsidiary of MetalFrio Solutions S.A. ("Sociedade Anônima"), an entity organized under the laws of the Federative Republic of Brazil. MetalFrio Solutions S.A. holds out MetalFrio Solutions, Inc. as both its office for the transaction of business in the United States and its marketing and sales arm for U.S. transactions. MetalFrio operates and transacts business extensively within the Middle District of Florida, including, but not limited to, with SuperCooler relating to the facts of this case.

11. Defendant COFCO Coke is a Chinese joint venture organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China between COFCO Beverages Ltd. ("COFCO") and Coca-Cola Holdings (Asia) Ltd. ("Coke Asia"). COFCO owns approximately 65% of the joint venture and Coke Asia owns approximately 35%. Coke Asia is a private company with a registered office at 24/F, Cambridge House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong. Coke Asia is a wholly owned subsidiary of Atlantic Industries. Atlantic Industries is organized under the laws of the Cayman Islands and is a subsidiary of Coke.

12. COFCO Coke knowingly received trade secrets from a United States company (Coke) and knew that such receipt would harm SuperCooler, which is

based in the Middle District of Florida. COFCO Coke worked with the Hisense

Defendants and Coke to sell, market, and distribute supercoolers and nucleators to

the United States, including, upon information and belief, to the Middle District of

Florida. These supercoolers and nucleators rely on SuperCooler's technologies and

trade secrets.

13.    In furtherance of the misappropriation alleged in this Complaint,

COFCO Coke partnered with a United States company (Coke) to market, sell, and

distribute machines that rely on SuperCooler's technologies and trade secrets.

COFCO Coke markets, sells, and distributes these machines not just in China but

also throughout the United States.

14.    Defendant Hisense Co. is a limited liability company duly organized

and existing under the laws of the People's Republic of China. It has a place of

business at No. 17, Donghai West Road, Qingdao, Shandong Province, 266071,

China. Hisense Co., together with its subsidiaries and other affiliates of the Hisense

group of companies, manufactures and sells coolers and refrigerators throughout the

world, including throughout the United States.

15.    Defendant Hisense Cold Chain is a joint stock limited company duly

organized and existing under the laws of the People's Republic of China. It has a

principal place of business at No. 8, Haisin Avenue, Nancun Town, Pingdu City,

Qingdao, Shandong Province, China. Hisense Cold Chain is a commercial

refrigeration equipment manufacturing enterprise that integrates research and development, production, and sales.

16. Defendant Hisense Freezer is a limited liability company duly organized and existing under the laws of the People's Republic of China. It has a principal place of business at No. 46, Wenfeng North Road, Ronggui, Shunde District, Foshan City, Guangdong Province, China. Hisense Freezer manufactures electrical equipment and appliances, including refrigerators and freezers.

17. Defendant Hisense Refrigerator is a limited liability company duly organized and existing under the laws of the People's Republic of China. It has a principal place of business at No. 8, Ronggui Ronggang Road, Shunde District, Foshan City, Guangdong Province, China. Hisense Refrigerator manufactures electrical equipment and appliances, including refrigerators and freezers.

18. Defendant Hisense USA is a Georgia corporation with a principal place of business at 7310 McGinnis Ferry Road, Suwanee, GA 30024. The Hisense Defendants hold out Hisense USA as the office for the transaction of business in the United States. Hisense USA operates and transacts business within the Middle District of Florida.

19. The Hisense Defendants knowingly received trade secrets from a United States company (Coke) and knew that such receipt would harm SuperCooler, which is based in the Middle District of Florida. The Hisense Defendants conduct business throughout the United States, including but not limited to business in the

Middle District of Florida.  The Hisense Defendants maintain a website to promote their products, including products that embody technologies invented by SuperCooler, and that website is accessible in the Middle District of Florida.

20.    The Hisense Defendants, including Hisense USA, sell products directly, and indirectly through resellers, into the Middle District of Florida.  The Hisense Defendants advertise their products through media outlets in the Middle District of Florida.  The Hisense Defendants have employees within the Middle District of Florida.  The Hisense Defendants have authorized repair companies in the Middle District of Florida.

21.    The Hisense Defendants are a related group of companies.  The Hisense Defendants are part of the same common ownership, corporate structure and distribution chain for the making, offering to sell, selling, and use of machines that incorporate SuperCooler's technologies.  The common ownership of the Hisense Defendants controls the business operations and affairs of the Hisense Defendants.

22.    In furtherance of the misappropriation alleged in this Complaint, the Hisense Defendants partnered with a United States company (Coke) to develop, manufacture, and distribute machines that rely on SuperCooler's technologies and trade secrets.  The Hisense Defendants developed, manufactured, and distributed these machines in China and throughout the United States.  According to a September 15, 2020 press release on Hisense Cold Chain's website, Hisense Cold Chain has sent supercoolers and nucleators to the United States, including, upon

information and belief, to the Middle District of Florida.  These supercoolers and nucleators rely on SuperCooler's technologies and trade secrets.

23.    Defendant Swire Coke Ltd. is a private company with a registered address at 33rd Floor, One Pacific Place, 88 Queensway, Hong Kong.  It is a wholly owned subsidiary of Swire Beverages Holdings Ltd., which is a wholly owned subsidiary of Swire Pacific Ltd.

24.    Defendant Swire Coke HK is a private company with a registered address at 33rd Floor, One Pacific Place, 88 Queensway, Hong Kong.  It is a wholly owned subsidiary of Swire Coke Ltd.  Swire Coke HK is the leading soft drink manufacturer in Hong Kong.

25.    Defendant Swire Guangdong Coke is a limited liability company duly organized and existing under the laws of the People's Republic of China.  It has a principal place of business at No. 8, Leijin Road, Economic and Technological Development Zone, Zhanjiang City, Guangdong Province, China.  Swire Guangdong Coke is a wholly owned subsidiary of Swire Beverages Holdings Ltd.

26.    Defendant Swire Pacific Holdings, Inc. is a Delaware corporation doing business in the United States under the name Swire Coca-Cola USA ("Swire Coke USA").  Swire Coke USA is a subsidiary of Swire Pacific Ltd.  Swire Coke USA produces, distributes, and sells Coke products.  It has six production facilities serving portions of 13 states in the United States.

27.    The Swire Coke Defendants are a related group of companies which, together with other affiliates, are part of the fifth largest Coke bottler in the world.

28.    The Swire Coke Defendants are part of the same common ownership, corporate structure, and distribution chain for the making, offering to sell, selling, and use of machines that incorporate SuperCooler's technologies.  The common ownership of the Swire Coke Defendants controls the business operations and affairs of the Swire Coke Defendants.

29.    The Swire Coke Defendants knowingly received trade secrets from a United States company (Coke) and knew that such receipt would harm SuperCooler, which is based in the Middle District of Florida.  The Swire Coke Defendants worked with the Hisense Defendants and Coke to sell, market, and distribute coolers and nucleators to the United States, including, upon information and belief, to the Middle District of Florida.  These coolers and nucleators rely on SuperCooler's technologies and trade secrets.

30.    In furtherance of the misappropriation alleged in this Complaint, the Swire Coke Defendants partnered with a United States company (Coke) to market, sell, and distribute machines that rely on SuperCooler's technologies and trade secrets.  The Swire Coke Defendants have partnered to market, sell, and distribute these machines in China and throughout the United States.

C.      **Related Nonparties**

31.     Coca-Cola Holdings (Asia) Ltd. is a company organized under the laws
of Hong Kong.  It is a subsidiary of Coke.

32.     Coca-Cola (China) Investment Ltd. ("Coke China") and Coca-Cola
Beverages (Shanghai) Company, Ltd. ("Coke China Beverages") (collectively, the
"Coke China Entities") are companies organized under the laws of the People's
Republic of China.  The Coke China Entities are subsidiaries of Coke.

33.     Sanmina Corporation ("Sanmina") is a Delaware corporation with its
principal place of business in San Jose, California.

## JURISDICTION AND VENUE

34.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331
(federal question jurisdiction) over SuperCooler's federal trade secret claim pursuant
to 18 U.S.C. §§ 1836–39 (Defend Trade Secrets Act) and SuperCooler's
inventorship claim pursuant to 35 U.S.C. § 256.  The Court has supplemental
jurisdiction over SuperCooler's state law claims pursuant to 28 U.S.C. § 1367.

35.     The Court also has subject matter jurisdiction under 28 U.S.C. § 1332
(diversity jurisdiction) because the parties are citizens of different states and the
amount in controversy exceeds $75,000.

36.     Venue is proper under 28 U.S.C. § 1391(b) because SuperCooler
resides in the Middle District of Florida and Defendants' acts at issue occurred in
the Middle District of Florida or were directed toward SuperCooler in the Middle

District of Florida.  In addition, a substantial part of the events giving rise to the claims alleged in the complaint occurred in the Middle District of Florida, including research, development, and manufacturing of SuperCooler's technologies, visits by Coke personnel to SuperCooler's headquarters in the Middle District of Florida, communications between Coke, MetalFrio, the Swire Coke Defendants and SuperCooler in the Middle District of Florida, and shipment of SuperCooler's products from Florida to Coke, MetalFrio, and the Swire Coke Defendants.  In addition, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants have directed products that rely on SuperCooler's technologies into the United States, including, on information and belief, into the Middle District of Florida. Coke, MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants knew or should have known that their activity would harm SuperCooler in the Middle District of Florida.  The Defendants also promoted and advertised machines embodying SuperCooler's technologies through the use of the internet and social media with the knowledge, belief, and intention that the internet and social media posts would be seen around the world, including in the Middle District of Florida, and the internet and social media posts were seen in the Middle District of Florida.

37.    Coke conspired with the other Defendants to breach Coke's contractual obligations to SuperCooler, breach Coke's fiduciary duty to SuperCooler, and misappropriate SuperCooler's trade secrets.  In furtherance of Coke's conspiracies

with the other Defendants to commit these unlawful acts, Coke and the other Defendants took overt actions in the Middle District of Florida, including without limitation (i) meeting with SuperCooler personnel; (ii) communicating with SuperCooler personnel through electronic means; (iii) actively concealing and failing to disclose material information; (iv) distributing, marketing, and promoting products that incorporate SuperCooler's technologies; (v) misappropriating trade secrets that SuperCooler invented and sought to protect; (vi) interfering with SuperCooler's contract with Coke; and (vii) inducing SuperCooler's reliance on material misrepresentations and omissions. These overt conspiratorial acts caused harm to SuperCooler in this District.

## FACTUAL ALLEGATIONS

### I.    Coke's Background

38.    Coke is a multibillion-dollar international beverage company with headquarters in Atlanta, Georgia. Coke makes its beverages available to consumers worldwide through its network of independent bottling partners, distributors, wholesalers, and retailers. As of December 2022, beverages bearing trademarks owned by or licensed to Coke account for 2.2 billion of the approximately 64 billion servings of all beverages consumed worldwide every day. Coke operates and transacts business extensively within the Middle District of Florida. For example, Coke's Arctic Coke machines incorporating SuperCooler's technologies recently

have been or currently are in operation at Walt Disney World Resort and Universal

Orlando Resort theme parks in Orlando, Florida in the Middle District of Florida.

## II.    MetalFrio's Background

39.    MetalFrio is a Brazilian commercial refrigeration company with sales

operations in more than 80 countries and a main manufacturing facility in Mexico.

MetalFrio operates and transacts business within the Middle District of Florida.

Indeed, MetalFrio supplied components for the Arctic Coke machines that are in

operation at Walt Disney World Resort and Universal Orlando Resort theme parks

in Orlando, Florida in the Middle District of Florida.

## III.    The Hisense Defendants' Background

40.    The Hisense Defendants, together with related entities, comprise a

multinational appliance and electronics manufacturer.  The Hisense Defendants have

factories and research and development facilities around the world.  The Hisense

Defendants market their products globally, including within the Middle District of

Florida.  The Hisense Defendants operate and transact business within the Middle

District of Florida.   The Hisense Defendants manufacture, market, sell, and

distribute machines that embody SuperCooler technologies throughout the world,

including the United States and, on information and belief, the Middle District of

Florida.

## IV.    COFCO Coke's Background

41.    COFCO Coke is a Chinese joint venture between COFCO Corporation and Coke Asia.  COFCO Coke operates 20 bottlers in provinces throughout China, covering 81% of China's geographic area and 49.4% of China's population. COFCO Coke manufactures, distributes, promotes, and sells Coke products. COFCO Coke is one of Coke's largest bottlers worldwide.  COFCO Coke worked with the Hisense Defendants to market, sell, and distribute machines that embody SuperCooler technologies throughout the world, including the United States and, on information and belief, the Middle District of Florida.

## V.    The Swire Coke Defendants' Background

42.    The Swire Coke Defendants are a major Coke bottler.  They have the exclusive right to manufacture, market, and distribute Coke products in 11 provinces in China, the Shanghai municipality, Hong Kong, Taiwan, Cambodia, Vietnam, and portions of the United States.

## VI.    SuperCooler's Background and Intellectual Property

43.    SuperCooler was founded by Douglas Shuntich, an aerospace engineer, entrepreneur, and small business owner.  Before founding SuperCooler, Mr. Shuntich was employed by United Space Alliance, a primary contractor for the NASA Space Shuttle program.  He worked as a software and launch systems engineer at NASA's Kennedy Space Center at Cape Canaveral.  Mr. Shuntich was

responsible for keeping the Space Shuttle's liquid oxygen fuel cooled to a precise temperature before launch.

44.    After leaving the Space Shuttle program, in 2012 Mr. Shuntich used his expertise in cooling to found SuperCooler.  Under his direction, SuperCooler developed and patented several cutting-edge, breakthrough technologies for refrigeration and cooling.  At all relevant times, SuperCooler conducted its operations in and around Orlando, Florida in the Middle District of Florida.

45.    SuperCooler's core technologies at issue in this dispute include the Super Chill, the Nucleator, the Rapid Chill, and related technologies.

46.    The Super Chill is a refrigerator specifically tuned for stably maintaining beverages in liquid form below their freezing temperatures (in a "supercooled" state).  The Super Chill incorporates several technologies and methods created by SuperCooler concerning airflow, heat-transfer, and temperature control.  Although some general knowledge existed in the public domain that beverages could be supercooled,[1] SuperCooler developed proprietary technology, secrets, methods, devices, and know-how for cooling beverages below their freezing point to a level of precision previously unobtainable with minimal amounts of unwanted freezing.

---

[1]    *See, e.g.*, U.S. Patent No. 7,824,725 (Coke patent describing some basic knowledge regarding supercooling beverages but misunderstanding some fundamental principles that were later explained to Coke by SuperCooler).

47.    The Nucleator is an ultrasonic device that consistently turns supercooled beverages into a soft-frozen slush within a sealed beverage container.[2] The combination of Super Chill and Nucleator allows for precise control of supercooling and on-demand slushing of beverages—something Coke had been attempting to accomplish for decades without success.  SuperCooler perfected these technologies and brought them to Coke, only disclosing the technology and know-how after the parties signed a confidentiality agreement.

48.    SuperCooler's Super Chill and Nucleator technologies are protected by one or more patents, including U.S. Patent Nos. 10,149,487 ("the '487 patent"), 10,302,354 ("the '354 patent"), and 10,959,446 ("the '446 patent"), which issued on December 11, 2018, May 28, 2019, and March 30, 2021, respectively.  Although those patents issued fairly recently, they were filed in 2015 ('487 patent) and 2018 ('354 and '446 patents).  These patents claim priority to U.S. Provisional Patent Applications filed as early as February 18, 2014—before SuperCooler had ever spoken with Coke.  The patents claim, among other things, systems for forming slush from liquids inside of closed beverage containers, and for preventing the unwanted occurrence of frozen, ruptured containers of supercooled liquid.  Like other patents

---

[2]    The following video on Coke's YouTube channel shows a Sprite being nucleated using a SuperCooler-manufactured Nucleator.  The SuperCooler logo appears at 1:12 of the video. *See Arctic Coke and the Pursuit of the Perfectly Slushy Coca-Cola (@TheCoca-ColaCompany)*, YouTube (Jul 18, 2016) https://www.youtube.com/watch?v=gDAoH1QYz_8.

owned by SuperCooler, they do not disclose certain proprietary and confidential information, including trade secret information, developed by SuperCooler.

49.    The Rapid Chill is a device that rapidly cools bottled or canned beverages to precise temperatures near or below freezing in a matter of seconds.  The Rapid Chill incorporates mechanical methods and systems for rotating a beverage container rapidly in a vertical position while submerged in a heat sink.  It also incorporates proprietary aqueous solutions that are ideal heat sinks for use with the rapid chilling mechanical components.  One significant commercial benefit of the Rapid Chill technology is that it reduces the need for retail stores to rely on energy-consuming glass-door coolers or ice machines to keep beverages cold.  The Rapid Chill has tremendous potential to reduce the carbon footprint associated with the energy inefficient coolers used by soft-drink bottlers and distributors.

50.    SuperCooler applied for a patent on certain aspects of its Rapid Chill technology on June 6, 2014, with a provisional application filed February 18, 2014. This application matured into U.S. Patent No. 9,845,988 ("the '988 patent") on December 19, 2017, and is titled "Rapid Spinning Liquid Immersion Beverage Supercooler."  SuperCooler applied for another patent on other aspects of its Rapid Chill technology on October 23, 2017.  That application matured into U.S. Patent No. 10,393,427 ("the '427 patent"), titled "Rapid Spinning Liquid Immersion Beverage Supercooler," on August 27, 2019.

51.    SuperCooler applied for a patent on the aqueous solutions it had developed, which could be used with Rapid Chill or for other applications, on January 24, 2014. That application, titled "Ice-Accelerator Aqueous Solution," matured into U.S. Patent No. 9,631,856 on April 25, 2017. It claims, among other things, systems and methods for cooling beverages and desserts using a combination of loose ice and an aqueous ice-melting composition with specific salinity. This patent was innovative, in part because of the nature of the aqueous solution, a critical component of later systems (the specifics of which would be disclosed as confidential and proprietary information, including trade secrets, to Coke).

52.    SuperCooler's technologies are valuable and have wide-ranging applications. For instance, before its involvement with Coke, SuperCooler had been developing consumer and stadium applications of its Ice-Accelerator aqueous solutions, as well as refrigeration systems and techniques for extending the edible life of produce and meats. These ventures—and others involving Super Chill, Rapid Chill, and the Nucleator—were promising opportunities, as evidenced by SuperCooler's exploratory meetings with several large companies, including Viking Range, LLC, Anheuser-Busch InBev SA/NV, Starbucks Corp., Nestlé S.A., and Coke's competitor, PepsiCo, Inc. These companies were interested in working with SuperCooler to bring its technologies to market.

53.    All of those opportunities came to a halt, however, after SuperCooler chose to partner with Coke, who through deceptive, fraudulent, and dishonest

practices hindered the manufacture, production, and commercialization of
SuperCooler's transformative technologies and misappropriated SuperCooler's
technologies for Coke's own use.

## VII.   SuperCooler's Relationship with Coke

### A.   SuperCooler First Made Contact with Coke in 2014.

54.    SuperCooler's relationship with Coke began in or around July 2014,
when Dan Cook, a SuperCooler employee, contacted a member of Coke's
innovations group in Palo Alto, California to see if Coke would be interested in
partnering with SuperCooler.  Coke personnel, including personnel in its Atlanta
headquarters, agreed to listen to SuperCooler give a WebEx presentation from
Orlando.  The WebEx presentation was a success; Coke was impressed with
SuperCooler's technology.  Coke indicated that the next step would be a face-to-face
meeting and demonstration at Coke's headquarters in Atlanta.

55.    In August 2014, Coke and SuperCooler entered into a one-way
nondisclosure agreement, which Coke demanded prior to SuperCooler entering
Coke's headquarters.  Later that month, Mr. Shuntich and his team traveled to
Atlanta for a demonstration meeting at Coke's headquarters.  During the 3.5-hour
meeting, Coke personnel tested and drank multiple beverages that had been
supercooled and nucleated (or slushed) using SuperCooler's technology.  Coke
expressed that it was convinced of SuperCooler's capabilities and the significant
benefits to Coke.  Coke was so impressed with SuperCooler's technology and team

that it proposed a subsequent meeting to discuss a contract between SuperCooler and Coke.  During this meeting, Coke personnel indicated that SuperCooler needed to end its discussions with PepsiCo.

### B.     SuperCooler Made Super Chill and Nucleator Devices for Coke, Trained Coke's Engineers, and Disclosed Significant Confidential Information and Trade Secrets.

56.     In October 2014, Coke and SuperCooler entered into the first of many agreements—Statement of Work ("SOW") #1.  This was one of several SOWs that SuperCooler eventually would enter into with Coke for the execution of specified projects and delivery of equipment.  SOW #1 was entirely self-contained, and no other written agreement was in place at the time.[3]  Although SuperCooler was not represented by counsel in negotiating SOW #1, its terms included confidentiality and intellectual property ("IP") protections for both SuperCooler and Coke.

57.     Paragraph 3 of SOW #1 created a "Confidentiality Relationship" between Coke and SuperCooler, which acknowledged that disclosures may be made in confidence between the parties for the limited purpose of "determin[ing] whether they will work together."  Paragraph 7 of SOW #1 contained an IP provision.  Under that IP provision, SuperCooler granted Coke a limited-use, limited-term license to SuperCooler's IP.  The license was "worldwide [and] royalty-free" providing a "twenty four (24) month" term.  This license, however, expressly stated that Coke could use SuperCooler's IP "for internal research purposes only."  Furthermore,

---

[3]     Later SOWs were subject to the provisions of a later-signed Master Services Agreement.

Coke was not granted any rights in IP that was developed by SuperCooler during the term of SOW #1. The detailed attachment to SOW #1 also specified that the prototypes were "for internal demonstration and testing."

58.    Pursuant to SOW #1, Coke purchased two Super Chill prototypes, each capable of supercooling over 130 bottled beverages and each equipped with a Nucleator for slushing the supercooled beverages. The prototypes collectively were referred to as "B-25"-style units, with the individual units being called "C-1" and "C-2." By the end of 2014, the C-1 largely was completed, needing only minor modifications. The C-2, however, still required additional work to be completed. Nevertheless, Coke insisted on delivery of both units during calendar year 2014, with completion of the C-2 to occur in Coke's facilities in Atlanta early in 2015. SuperCooler delivered the C-1 and C-2 to Coke's Engineering Development Center ("Engineering Center") on or around December 31, 2014.

59.    In early 2015, Mr. Shuntich and Jeff Persing from SuperCooler traveled to Atlanta to complete the C-2, entering Coke's Engineering Center nearly daily for approximately a month. During this time, SuperCooler personnel (including Mr. Shuntich) finished the C-1 and completed the modifications to aspects of the C-2, such as airflow structures, heating elements, lights, fans, temperature sensors, and controls. As Messrs. Shuntich and Persing worked in Coke's Engineering Center, they spoke with numerous Coke personnel, who asked questions about the operation of the B-25 prototypes, supercooling, and nucleation. Messrs. Shuntich and Persing

responded to those questions with the understanding that their responses were protected by SOW #1's confidentiality provisions.  Messrs. Shuntich and Persing gave explanatory demonstrations to personnel from multiple Coke divisions, including marketing, legal, non-carbonated, cold beverage equipment, and senior management.  Also during this time, Coke requested, and SuperCooler provided, a full demonstration of Rapid Chill.  Coke again indicated that SuperCooler needed to end its discussions with anyone else regarding the technology.

60.     Between January and September of 2015, SuperCooler intensively trained Coke's engineers on how to use SuperCooler's technology, control temperatures for specific beverage products, and access real-time cooler data. SuperCooler explained the B-25 prototypes and shared SuperCooler's know-how in great detail, once again with the understanding that these disclosures were protected by SOW #1's confidentiality provisions.  Coke later listed the engineers who spoke with SuperCooler during this time as "inventors" on Coke's copycat patents of SuperCooler's technology.  The Coke engineers listed on these copycat patents were not the actual inventors.

61.     Both the C-1 and C-2 were complete by early February 2015.  Mr. Shuntich and his team successfully supercooled hundreds of Coke beverages across multiple Coke product lines.  During this time and continuing for several years thereafter, Coke personnel made several representations to the SuperCooler team that led SuperCooler to believe that Coke considered SuperCooler to be a long-term

partner.  For example, Tom Howell (Coke's principal engineer for cold drink equipment) told Mr. Shuntich that he envisioned SuperCooler being Coke's lead experts on airflow patterns, control software, fan layouts, and nucleation devices. Kirk Dahlberg (a Coke Research and Development engineer) indicated that Coke would be interested in becoming a minority owner of SuperCooler.

62.    Coke was pleased with the Super Chill prototypes.  Mr. Dahlberg, who was on-site at the Engineering Center in early 2015, told Mr. Shuntich that senior Coke executives wanted to see a demonstration of the Super Chill prototypes.  Mr. Dahlberg also asked Mr. Shuntich about Rapid Chill.  Mr. Shuntich offered to bring a Rapid Chill prototype machine to Atlanta for Coke to inspect.  In or around February 2015, SuperCooler demonstrated the Rapid Chill technology to Coke.

63.    In or around April 2015, Coke asked that SuperCooler work exclusively with Coke to develop commercial applications of Rapid Chill.  Coke represented to Mr. Shuntich that Coke would provide SuperCooler with another SOW with compensation to SuperCooler over $150,000.  Coke insisted that SuperCooler end its discussions with PepsiCo, which were in the final stages of technical and financial specifications regarding Rapid Chill prototypes, in order to work exclusively with Coke.  SuperCooler was not represented by counsel during these negotiations, and Coke actively discouraged SuperCooler from involving lawyers.

### C.   SuperCooler Provided Additional Confidential and Trade Secret Information to Coke in Reliance on Coke's Promises of Lucrative Manufacturing Rights and Royalties.

64.    In or around May 20, 2015, as Coke and SuperCooler were finalizing their second SOW, Mr. Dahlberg of Coke sent an email to Mr. Shuntich requesting that SuperCooler send Coke all of SuperCooler's confidential, unpublished patent applications relating to Rapid Chill, Super Chill, and the Nucleator.  Mr. Dahlberg represented that Coke's "legal department" needed to see these applications to make "decisions internally regarding the joint-development agreements."

65.    Mr. Shuntich was hesitant to provide the confidential information to Coke, but Mr. Dahlberg assured Mr. Shuntich that Coke was interested only in assessing the potential value of the patents so that Coke could "understand[] the patent position before entering into a [joint-development agreement]."  Mr. Dahlberg also assured Mr. Shuntich that Coke would not reverse engineer SuperCooler's technology or apply for its own patents with the information provided—promises that Coke later breached during the period for actionable claims under the relevant statutes of limitations.  In reliance on Coke's representations, SuperCooler sent the patent applications to Coke that same day with the express "understand[ing] that this information and these files fall under the 2-way NDA signed by [Coke] and [SuperCooler] as part of the SOW #1 Agreement."  SuperCooler was not represented by counsel during the discussions about providing its unpublished patent

applications to Coke, and Coke actively discouraged SuperCooler from involving
lawyers.

66.    In or around May 2015, Shell Huang (Coke's Senior Director of
External Technology Acquisition) represented to Mr. Shuntich that Coke was
prepared to discuss an equity investment in SuperCooler if field testing of the
SuperCooler products was successful.  The field testing ultimately was successful.

### D.    SuperCooler and Coke Executed an MSA.

67.    In or around July 2015, SuperCooler and Coke executed a Master
Services Agreement ("MSA") that governed all SOWs going forward.

68.    Article III of the MSA, entitled "Confidentiality Relationship,"
imposed confidentiality obligations and use restrictions on the parties.  According to
Article III, the "sole purpose" of the parties' disclosure of confidential information
"will be for the parties to use the information to determine whether they will work
together and to actually work together for any fully executed SOWs."  Article III
further states, "[e]ach party receiving Confidential Information will . . . only use the
Confidential Information for the purposes of this Agreement."  Article III further
states that Coke may only share confidential information with certain enumerated
entities "who are subject to at least the same obligations of confidentiality [as
Coke]," "who have a need to know the [c]onfidential [i]nformation to achieve the
purposes of the MSA," and that each party receiving confidential information will
"only use the [c]onfidential [i]nformation for purposes of [the MSA]."

69.    Article VII of the MSA, entitled "Intellectual Property," granted Coke "a worldwide, royalty-bearing exclusive or non-exclusive license" to certain SuperCooler background intellectual property ("Background IP").   The limited purpose of the license was for Coke to partner with SuperCooler to develop and sell the products SuperCooler created based on SuperCooler's patented technology.   This purpose is reflected in the royalty payments from the license, which were to be calculated as "a percentage of the sales price of related equipment comprising [SuperCooler's] Background IP."   Article VII further states that royalties would be paid to SuperCooler within 60 days at the end of each calendar quarter "while patents or patent applications of [SuperCooler] are pending or issued in the countries where related equipment is manufactured, sold or used."

70.    Article XV of the MSA, entitled "Dispute Resolution and Audit," contains an arbitration clause but carves out from arbitration any dispute regarding a "violation of the confidentiality, intellectual property license, or limited-use provisions of [the MSA]."   Article XV also requires that, "[p]rior to filing litigation," the parties "shall attempt to resolve the dispute in good faith directly or through a third party mediator reasonabl[y] acceptable to the parties."

71.    Article XVIII of the MSA, entitled "Supplier Guiding Principles & Code of Business Conduct for Suppliers," described the standards by which Coke would conduct itself in its relationship with SuperCooler during the performance of the MSA and any subsequent SOW.   Article XVIII incorporated Coke's then-current

Code of Business Conduct into the agreement and included a link: http://www.thecoca-colacompany.com/ourcompany/business_conduct.html.

72.    The link to the Code of Business Conduct is no longer active, but versions of the Code of Business Conduct that applied during Coke's relationship with SuperCooler required Coke personnel to not disclose nonpublic information to anyone outside Coke and to respect the nonpublic information of other companies.

73.    SuperCooler was not represented by counsel during the negotiations of the MSA and relied on Coke to act in good faith consistent with the duties arising out of the parties' confidential relationship. Coke actively discouraged SuperCooler from consulting lawyers.

74.    As explained in further detail below, Coke violated the MSA's confidentiality, intellectual property license, and limited use provisions (contained in Article III, Article VII, and Article XVIII and not subject to mandatory arbitration)[4] by: (i) sharing confidential information with unauthorized entities such as MetalFrio, the Hisense Defendants, COFCO Coke, the Swire Coke Defendants, and the Coke China Entities; (ii) systematically filing secret patent applications claiming and disclosing SuperCooler's Background IP as belonging to Coke; and (iii) working with unauthorized entities such as MetalFrio, the Hisense Defendants,

---

[4]    There is no article in the MSA titled "Limited Use," but Articles III and VII both contain language that limits the use of SuperCooler's confidential information and intellectual property. The limiting language from both Articles constitutes the MSA's limited use provision.

COFCO Coke, the Swire Coke Defendants, and the Coke China Entities to develop products that embody SuperCooler's intellectual property.

75.    The MSA allowed Coke to disclose confidential information to certain entities so long as the disclosure was "to achieve the purpose of the [MSA]."  As defined in the MSA, the express "Purpose" was to "use the information to determine whether [Coke and SuperCooler] will work together and to actually work together for any fully executed SOWs."  Because the purpose of Coke's disclosures to the other Defendants and the Coke China Entities was to exclude SuperCooler rather than to work together with SuperCooler, Coke's disclosures to these entities violated the MSA.

76.    The negotiations and relationship between Coke and SuperCooler were not at arm's length:  Coke repeatedly discouraged SuperCooler from retaining counsel; Coke repeatedly exhibited and used its superior bargaining power, including by putting time pressure on SuperCooler, making take-it-or-leave-it offers, and exploiting SuperCooler's financial condition; Coke repeatedly threatened SuperCooler if it raised any concerns; Coke repeatedly promised it would invest in SuperCooler; and Coke repeatedly represented to SuperCooler and the public that Coke and SuperCooler were partners.

## E.    Coke Demonstrated SuperCooler's Technologies to Its CEO and Board of Directors.

77.    In or around July 2015, Mr. Dahlberg demonstrated SuperCooler's Rapid Chill prototype to a group of Coke vice presidents after receiving training from Mr. Shuntich.  Mr. Dahlberg told Mr. Shuntich that the demonstration was well received, and that Coke's mergers and acquisitions group would contact SuperCooler in the next one to two months.  During this time, Coke induced SuperCooler to rely on Coke to commercialize SuperCooler's technologies by discouraging Mr. Shuntich from seeking other opportunities.  Coke personnel repeatedly told Mr. Shuntich not to commit to any "as seen on TV" company regarding the Super Chill.

78.    In a July 16, 2015 email, Mr. Dahlberg told Mr. Shuntich that the Rapid Chill technology "worked perfectly!" during a Coke demonstration.

79.    In August 2015, SuperCooler met with Matthew Mitchell (director of Coke's venture capital division) to discuss a partnership and minority ownership stake between Coke and SuperCooler in the amount of approximately $30 million. Mr. Dahlberg and Therron Foley (Coke's Director of Cold Drink Equipment Research & Development) also were present at the meeting.  During and after the meeting, Mr. Dahlberg, Mr. Foley, and other Coke representatives assured the SuperCooler team that SuperCooler would be the primary manufacturer of the Super

Chill coolers, the exclusive manufacturer of the Nucleators, and, at a minimum, a primary partner in manufacturing Rapid Chill machines worldwide.

80.    On August 26, 2015, Mr. Dahlberg again demonstrated the Super Chill and Rapid Chill technologies to Coke vice presidents and VIPs at Coke's annual Innovation Day.   Mr. Dahlberg said that the VIPs were beyond excited about SuperCooler's technologies.  SuperCooler's technologies were such a hit that Coke decided to take the extraordinary step of presenting the Rapid Chill prototype to Coke's entire Board of Directors that fall.  In preparation for the board meeting, SuperCooler accelerated its prototype production, testing, and preparation of presentation materials.

81.    In the meantime, Coke continued to make representations to SuperCooler about Coke's plans to deploy tens of thousands (and possibly many more) of SuperCooler's products annually.  Coke executives projected *annual* placements of at least 50,000 Super Chill merchandisers (with Nucleators) and potentially larger numbers of Rapid Chill machines.   Relying on Coke's representations about manufacturing and production, SuperCooler declined opportunities to work with PepsiCo, Nestlé, and others.

82.    In October 2015, Mr. Dahlberg of Coke emailed Mr. Shuntich after a rehearsal for the upcoming presentation to the board.  Mr. Dahlberg thanked Mr. Shuntich for his ongoing "dedication to both projects we are partnering on."  Mr. Dahlberg continued, "[t]he meeting today was a success, Muhtar [(Coke's CEO and

Chairman of the Board at that time)] really like the superchilled Fair Life Chocolate, and decided to include both the supercooler + nucleator and rapid chill prototype in the R&D meeting with the Board of Directors next week."

83.    The following week, Mr. Howell and Mr. Dahlberg of Coke demonstrated the Rapid Chill and Super Chill products to Coke's entire Board of Directors.    As part of this demonstration to Coke's Board of Directors, a Coke-created informational placard posted beside the Rapid Chill machine indicated that Coke estimated *10 million* total placements of SuperCooler's Rapid Chill devices in North America alone and across commercial, residential, and vending markets.  During the demonstration, SuperCooler's personnel were not allowed to be in the demonstration room or to interact in any way with members of the board. Instead, the SuperCooler team was kept in a small, adjacent room and told to be available on text message to answer any questions from Mr. Dahlberg, Mr. Howell, or Ms. Huang of Coke as they conducted the demonstration to the board members.

84.    The presentation to the board was a total success.  Mr. Dahlberg reported that the feedback from the presentation was "overwhelmingly positive," particularly with respect to the potential that superchilled beverages had for Coke. Each board member tried at least one superchilled beverage and several board members tried more than one.  After the meeting, Coke reemphasized its partnership relationship with SuperCooler.  Ms. Huang of Coke wrote to Mr. Shuntich that she was "looking forward to our continued *partnership*."  (Emphasis added.)

**F.    While SuperCooler Continued Developing its Technology for
Coke, Coke Began Parallel Efforts To Reverse Engineer
SuperCooler's Technology.**

85.    From fall 2015 through summer 2016, SuperCooler continued to fulfill
multiple SOWs for Coke.  These subsequent SOWs included so-called "stop shop"
provisions, which provided Coke with an exclusive license to the Background IP.
All the while, Coke personnel continually led SuperCooler to believe that Coke
imminently was planning to invest $3–6 million in SuperCooler, either in the form
of a direct equity stake or a convertible loan.

86.    In reality, Coke was working with unauthorized entities to reverse
engineer SuperCooler's technology without SuperCooler's permission.    For
example, from 2016 through at least 2017, Coke enlisted multiple teams of
undergraduate engineering students at the Georgia Institute of Technology
("Georgia Tech") to work around SuperCooler's intellectual property.  To help the
students and their faculty advisors reverse engineer SuperCooler's products, Coke
provided Georgia Tech with access to SuperCooler's trade secrets in breach of the
confidentiality, intellectual property license, and limited use provisions of the MSA,
for which claims are not subject to mandatory arbitration.

87.    Although the MSA gave Coke the limited ability to share
SuperCooler's trade secrets with any parent companies and majority-owned
subsidiaries (defined in the MSA as "Related Companies"), Georgia Tech is not a
parent company or subsidiary of Coke.

88.     During a meeting at Coke headquarters, Chris Vallette (Coke's VP of Research & Development) told Mr. Shuntich that he (Mr. Vallette) needed to "apologize" to Mr. Shuntich for this activity by Coke.  Mr. Shuntich did not prompt or otherwise initiate Mr. Vallette's comment.

89.     Mr. Vallette then admitted that Georgia Tech and the Global Group within Coke had been trying to "reverse-engineer" SuperCooler's Nucleator, but they could not do it.  Mr. Vallette told Mr. Shuntich that he should feel good about the failure of these reverse engineering attempts because the failures validated the design of SuperCooler's Nucleator.  Mr. Vallette promised Mr. Shuntich that this would "never happen again."  Mr. Vallette also told Mr. Shuntich that these reverse engineering efforts had to be "kept quiet," and Mr. Shuntich should not repeat the details of their discussion within Coke.  Coke's reverse engineering efforts with other entities using SuperCooler's trade secrets—in breach of the confidentiality, intellectual property license, and limited use provisions of the MSA—have continued to the present day.

## G.     Coke Successfully Tested SuperCooler's Products in the Field.

90.     Coke's initial ("alpha") field testing validated the transformative potential of SuperCooler's products.    In summer 2016, Coke deployed SuperCooler's Super Chill refrigeration units and Nucleators, which Coke renamed "Arctic Coke," for a six-month field test.  The field test took place at 20 Speedway convenience stores in and around Indianapolis.  The results were a dramatic success.

The Arctic Coke machines increased Coke's soft drink product sales by an average of at least 15–20% at each location.

91.     The alpha field test was such a success that Coke gave SuperCooler only nine months from the close of the alpha test to the beginning of a larger beta field test.  This period of time is approximately half the time that Coke usually allotted for beta testing.  Coke also wanted 1,000 units of the Super Chill and Nucleator for the beta test.  This quantity is approximately three to five times the quantity of units that Coke usually orders for beta testing.  Coke's demand and corresponding statements led SuperCooler to believe that it needed to expend significant capital to ramp up its operation so that it could meet Coke's requirements. Some of this beta testing was conducted from August through November 2017.  Like the alpha test, this larger-scale beta test also was successful and resulted in increased sales of Coke's products.

### H.     In Desperate Need of Capital and Trusting Coke's Promises, SuperCooler Agreed to the 2016 Licensing Agreement, Note Purchase Agreement, and Exclusive License on Highly Unfavorable Terms.

92.     Given Coke's aggressive beta testing schedule, Coke told SuperCooler that another "original equipment manufacturer" ("OEM") likely would be needed to assist with making the first 1,000 Super Chill units "in the short term."  Coke represented to SuperCooler that the OEM would produce only "white box" coolers—regular coolers without any of SuperCooler's core technologies.

SuperCooler would produce all the key components that transform the simple "white box" coolers into the Super Chill coolers. Coke told SuperCooler that it would be the sole manufacturer and responsible for manufacturing the first 1,000 nucleators from "end-to-end." Despite the potential involvement of another OEM, Coke never relieved SuperCooler of its obligation to build the first 1,000 Super Chill coolers.

93.    In December 2016, Coke and SuperCooler entered into a licensing agreement ("2016 Licensing Agreement") whereby SuperCooler agreed to provide specification documents and instructions to a single Coke-approved OEM vendor capable of manufacturing the Nucleator for only 1,000 units. The agreement provided that the OEM would purchase smart boards and software from SuperCooler and follow SuperCooler's installation and testing procedures. In return, Coke agreed to pay SuperCooler $55 per Nucleator produced by the OEM and the OEM agreed to purchase smart boards and software from SuperCooler for $55 per board and software bundle. SuperCooler was not represented by counsel during these negotiations and relied on Coke to act in good faith. Coke actively discouraged SuperCooler from consulting lawyers.

94.    In February 2017, after years of delay, Coke finally extended SuperCooler a $3 million loan, memorialized in a Note Purchase Agreement and Note. The Note is Exhibit A to the Note Purchase Agreement. The Note Purchase Agreement required Coke to use SuperCooler in the production of Super Chill coolers and Nucleators. Schedule A of the February 2017 Note Purchase Agreement

states that "upon agreement by the parties, in order to achieve the milestones, the cooler[s] and Nucleators may be supplied by SCTI or an alternate source *with support by SCTI to apply SCTI IP*." (Emphasis added). The terms of the Note required Coke to disburse the loan proceeds in installments: SuperCooler would receive $1.5 million up front, and the remaining $1.5 million would be paid when SuperCooler met certain production milestones. The terms of the loan also prohibited SuperCooler from using the loan proceeds to work with any other company in the nonalcoholic beverage industry without Coke's consent. During the negotiations of the Note and Note Purchase Agreement, Coke did not inform SuperCooler that Coke secretly had begun to seek patents on technologies that SuperCooler had invented.

95. Coke made the milestones deliberately difficult to achieve and stymied SuperCooler's completion of them. Because SuperCooler also was subject to the "stop shop" arrangements of the SOWs, the Note effectively required SuperCooler to work with Coke to earn any revenue to pay the Note. Coke was well aware that the Note would make SuperCooler dependent on Coke because Coke required SuperCooler to disclose its financials as part of the Note negotiations. The Note also severely hampered SuperCooler's ability to negotiate favorable terms with Coke in the future because Coke knew that SuperCooler needed revenue to pay the Note. Most of the money SuperCooler received from Coke was reinvested in trying to achieve the near-impossible milestones and building the company infrastructure to

Case 6:23-cv-00187-CEM-RMN    Document 87    Filed 07/07/23    Page 39 of 187 PageID
1021

support Coke's repeated expectation that Arctic Coke (*i.e.*, Super Chill) machines would be distributed worldwide.

96.    Coke used the Note Purchase Agreement and the promise of a lucrative manufacturing contract as leverage to induce SuperCooler to agree to an amendment of the MSA ("First MSA Amendment") simultaneously with the Note Purchase Agreement.  The First MSA Amendment amended Article II of the MSA to grant Coke a four-year exclusive license for commercial Super Chill and Nucleator products, to expire on February 2, 2021.  It also granted Coke the option to extend this exclusive license for an additional three years upon notice and payment of $3 million.  The First MSA Amendment further granted Coke a three-year right of first refusal for residential Super Chill and Nucleator products and a three-year right of first refusal for residential or commercial Rapid Chill products.

97.    The First MSA Amendment also granted Coke a "worldwide, non-exclusive, sublicensable right under its Background IP to make, have made, sell, offer for sale, import or otherwise exploit a Commercial Supercooler or Nucleator."

98.    The First MSA Amendment also states that after the exclusive license expired, Coke would have a "worldwide, non-exclusive, sublicensable right under its Background IP to make, have made, sell, offer for sale, import or otherwise exploit a Commercial SuperCooler or Nucleator."

99.    The First MSA Amendment also explicitly mentions the possibility that another party—not SuperCooler—could manufacture the Super Chill and Nucleator.

In order for Coke to work with another such party, however, the First MSA Amendment required Coke to "negotiate in good faith for a royalty payment" to SuperCooler.

100. In exchange for SuperCooler's concessions in the First MSA Amendment, Coke offered assurances that SuperCooler would continue to be an integral partner in the production and commercialization of SuperCooler's technologies. SuperCooler needed the capital provided by the Note Purchase Agreement to continue paying its employees, building its corporate infrastructure, and developing its technologies. Coke also consistently gave SuperCooler the impression that it would develop the Rapid Chill cooperatively with SuperCooler at a later date. In fact, the loan amount in the Note Purchase Agreement originally was supposed to include additional funds for that purpose. SuperCooler was not represented by counsel when it executed the 2016 Licensing Agreement, the Note Purchase Agreement, the underlying Note, or the First MSA Amendment; and SuperCooler relied on Coke to act in good faith. Coke actively discouraged SuperCooler from consulting lawyers.

101. On the day that the Note Purchase Agreement was executed, Mr. Vallette emailed Mr. Shuntich and wrote, "I'm excited we are now officially *partners* in changing how consumers enjoy our beverages." (Emphasis added). The reference to "partners" echoed what Mr. Vallette and others at Coke had said

repeatedly to Mr. Shuntich in describing the relationship between SuperCooler and Coke both before, during, and after entering agreements with SuperCooler.

102.  Nancy Quan, Coke's Chief Technology Officer, signed the Note Purchase Agreement on Coke's behalf.  When Mr. Shuntich requested a photo with Ms. Quan at the contract signing, he was warned that any external use of the photos would be a breach of the MSA's publicity clause.  Coke's resistance to SuperCooler publicizing the photo was motivated by Coke's desire to conceal SuperCooler's principal role in developing the Super Chill, Rapid Chill, and Nucleator technologies.

103.  With these agreements in place, Coke pushed aside SuperCooler in favor of foreign manufacturers and backed out of promises to apply SuperCooler intellectual property with SuperCooler support.  Without SuperCooler, Coke failed to produce a machine that could replicate the highly successful results of the Indianapolis field testing.

I.    **Breaking Its Promises, Coke Informed SuperCooler that Coke Would Be Using MetalFrio To Manufacture the Super Chill and Would Relegate SuperCooler To Manufacturing Only Nucleator Smart Boards.**

104.  In or around March 2017, mere weeks after signing the Note, Mr. Foley informed Mr. Shuntich that—contrary to Coke's earlier representations—MetalFrio would manufacture the first 1,000 Super Chill units, and Sanmina, an electronics manufacturing company in San Jose, California, would manufacture the first 1,000

Nucleators for use with the Super Chill units. Although Coke demanded that SuperCooler meet production milestones for 1,000 complete Super Chill and Nucleator assemblies, Coke indicated that SuperCooler now would be limited to producing only the smart-board controllers for the Nucleator. In other words, Coke's OEMs would not simply be producing "white box" coolers as Coke previously represented to SuperCooler; these OEMs would be producing virtually the entire Super Chill product. Despite SuperCooler's reduced production role, SuperCooler remained responsible for prepayments for parts, production, injection molds, supplies, full-time staff, and certifications for complete assemblies that Coke had no intention of ever buying from SuperCooler. Coke attempted to excuse this sudden about-face by claiming that SuperCooler could not have manufactured the Super Chill coolers and Nucleators because SuperCooler was not an "authorized supplier" in the Coke network, and achieving this status would take time. To make things worse, Coke did not permit SuperCooler to sell the completed Super Chill assemblies to anyone else.

105. Nevertheless, Coke expressed willingness to shift all (or a majority of) the production of Super Chill coolers and Nucleators to SuperCooler after MetalFrio and Sanmina produced the first 1,000 units. With this understanding, SuperCooler drew down the second half of its $3 million loan to provide smart boards to Sanmina; to supervise MetalFrio's production of the first 1,000 units by making sure they were built, tested, and performing to SuperCooler's specifications and standards; and to

ramp up for eventually taking over production of substantially all Super Chill coolers and Nucleators.

106.    Coke's prior representations during the negotiations of the December 2016 Licensing Agreement and February 2017 Note Purchase Agreement regarding Coke's commitment to purchase SuperCooler-produced products were a fraud to induce SuperCooler to enter into an exclusive license and to continue providing Coke access to SuperCooler's intellectual property, engineering, and manufacturing know-how.  During the negotiations leading up to the signing of the February 2017 Note Purchase Agreement, Coke already had decided to rely on MetalFrio and Sanmina to manufacture the Super Chill coolers and Nucleators for the first 1,000 units and beyond.  By this time, Coke already had begun its secret attempts to patent Rapid Chill.  Coke provided SuperCooler's confidential trade secret information to MetalFrio and Sanmina in violation of the confidentiality, intellectual property license, and limited use restrictions in the MSA.

107.    Coke's decision not to buy any Super Chill units or Nucleators from SuperCooler immediately harmed SuperCooler.  Just three months before Coke informed SuperCooler of its decision to rely on MetalFrio for manufacturing, SuperCooler signed a $3 million term sheet with a foreign investor and received a $300,000 down payment.  This investor backed out of the deal and requested a refund of the down payment after learning that Coke had decided not to buy any Super Chill coolers or Nucleators from SuperCooler and that Coke had demanded a

reduction in royalties in exchange for placing a 1-inch by 1-inch SuperCooler sticker on the MetalFrio/Sanmina-produced units for the United States market.

108.    In or around May 2017, Mr. Shuntich raised his concerns regarding the reduced production and royalties with Mr. Vallette (Coke's VP of Research and Development).  At an in-person meeting, Mr. Shuntich handed Mr. Vallette a letter describing Mr. Shuntich's grievances with the way Coke had behaved toward SuperCooler.  The letter cited Coke's decision not to buy Super Chill coolers or Nucleators from SuperCooler for the 1,000-unit rollout, which Coke kept secret during the October 2016–February 2017 negotiations for the Note Purchase Agreement.  The letter also cited Coke's refusal to sign any document confirming that SuperCooler had the right to lease its equipment to non-beverage companies and refusal to sign any document confirming that SuperCooler could sell units directly to alcoholic beverage companies.  Finally, the letter criticized Coke's demand for a royalty reduction in exchange for the placement of the 1-inch by 1-inch sticker on the machines built by MetalFrio and Sanmina.

109.    Mr. Vallette of Coke reviewed the letter and threatened that if Mr. Shuntich emailed him any written complaints on these subjects, Coke's relationship with SuperCooler would be "done" and the entire Arctic Coke program would be cancelled forever.  Mr. Vallette assured Mr. Shuntich that he would resolve Mr. Shuntich's concerns, and that SuperCooler would oversee all production and testing and be the primary manufacturer of machines after the first 1,000 units.  Mr. Vallette

lulled SuperCooler into believing that Coke would right its wrongs and give SuperCooler credit as the inventor of the Arctic Coke (*i.e.*, Super Chill) technology. SuperCooler relied to its detriment on Mr. Vallette's assurances.

110.   Meanwhile, in November 2017, Coke CEO James Quincey appeared on national television on CNBC to demonstrate SuperCooler's Super Chill and Nucleator technologies (which Coke had renamed "Arctic Coke") and Rapid Chill. During the CNBC appearance, Mr. Quincey acknowledged that a NASA "scientist" (that is, Mr. Shuntich) "helped" Coke develop Arctic Coke and indicated that there were 1,000 Arctic Coke machines in U.S. stores already.  Mr. Quincey did not mention SuperCooler, its partnership with Coke, or Mr. Shuntich specifically by name.[5]  Mr. Quincey also explained how the SuperCooler Rapid Chill prototype improved on Arctic Coke by not requiring an "ice machine."  In the television appearance, Mr. Quincey confirmed that consumers "love" slushy drinks, that the supercooled beverages taste great, that consumers wanting slushy beverages was "absolutely" a global phenomenon, and that, with respect to Rapid Chill, the machine removes the need for a retail store to have an ice machine, "so it's a win-win for everyone."  That same month, Coke filed its second patent application containing certain trade secrets of SuperCooler and attempting to patent Rapid Chill

---

[5]    A video of Mr. Quincey's television appearance can be seen at this link:
https://www.youtube.com/watch?v=PZqI5z2aXPU.

in violation of the provisions of the MSA, including the confidentiality, intellectual property license, and limited use provisions.

111.   Despite earlier setbacks in the relationship, the fact that the CEO went on national television to tout the enormous opportunity that Coke saw in SuperCooler's technologies led SuperCooler to believe that its partnership with Coke would continue.

112.   Without SuperCooler's knowledge, a December 2017 MetalFrio business presentation claimed that "MetalFrio has led the global development of the Coke Arctic Cooler."  This presentation occurred a mere month after Coke CEO James Quincey said that a NASA scientist (that is, Mr. Shuntich) helped Coke develop the Arctic Coke.  MetalFrio applauded itself for being "incredibly proactive in both their technical development, customer service, program logistics and performance capability to meet [Coke's] aggressive market timing."  MetalFrio also claimed credit for delivering "game-changing technology" for Coke and a new way for Coke's customers to enjoy its products.  MetalFrio's business presentation did not mention SuperCooler.

113.   MetalFrio's 2017 business presentation also contains a Coke-branded slide that copies—often verbatim—the words from an internal "sell sheet" that Jeff Busch (Director of Equipment Commercialization at Coke), Kim Drucker (Director of Platform Innovation at Coke), and Mr. Dahlberg (Research and Development Engineer at Coke) provided to SuperCooler in 2015.  The 2015 SuperCooler sell

sheet and the 2017 MetalFrio presentation clearly describe the same products, despite the attribution to different manufacturers:

| 2015 SuperCooler Sell Sheet | 2017 MetalFrio Presentation |
|---|---|
| "Simply select a drink and press the button!" | "Simply select a drink and press the button!" |
| "Unique beverage offering providing ice/slushy effect to beverages" | "Unique beverage offering providing ice/slushy effect to beverages" |
| "Superbright LED lighting with motion sensors" | "Back lit LED panel allows consumers to watch ice being formed in PET containers"; "Internal and external LED lighting" |
| "Indicator lights to inform consumers when product is ready" | "LED indicator lights to inform consumers when product is ready" |
| "Automatic 'door open' alarm after 10 seconds" | "Automatic 'door open' alarm after 10 seconds" |
| "Customer overnight 'safe temperature mode' to prevent freezing of products during low activity periods" | "Overnight 'safe temperature mode' to prevent freezing of products during low activity periods" |
| "Coca-Cola Bottle/Can Equipment" | "Coca-Cola Bottle/Can Equipment" |
| "Increase customer satisfaction by offering the high quality, **ice cold** Coca-Cola immediate consumption beverages your guests expect." | "Increase customer satisfaction by offering the high quality, **ice cold** Coca-Cola immediate consumption beverages your guests expect." |
| "**MANUFACTURER**: SCTI [*i.e.*, SuperCooler]" | "**MANUFACTURER**: METALFRIO" |

114.  The 2017 MetalFrio presentation also states that the Arctic Coke coolers were field tested from "August – October, 2016 with [a] major [convenience] retailer" and that the test "[d]rove incremental sales." The field testing described in MetalFrio's presentation refers to the Indianapolis alpha field testing of SuperCooler's machines, not MetalFrio's machines.

115.    The coolers referred to in the MetalFrio presentation are SuperCooler's technology, which MetalFrio and Coke misappropriated.    At no point did SuperCooler directly share its trade secrets with MetalFrio, and MetalFrio did not solicit SuperCooler's help to produce the Super Chill units.    In fact, when SuperCooler personnel traveled to MetalFrio's manufacturing facility in Mexico in April 2018 to inspect MetalFrio's Nucleator and cooler assembly lines, MetalFrio prevented SuperCooler personnel from seeing the cooler assembly line despite multiple requests from SuperCooler.  The *only* way MetalFrio could have produced an imitation of the Super Chill is through Coke wrongfully disclosing SuperCooler's confidential information and trade secrets to MetalFrio without SuperCooler's permission in violation of the confidentiality, intellectual property license, and limited use provisions of the MSA and MetalFrio using those trade secrets.

## J.    **Shortly After SuperCooler Negotiated a Slight Raise in Royalties, Coke Suddenly Stopped Ordering the Super Chill.**

116.    In early 2018, Coke began ordering smart boards for the Super Chill from SuperCooler.  The royalty arrangement between the parties at that time was still limited to SuperCooler being paid $55 per Nucleator, with no agreed-upon royalties for the Super Chill cooler.  In March 2018, Mr. Shuntich met with Mr. Vallette to discuss the inadequacy of the Super Chill royalties.

117.    At the meeting, far from "fixing everything" as Mr. Vallette of Coke had represented to Mr. Shuntich in May 2017, Mr. Vallette informed Mr. Shuntich

and SuperCooler that Coke "had a room full of lawyers" who were convinced that the MetalFrio cooler had been engineered such that it did not make use of SuperCooler's intellectual property and therefore Coke would not be paying royalties to SuperCooler on the merchandiser cooler. Mr. Shuntich reminded Mr. Vallette that the SuperCooler team had taught Coke everything they knew regarding relevant temperatures, data, designs, airflow, and ready lights. Mr. Shuntich stated that it was not fair for Coke to lead SuperCooler to believe that it would be paid royalties or that Coke would purchase coolers directly from SuperCooler when, in fact, Coke was attempting to reverse engineer SuperCooler's devices (using SuperCooler's confidential information) to avoid paying royalties. After tense negotiation, Coke begrudgingly agreed to give SuperCooler another $55 royalty for each "NG5CHC-model" Super Chill cooler sold.[6] Coke also agreed that the fee would apply to "other models" of coolers. This agreement was memorialized in a revised licensing agreement ("2018 Licensing Agreement") that stated the additional $55 royalty was "compensation for prior consulting services offered by SuperCooler." The revised licensing agreement provided that SuperCooler would "partner with [Coca-Cola North America Technical Innovation & Stewardship]" to help manufacture the Super Chill with MetalFrio.

---

[6] Coke also agreed to continue paying SuperCooler a $55 licensing fee for each bundle of smart-controller boards and their software and an additional $45 to $70 fee per smart-controller board, depending on the quantity delivered in 2018.

118. Despite the persistent friction caused by Coke's fraudulent and underhanded negotiations regarding royalties, licensing, and production, Coke still held itself out to the public as SuperCooler's partner. A February 12, 2018 news article reported, "[t]he company [*i.e.*, Coke] said Coca-Cola R&D had been working on the Arctic Coke project for decades before partnering with SuperCooler Technologies Inc. in 2015."

119. As 2018 progressed, SuperCooler shipped several thousand smart boards to Coke, and Coke instructed SuperCooler to prepare to ship 6,000 more. By 2018, the beta test of the first 1,000 units was over and Coke was moving forward with commercializing the Super Chill. Indeed, on or about May 4, 2018, Coke personnel gave a presentation to SuperCooler employees and investors, in which Coke claimed that the Super Chill was "officially" becoming commercialized, and that Coke anticipated buying hundreds of thousands of Super Chill units over the next five years. Such a high volume meant, at a minimum, millions of dollars in royalties for SuperCooler. Moreover, SuperCooler stood to reap additional revenues if it obtained the status of authorized supplier and was permitted to directly produce the Super Chill units for Coke.

120. Coke's decision to move forward with commercialization necessarily meant that the beta test was a success, but Coke refused to share any data from the beta testing with SuperCooler. In fact, Coke refused to disclose even the location of the MetalFrio Arctic Coke machines that were part of the beta test.

121.    SuperCooler invested significant time and resources in the process of becoming an authorized supplier and preparing for mass production in reliance on Coke's fraudulent representations.   For example, at Coke's behest, SuperCooler sought and received ISO 9001, CCC, UL, and ETL certifications.   Going through these certification processes took SuperCooler a significant amount of time, cost thousands of dollars, and required outside auditing.   SuperCooler's investment in these certifications was based on Coke's untruthful assertions that SuperCooler would become the exclusive (or primary) manufacturer for the Super Chill—unless, and only to the extent SuperCooler agreed otherwise—if SuperCooler fulfilled all of the requirements for becoming an authorized supplier.   SuperCooler also had documented contracts in place with various component suppliers and manufacturers in anticipation of mass producing the Super Chill.

122.    In June 2018, MetalFrio abruptly told SuperCooler that Coke was cancelling all orders for the Nucleator smartboards for the time being.   Coke's sudden stop caused SuperCooler to issue a temporary suspension of pay to its employees.   The explanation given to SuperCooler at the time was that there was a "nationwide bottler restructuring" that resulted in dramatically reduced purchases of cooling equipment by North American bottlers.   The sudden termination actually was due to MetalFrio's inability to accurately replicate SuperCooler's technology, due, at least in part, to Coke's and MetalFrio's failure to involve SuperCooler in the production, testing, and validation processes in violation of the 2016 Licensing

Agreement and February 2017 Note Purchase Agreement. These agreements required Coke and MetalFrio to follow SuperCooler's installation and testing procedures and to rely upon SuperCooler's support to apply SuperCooler's intellectual property. For nearly a year after the cancellation, until March 2019, Coke led SuperCooler to believe that Coke would place more orders in the future, and SuperCooler incurred significant expenses to be ready for Coke's future orders, which never came.

123. Later in 2018, Coke personnel invited Mr. Shuntich to Coke's headquarters because of problems related to the MetalFrio-built coolers. SuperCooler previously helped Coke fix a weak nucleation issue caused by MetalFrio failing to screw the bowl of the Nucleator tightly enough to the ultrasonic transducer.

124. When Coke asked SuperCooler to help fix another problem, SuperCooler examined the MetalFrio-built coolers and identified several defects in the coolers due to deviation from SuperCooler's original design, including deviations with respect to the Go/No-Go ready light, internal airflow (which resulted in unwanted freezing), and the temperature on the top shelf of the cooler being too warm.

125. SuperCooler proposed to fix the MetalFrio-manufactured coolers in exchange for SuperCooler receiving a larger role in manufacturing the coolers and waterless Nucleators. Coke personnel recommended that SuperCooler discuss the

relationship problems with senior personnel at Coke. SuperCooler attempted to contact senior personnel at Coke, but they did not engage in substantive discussions with SuperCooler.

126.   Coke repeatedly has breached and continues to breach its fiduciary and contractual duties to SuperCooler by: (i) marketing and commercializing Arctic Coke and the underlying technologies as its own; (ii) continuing to use SuperCooler's trade secrets in Arctic Coke machines; and (iii) continuing to prosecute patents that claim inventorship and ownership of SuperCooler's trade secrets.

127.   For example, Coke is breaching its duty of candor by continuing to disclose SuperCooler's confidential and proprietary trade secrets to unauthorized entities. In breach of ongoing confidentiality obligations and its duty of candor, Coke continues to disclose SuperCooler's trade secrets to unauthorized entities (including MetalFrio, the Hisense Defendants, COFCO Coke, the Swire Coke Defendants, and the Coke China Entities) in furtherance of Coke's manufacturing, maintenance, and global distribution of Arctic Coke machines and similar supercooler and nucleator technologies. Coke has included references to Arctic Coke as a driver of revenue growth in multiple presentations to investors, including as recently as Q1 2023. Coke's contractual confidentiality obligations are ongoing.

128.   Since at least 2020, Coke also has breached its duty of candor to SuperCooler by continuously prosecuting patents—without informing

SuperCooler—claiming ownership and inventorship of SuperCooler's valuable technologies.

129. Since at least 2020, Coke has breached its duty of loyalty by acting in its own interest and not in the joint interest of Coke and SuperCooler. Coke is excluding SuperCooler—in favor of other companies such as MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants—from manufacturing and deploying machines that rely on SuperCooler's trade secrets.

### K.   SuperCooler Discovered Coke's Copycat Patents of Technology that Coke Obtained from SuperCooler.

130. Coke has relied on—and to this day continues to rely on—SuperCooler's trade secrets to assist or accelerate Coke's own research and development, without SuperCooler's knowledge or permission. This reliance is evidenced by Coke's in-progress prosecution of patent applications that are fundamentally based on core SuperCooler technology and based on the disclosures SuperCooler shared with Coke in confidence.

### a.   Coke Tries To Patent SuperCooler's Rapid Chill Technology.

131. In mid-October 2019, while the parties were pursuing mandatory mediation as required by Article XV of the MSA, SuperCooler learned for the first time that Coke secretly had filed patent applications covering SuperCooler's Rapid Chill technology which disclosed numerous SuperCooler trade secrets that were not disclosed in SuperCooler's patents. Specifically, SuperCooler discovered two

published international patent applications, WO 2018/102434 and WO 2019/099135[7] (corresponding to application numbers PCT/US2017/063748 and PCT/US2018/055930). In these patent applications, Coke claimed ownership over many of SuperCooler's trade secrets and other information that SuperCooler had provided to Coke in confidence pursuant to non-disclosure agreements. Coke's disclosures of some of SuperCooler's trade secrets in the patent applications are in direct violation of the confidentiality, intellectual property license, and limited use provisions of the MSA.

132. In the patent applications, Coke named its own personnel as inventors and omitted all SuperCooler personnel. These named Coke "inventors" gained their knowledge of the technology from training that Mr. Shuntich and other SuperCooler personnel provided to Coke. SuperCooler provided this training pursuant to confidentiality agreements and solely for Coke to evaluate SuperCooler's technologies. The named "inventors" that were trained by SuperCooler include Kirk Dahlberg, David Slagley, Thomas North, Thomas Howell, Pranav Godbole, Clark Monroe, Ryan Livingston, Clayton Burnett, and Alan Hawkins.

133. This set of Coke applications included numerous SuperCooler Rapid Chill trade secrets, such as: (i) SuperCooler's air drying system to move a can or bottle that has been chilled in SuperCooler's Rapid Chill liquid immersion system

---

[7] This application also lists "Georgia Tech Research Corporation" as an applicant.

through an air drying system to clean the beverage container of any immersion liquid; (ii) SuperCooler's integrated nucleation system, which integrates SuperCooler's Rapid Chill cooling system with a nucleation device capable of achieving rapid phase or state change from fluid state to soft-frozen state at the end of the chilling process; (iii) supercooling temperatures and metastable states to be used for supercooling for different beverage types; and (iv) spin profiles (*e.g.*, the specific setting for accelerations, peak rotations per minute ("RPM"), total spin time, and stop time between forward and reverse spin for different beverages and beverage containers when used with the Rapid Chill).

### b.  Coke Tries To Patent SuperCooler's Super Chill Technology.

134.   SuperCooler discovered that Coke also was attempting to patent aspects of SuperCooler's Super Chill refrigeration technology, while disclosing SuperCooler trade secrets in the process.  In or around October 2019, SuperCooler discovered an application that led to U.S. Patent No. 11,369,214 ("the '214 patent"), titled "Cooler with Shelf Plenum."  Although this patent is assigned solely to Coke, the patent is based on the knowledge SuperCooler passed to Coke in confidence pursuant to SOW #1.  The purported inventor on the '214 patent, Alan Hawkins of Coke, was stationed in the Coke Engineering Center at the critical time before the MSA but during the effective period of SOW #1.

135.   The patent describes a tall, narrow refrigeration unit used to supercool beverages by directing the heat transfer from the evaporator coils to the bottles

through controlled airflow (as opposed to simply dumping cold air from the evaporator on top of the cooler directly into the main chamber). This airflow is directed down a supply duct in the rear of the cooler and is redirected into forward-pointing shelf plenums that have openings to disperse the cold air.

136.   Mr. Shuntich of SuperCooler invented this design, not Mr. Hawkins of Coke. Mr. Shuntich showed and explained this design to Coke personnel while he and Mr. Persing were completing the modifications in Coke's Engineering Center. *See supra* Section IV.B. Mr. Shuntich's disclosure was protected by confidentiality, intellectual property license, and limited use provisions, but Coke patented the design as its sole property anyway.

137.   Coke filed its provisional application to this design on November 30, 2016, approximately a year and a half after Messrs. Shuntich and Persing explained to Coke personnel what they were doing to modify the B-25s. Provisional patent applications are not published until a patent claiming priority to them is published or granted, so SuperCooler could not have discovered that Coke secretly filed this application.

138.   The first publication relating to this application occurred on June 7, 2018, for International Patent Application PCT/US2017/064070 (Coke's international patent application claiming priority back to the U.S. provisional application). But to enforce this international application in any particular country, Coke would need to file a "national stage" application in that country. Coke filed a

national stage application in the United States on June 6, 2019.  This national stage

application published on March 5, 2020—while SuperCooler was trying to mediate

with Coke "in good faith," as required by Article XV of the MSA and while Coke

was lulling SuperCooler into believing there were no further attempts to patent

SuperCooler's technology.

139.   Coke continued prosecuting this patent throughout its dispute with

SuperCooler, obtaining a Notice of Allowance on February 1, 2022 and paying the

issuance fee on May 2, 2022.  The '214 patent issued on June 28, 2022.

### c.   Coke Tries To Patent SuperCooler's Nucleator Technology.

140.   As described below, SuperCooler brought Coke the idea of nucleation

within a sealed beverage container.  Coke previously believed that nucleation was

possible only through the release of pressure associated with opening a carbonated

beverage.  SuperCooler demonstrated to Coke its ultrasonic nucleator technology—

which could nucleate carbonated or non-carbonated beverages—but SuperCooler

did not explain how the technology worked until Coke and SuperCooler entered into

a confidentiality agreement pursuant to SOW #1.

141.   Beginning in early 2015, SuperCooler taught and trained Coke

personnel (including Miyako Sekita and Alan Hawkins, among many others) as to

numerous aspects of SuperCooler's nucleator technology.  Some aspects of the

technology were in SuperCooler's then-unpublished patent application (which Coke

requested and obtained from SuperCooler), and some aspects were not described in

any patents or publications. All the information disclosed during these trainings about SuperCooler's nucleator technology constituted confidential information about SuperCooler's IP that SuperCooler would not have shared with Coke without a confidentiality agreement.

142.  Coke later began a secret campaign of filing patent applications to nucleator technology. First, Coke filed a provisional patent application in February 2017 listing Ms. Sekita as the inventor—U.S. Provisional Patent Application No. 62/464,490.[8] Coke then filed an international patent application claiming priority to that provisional—PCT/US2018/020021 ("the '021 PCT"). Before the provisional filing, SuperCooler personnel had detailed discussions regarding SuperCooler's nucleator technology with Ms. Sekita and Thomas Howell, who worked closely with Ms. Sekita.

143.  In one series of interactions in early 2015 (before the MSA but during SOW #1), SuperCooler personnel demonstrated different aspects and capabilities of its nucleation technology, including inverted nucleation (*i.e.*, placing the bottle upside down on the ultrasonic transducer, rather than upright). This demonstration was intended to show Coke the capabilities of SuperCooler's technology and gauge Coke's interest in such a design. Mr. Shuntich and Mr. Persing of SuperCooler

---

[8]  As described above, due to the nature of provisional patent applications not being publicly available until a non-provisional patent application claims priority to that provisional publishes or issues as a patent, SuperCooler was not aware of this filing at that time. Coke also did not alert SuperCooler to this filing, even though it previously demanded access to SuperCooler's unpublished patent applications.

demonstrated the inverted nucleation to Coke personnel Thomas Howell, Kirk Dahlberg, and Brad Anderson in Coke's Engineering Center.

144. SuperCooler explained the benefits of such a design to Coke. For instance, SuperCooler explained that the relatively flat geometry of the top of the beverage lid provided a superior point of contact to the more complex geometries of the bottoms of beverage containers. SuperCooler also taught Coke the importance of moving the excess air bubble in the empty space of the container through the supercooled liquid, something that would occur naturally in an inverted nucleation design. Finally, SuperCooler explained that a lower power setting could be used with such an inverted design, reducing energy consumption.

145. None of this knowledge was published in SuperCooler's nucleator patents.

146. Even though Mr. Shuntich taught inverted nucleation to Coke in early 2015, Coke later included it as a point of novelty in Coke's international patent application, the '021 PCT. For instance, the PCT states that "the use of the hard, flat, and relatively compact surface of the [beverage] closure 120 may limit energy losses therethrough for improved ice crystal nucleation therein." '021 PCT at ¶ 150; *see also id.* at ¶ 148 ("The beverage container 106 may be removed from a cooler or

other type of supercooling refrigeration device and may be inserted into the waterless

ice crystal nucleator system 100 in an inverted position.").[9]

147.  This technology, built fundamentally from SuperCooler's confidential

disclosures, now is being used in Coke machines abroad:



'021 PCT Fig. 7 (excerpt)



Hisense Machine in Beijing, China
(photograph taken May 11, 2023)

---

[9]  The U.S. Patent Application related to this PCT application—U.S. Patent Application No.
16/489,427—recently issued on July 4, 2023.  *See* U.S. Patent No. 11,690,388.  As discussed
below, this patent inappropriately is assigned to Coke, and SuperCooler seeks correction of
this patent under 35. U.S.C. § 256.



Label inside Hisense Machine in Beijing, China
(photograph taken May 11, 2023 showing manufacturing date of "2022-04-04")

148.    Separately, in September 2018, Coke filed U.S. Provisional Patent Application No. 62/727,867 ("the '867 Provisional").[10]    That document, which identifies Alan Hawkins and Ryan West of Coke as inventors, relates to "a beverage nucleator system that can initiate ice crystal nucleation . . . [in a] container containing a supercooled beverage," which is a core SuperCooler technology.  Messrs. Hawkins and West were both long-time Coke employees, having been employed with Coke since 2005 and 1995, respectively.  Mr. Hawkins continues to be employed by Coke as a mechanical engineer.  Mr. West was a global research and development director for cold drink equipment, but he left Coke in late 2019.

---

[10]    As with the other provisional patent applications filed by Coke, SuperCooler was not aware of this application at the time of filing.  The first publication of this application did not occur until March 2020, when the PCT application claiming priority to the '867 provisional published.  *See* Int'l Patent Application Publication No. WO 2020/051491.

1045

149.    The '867 Provisional reflects Coke's understanding of nucleation before its relationship with SuperCooler—that "carbonated soft drinks can contain sufficient energy such that the initial release of carbon dioxide that occurs when the container is opened initiates ice crystal nucleation."  The provisional then described a desire to nucleate "non-carbonated beverages such as water, dairy-based beverages, sports drinks, coffees, teas, and the like."  Next, it described the solution that SuperCooler brought to Coke—"use of ultrasound waves"—without any attribution to SuperCooler.  But the provisional discounted that solution as requiring a "fluid transmission medium" that it claims "causes hygiene concerns."  Its solution involved "a directed flow of pressurized gas" to impart energy to the beverages.  This understanding, disclosure, and solution were based on the work of SuperCooler that was disclosed to Coke in confidence.   This information, disclosed before SuperCooler's patents published, allowed Coke to get a jump start in its research and development of such alternative nucleation methods.

150.    Coke's publication of SuperCooler's trade secrets in these patent applications violated Coke's confidentiality, intellectual property license, and limited use contractual obligations.

d.  <u>Coke Misappropriates Other SuperCooler Trade Secrets.</u>

151.    Although Coke wrongfully included many of SuperCooler's trade secrets in Coke's numerous patent applications, Coke's applications did not include the full universe of trade secret and confidential knowledge SuperCooler shared with

Coke in confidence.  SuperCooler believed through the end of 2020 that dispute

resolution through mediation would permit Coke to continue using SuperCooler's

Background IP and know-how, with proper compensation to SuperCooler.  This

hope evaporated after mediation concluded without resolution.  After the failed

mediation, SuperCooler no longer had any avenue (besides litigation) to protect its

other, still-unpublished trade secrets.

152.  Since at least the end of 2020, Coke has misappropriated SuperCooler's

trade secrets by wrongfully disclosing them to MetalFrio, the Hisense Defendants,

COFCO Coke, the Swire Coke Defendants, and the Coke China Entities.  MetalFrio,

the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants

misappropriated SuperCooler's trade secrets by using them in machines

manufactured and promoted by Coke, MetalFrio, the Hisense Defendants, COFCO

Coke, and the Swire Coke Defendants.  Coke, MetalFrio, the Hisense Defendants,

COFCO Coke, and the Swire Coke Defendants continue to misappropriate

SuperCooler's trade secrets.

153.  Some of the unpublished SuperCooler trade secrets that Coke,

MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants

have misappropriated since at least the end of December 2020 include: (i) optimal

temperature sensor placement; (ii) supercooling temperature and metastable state

information; (iii) methods of optimal fan control and airflow; (iv) methods of power

management for the compressor and door heating element; (v) ranges of on/off

compressor cycles; (vi) methods of overnight control to adjust compressor cycles; (vii) ready light design features; (viii) pulldown (beverage chilling) temperature testing data; (ix) methods of remote data access particularly useful for supercooling fridge systems; (x) door opening data; (xi) design of door temperature control; (xii) defrost condition requirements for supercooling refrigeration design; (xiii) test development data for the Nucleator's ultrasonic transducer/transmitter; and (xiv) other operational requirements for use of Super Chill.    Coke also has misappropriated unpublished SuperCooler trade secrets involving (i) motor durability and suitability testing for Rapid Chill; and (ii) CFD simulations and modeling for Rapid Chill.    These trade secrets span all three categories of SuperCooler's technologies:  Super Chill, the Nucleator, and Rapid Chill.

**L.    Coke Believed the Arctic Coke Machines Would Be Successful and Continues To Profit from Them in the United States and in Foreign Countries.**

154.    After the successful 2016 field test in and around Indianapolis, Coke expanded its testing of Arctic Coke.  This testing was part of Coke's overall strategy to develop and roll out Arctic Coke and similar machines embodying SuperCooler's technologies around the world over several years, which it has begun to do.

155.    In his November 2017 appearance on CNBC, Mr. Quincey demonstrated the Rapid Chill and Arctic Coke products and emphasized the "global phenomenon" of consumers wanting slushy beverages.  He said there were already over 1,000 Arctic Coke machines in U.S. stores.  Regarding Rapid Chill, he said the

technology would be a "win-win" because it produced slushy beverages rapidly while eliminating the need for the store to have an ice machine.

156.  Around the same time as Mr. Quincey's CNBC appearance, Jeff Persing of SuperCooler observed a whiteboard near the office of Coke's Chief Innovation Officer Robert Long at Coke headquarters.  The words "Robert Long's Top Innovation Priorities" were written on the whiteboard, followed by a list of important Coke technologies.  The Arctic Coke/Super Chill was at the top of the list.

157.  Coke expanded testing of the Arctic Coke machines to 800 convenience stores in the United States.  In a February 2018 article, Ms. Drucker (Coke North America's Director of Platform Innovation) spoke positively about the expanded testing and said that she and her team were exploring additional channels for Arctic Coke beyond convenience stores.

158.  Coke's expansion continued the next year.  In a June 2018 tweet, Coke announced:  "Good news! Not only will there be [Arctic Coke] locations in Indianapolis **but also in many other cities**.  If you [direct message] us with some cities/state you are in or will be traveling to, we can let you know where the Arctic Coke Machines will be!"  (Emphasis added).

159.  In 2019, CEO James Quincey and Deputy CFO John Murphy gave a presentation to the Consumer Analysis Group of New York.  In the presentation, they described the Arctic Coke opportunity as "exponential," which, according to the presentation, placed Arctic Coke in the highest quadrant on Coke's spectrum of

growth for recent innovations. The "exponential" rating is higher than the "transformational" rating ascribed to Coke's Freestyle machines.



160. Two slides later, Coke referred to an Arctic Coke machine on a slide entitled "DISCIPLINED PORTFOLIO GROWTH: REVENUE GROWTH MANAGEMENT IS A RENEWED PHILOSOPHY ON SYSTEM-WIDE VALUE CREATION." Below the picture of the Arctic Coke machine is a caption informing consumers that these "Revenue Growth Management Initiatives **Are Rolling Out Globally**" (emphasis added):



161.   In a Q3 2019 Investor Overview presentation, Coke again described the

Arctic Coke opportunity as "exponential."



162.   Two slides later, Coke again referred to an Arctic Coke machine on a slide entitled "DISCIPLINED PORTFOLIO GROWTH:   REVENUE GROWTH MANAGEMENT IS A RENEWED PHILOSOPHY ON SYSTEM-WIDE VALUE CREATION."   Again, below the picture of the Arctic Coke machine is a caption informing investors that these "Revenue Growth Management Initiatives **Are Rolling Out Globally**"  (emphasis added):



163.   In a Q3 2020 Investor Overview presentation, Coke again included an Arctic Coke machine on a slide entitled "PLATFORM TO ACCELERATE: REVENUE GROWTH MANAGEMENT IS A RENEWED PHILOSOPHY ON SYSTEM-WIDE VALUE CREATION."   Like the 2019 presentation, the Arctic Coke reference is included as part of Coke's "Defined Strategy."   Below the picture

of the Arctic Coke machine is a caption saying that Coke is "Developing price/pack

architectures that are appropriate to consumer & customer needs":



164.    In a Q4 2022 Investor Overview presentation, Coke again included an

Arctic Coke machine on a slide entitled "MEETING CONSUMER NEEDS

THROUGH IMPROVED RGM."  Like the 2019 and 2020 presentations, the Arctic

Coke reference is included as part of Coke's "Defined Strategy."  Below the picture

of the Arctic Coke machine is a caption saying Coke is "Developing price/pack

architectures that are appropriate to consumer & customer needs:"



165.   In a Q1 2023 Investor Overview presentation, Coke again included an Arctic Coke machine on a slide entitled "MEETING CONSUMER NEEDS THROUGH IMPROVED RGM."   Like earlier presentations, the Arctic Coke reference is included as part of Coke's "Defined Strategy."  Below the picture of the Arctic Coke machine is a caption saying that Coke is "Developing price/pack architectures that are appropriate to consumer & customer needs:"



166.   Consistent with the planned global rollout of Arctic Coke as part of the

"defined strategy" discussed in the presentations above, and without SuperCooler's

knowledge or permission, Coke spent substantial sums of money on marketing firms

such as Collective Bias, Inc., a self-described leader in shopper-focused influencer

marketing, to promote Arctic Coke on social media.   Without SuperCooler's

knowledge or permission, Coke and its marketing firms continue to promote and

market Arctic Coke through, *inter alia*, the use of social media influencers.

167.   Without SuperCooler's knowledge or permission, Coke has launched

Arctic Coke in markets around the world.   For example, in or around July 2021,

Coke began its launch of Arctic Coke in Singapore with the first unit located at a 7-

Eleven x Coca-Cola Crossover Store in the House of Eden, Raffles Place, Singapore.

This unit was manufactured by MetalFrio and has a model number of NG5CHCEN,

which indicates that it is a different model than other versions of the machine with model number NG5CHC. The existence of various models confirms that, without SuperCooler's permission, Coke continues to rely on SuperCooler's technologies to develop new versions of the Arctic Coke machines.

168.    Coke, through its relationship with 7-Eleven, is generating significant sales for Coke and continuing to harm SuperCooler. There are approximately 400 7-Eleven stores in Singapore, and that deployment continues throughout Singapore. For example, on or about June 25, 2022, 7-Eleven opened a new beachfront store in Sentosa Island, Singapore that has an Arctic Coke machine featuring SuperCooler's technology.

169.    Since the decline of the COVID-19 pandemic, Coke has continued to deploy Arctic Coke machines using SuperCooler's technologies. For example, Coke has been deploying Arctic Coke machines using SuperCooler's technologies in Thailand. According to one source, there are 150 Arctic Coke machines in use in Thailand alone.

170.    Also since the decline of the COVID-19 pandemic, Coke has launched a massive campaign with the Hisense Defendants to deploy and promote machines using SuperCooler's technologies throughout China, all while sharing SuperCooler's secrets with the Hisense Defendants without SuperCooler's authorization.

171.    Without SuperCooler's knowledge or permission, Coke continues to market and deploy machines to convenience stores, gas stations, and tourist attractions around the world that embody SuperCooler's trade secrets, employ SuperCooler's trade secrets in manufacturing and production, and rely on SuperCooler's trade secrets to assist or accelerate research and development.

172.    As documented by both news media and social media, Coke has deployed and continues to deploy SuperCooler's Super Chill and Nucleator technologies in the United States and around the world, including in the Middle District of Florida.  There are hundreds of videos, tweets, reports, and other media posts that document Coke's worldwide deployment of machines embodying SuperCooler's technologies to countries such as China, Singapore, Thailand, Malaysia, Vietnam, Australia, Canada, Mexico, and Switzerland.  The following list is only a representative sample:

    a.  On April 10, 2023, user @JimmyCoke uploaded a short to YouTube titled "Arctic Coke" that showed someone using an Arctic Coke machine in Mexico.  The video cuts to schematics of the Super Chill created by Mr. Shuntich and photographs of a Super Chill prototype created by SuperCooler.  *Arctic Coke*, YouTube (Apr. 10, 2023), https://youtube.com/shorts/8Pgne9GPOqA.

    b.  On February 5, 2023 Walt Disney World News Today reported that there was a functioning Super Chill/Arctic Coke machine in the Betty

Boop Store at Universal's Islands of Adventure.  Shannen

Michaelson, *Arctic Coke Machine Moves to Betty Boop Store in*

*Universal's Islands of Adventure*, WDW News Today (Feb. 5, 2023),

https://wdwnt.com/2023/02/arctic-coke-machine-moves-betty-boop-

store-ioa/.

c. A December 31, 2022 video showing an individual using an inverted

nucleator attached to a Coke cooler in Xiamen, Fujian Province,

China https://www.douyin.com/video/7183146564922117410.

d. On June 25, 2022, Mothership.sg reported that there was an Arctic

Coke machine at a 7-Eleven in Sentosa, Singapore.  Joshua Lee, *7-*

*Eleven x Tiger Beer Sentosa Outlet Has Nitro Tea, Arctic Coke*

*Machine & Beer on Reverse Tap*, Mothership, (June 25, 2022, 3:30

p.m.), https://mothership.sg/2022/06/7-eleven-x-tiger-beer-sentosa-

outlet-has-nitro-tea-arctic-coke-machine-beer-on-reverse-tap/.

e. On May 8, 2022, user FUUDIE posted a video of himself using a

Super Chill/Arctic Coke Machine at a 7-Eleven convenience store in

Bangkok, Thailand.  *INSTANT Freeze Coke Machine At 7 Eleven*,

YouTube (May 8, 2022), https://youtu.be/fI8NfyTYWZI.

f. On May 1, 2022, user AdrianWidjy posted a video of himself using a

Super Chill/Arctic Coke Machine at Caltex Petrol Station in

Marrickville, New South Wales, Australia.  *How cool! A machine that*

*turn your soft drinks into slushies! Arctic coca cola! #shorts*,
YouTube (May 1, 2022), https://youtu.be/vbHe3nMZxGY.

g.  On March 20, 2022, user DancingBacons posted a video of two
individuals using a Super Chill/Arctic Coke Machine at a 7-Eleven
store in Singapore.  *Instant Freeze Coke Machine*, YouTube (Mar. 20,
2022), https://youtu.be/vEXRdYPyQNc.

h.  On March 6, 2022, user Thailand Style posted a video of himself
using a Super Chill/Arctic Coke Machine at a 7-Eleven store in
Thailand.  *ARCTIC Coke, Coca-Cola Slush Machine*, YouTube (Mar.
6, 2022), https://youtu.be/-c2lsLw1dcw.

i.  On January 28, 2022, user Sprinkle of Truth posted a video of two
individuals using a Super Chill/Arctic Coke Machine at a 7-Eleven
store in Raffles Place in Singapore.  *EP 88 ARCTIC COKE
MACHINE*, YouTube (Jan. 28, 2022), https://youtu.be/iQTv401r__o.

j.  On October 29, 2021, user Thai Street Food Channel posted a video of
himself using a Super Chill/Arctic Coke Machine in Thailand.
*#Shorts / Arctic Coke Machine / Slushie Machine / Street Drink / Thai
Street Food*, YouTube (Oct. 29, 2021),
https://youtu.be/jookt8XHmsQ.

k.  On October 27, 2021, user firdausbunny posted a video of a Super
Chill/Arctic Coke Machine.  *The Arctic Coke machine turns a bottle*

*of Coca-Cola into a slushy in seconds #sedaphai #coke*, TikTok (Oct. 27, 2021), https://www.tiktok.com/@firdausbunny/video/7023736837554343170.

l.  On September 6, 2021, user AmazingChina posted a video of an individual inserting an inverted Coca-Cola bottle in a waterless nucleator.  *AmazingChina:  Instant Slushie Frozen Coke Slush Drink*, YouTube (Sept. 6, 2021), https://youtu.be/Uk8OqBN1BS8.

m.  On August 14, 2021, user Biannual Travellers posted a video of an individual using a Super Chill/Arctic Coke Machine in Singapore.  *7 Eleven / Coca Cola Instant Freeze Artic Coke Machine / Singapore*, YouTube (Aug. 14, 2021), https://youtu.be/0DUmtwEON5Q.

n.  On August 8, 2021, user DaDaGe posted a video of an individual using a Super Chill/Arctic Coke Machine at Raffles Place in Singapore.  *Crush the Cola, Slush Coke at 7-Eleven in Singapore*, YouTube (Aug. 8, 2021), https://youtu.be/GGJeBIJMYmY.

o.  On July 31, 2021, TheDishSpace.com reported that there was an Arctic Coke machine at the 7-Eleven/Coca-Cola Crossover Store located at House of Eden, 4 Robinson Road, Singapore 048543.  *The Icy Coke Slushie*, YouTube (July 31, 2021) https://thedishspace.com/the-icy-magic-coke-slushie/.  The report says that "Coca-Cola was inspired by former NASA engineers that dealt with cryogenics.  In

2015, Coca-Cola R&D worked with the NASA engineers in SuperCooler Technologies Inc to develop precision refrigeration and nucleating technologies for the slushing result, which led to the science behind the Arctic Coke machine."

p.  On June 12, 2021, user YUMMY FC posted a video of himself using a Super Chill/Arctic Coke Machine at a convenience store in Thailand.  *Arctic Coke Machine Slushie Slush Machine / YUMMY FC #shorts*, YouTube (June 12, 2021), https://youtu.be/UrPFczajQzA.

q.  On July 30, 2021, Yahoo reported that there was an Arctic Coke Machine in a 7-Eleven/Coca-Cola Crossover Store at Raffles Place, Singapore.  Vera Leng, *Watch Your Coke Get Turned Into Slush in Seconds By This Machine at Raffles Place*, Yahoo (July 30, 2021) https://sg.style.yahoo.com/watch-coke-turned-slush-seconds-172441297.html.

r.  On Feb. 17, 2021, user Visit Thailand posted a video of an individual using an Arctic Coke Machine in Thailand.  *Arctic Coke.  Instant Slushy Coca Cola Vending Machine.  Slushie Slurpee Smoothie Magic Ice Drink*, YouTube (Feb. 17, 2021), https://youtu.be/9Za9JHd-S88.

s.  On December 2, 2020, Alvinology Media reported that "Coca-Cola Singapore today introduced the country's first Arctic Coke Cooler, a machine that keeps drinks cold enough to be on the verge of freezing,

turning your beverage into an icy-cold slushy."  Irone Kim, *This New
Arctic Coke Cooler Can Turn Your Favourite Drink Cold Enough To
Be On The Verge of Freezing, The Perfect Thirst Quencher*,
Alvinology Media (Dec. 2, 2020) https://alvinology.com/2020/12/02/
this-new-arctic-coke-cooler-can-turn-your-favourite-drink-cold-
enough-to-be-on-the-verge-of-freezing-the-perfect-thirst-quencher/.

t.   On October 2, 2020, user Sayle Oil Company posted a video of an
employee at their convenience store in Grenada, Mississippi using an
Arctic Coke machine.  *Check out the Arctic Coke Machine at our
Grenada C-Store Location!* (@SayleOilCompany), YouTube (Oct. 2,
2020), https://youtu.be/OYXYELH7Naw.

u.   On April 7, 2020, Yahoo reported that there was an Arctic Coke
machine in the Coca-Cola Store in Disney Springs, Florida.  Alex
Lasker, *Watch This Coca-Cola Machine Turn Soda Into A Perfect
Slushy*, Yahoo (Apr. 7, 2020) https://www.yahoo.com/lifestyle/2020-
04-07-watch-this-coca-cola-machine-turn-soda-into-a-perfect-slushy-
23972572.html.

v.   On February 23, 2020, user lordmadone posted a picture of a Super
Chill/Arctic Coke machine inside a convenience store in South
Carolina.  *Coke Artic coolers still exist!  (found in South Carolina)*,

Reddit (Feb. 23, 2020) https://www.reddit.com/r/ToFizzOrNotToFizz/
comments/f8e9hl/coke_artic_coolers_still_exist_found_in_south/.

w.  On August 9, 2019, a Facebook account for Walmart Fuel Station

Plano-Coit Road in Texas posted a video of an Arctic Coke machine

inside a Walmart gas station.  Facebook (Aug. 9, 2019)

https://www.facebook.com/Walmart997/videos/you-know-its-hot-in-

texas-this-week-so-why-not-stop-by-and-check-out-our-arctic-

/404945070130381/.

173.  Several replacement components for Arctic Coke machines are
available to order on Coke's website to this day.  *See, e.g.*, Coca-Cola Parts (search
for  "NG5CHC")    https://www.coca-colaparts.com/parts-manual/#146814.
MetalFrio is listed as the manufacturer.  *See, e.g.*, DECK, REFRIG, NUCLEATOR,
ASSY, COMPLETE https://www.coca-colaparts.com/item-detailsx/?item=148641.
Indeed, Coke has been offering field service assistance to retail outlets who use
Arctic  Coke  machines.    *See*  Arctic  Coke  Operation  Instructions  at  18,
https://www.coca-colaparts.com/parts-manual/?op=dwnattach&fid=2916.

174.  Without  SuperCooler's  knowledge  or  permission,  in  or  around
September 2020, Coke partnered with a major Chinese manufacturer (the Hisense
Defendants) and major Chinese bottlers named COFCO Coke and the Swire Coke
Defendants to build and market new iterations of supercoolers and nucleators that
incorporate SuperCooler's technologies.  In doing so, Coke intentionally shared

SuperCooler's trade secrets with the Hisense Defendants, COFCO Coke, the Swire
Coke Defendants, and the Coke China Entities in breach of Coke's confidentiality
and fiduciary duties owed to SuperCooler.  These new machines employ the inverted
nucleation technique that SuperCooler personnel confidentially shared with and
demonstrated to Coke in early 2015 (before the MSA but during SOW #1).
According to the Hisense Defendants' website, these machines have been sent
around the world to "China, Europe, the United States, South Korea, Japan, and
[eight other] countries and administrative regions."  There are many videos available
on the internet of individuals nucleating Coke beverages using supercoolers and
machines manufactured by the Hisense Defendants that unlawfully incorporate
SuperCooler technologies.

175.  SuperCooler shared the details of its supercoolers and innovative
inverted nucleation design with Coke in confidence and pursuant to SuperCooler's
contractual and fiduciary relationship with Coke.  Then, in or about 2020 and
without SuperCooler's consent, Coke intentionally shared SuperCooler's trade
secrets with the Hisense Defendants, COFCO Coke, the Swire Coke Defendants,
and the Coke China Entities.  The supercoolers and nucleators manufactured by the
Hisense Defendants incorporate SuperCooler's technologies, including but not
limited to (i) the design and process for inverted nucleation; (ii) push-button
nucleation through an ultrasonic transducer; (iii) multiple air-flow vents in the back
of the cooler to optimize cooling; (iv) wire racks with dividers in the cooler to

optimize cooling and prevent premature freezing; (v) a Go/No-Go ready light; (vi)

step-by-step instructions for customers; and (vii) algorithms to control the nucleators

and regulate the temperature of the cooler.  SuperCooler never shared these details

with the Hisense Defendants, COFCO Coke, or the Swire Coke Defendants.

SuperCooler never authorized Coke to share these details with the Hisense

Defendants, COFCO Coke, or the Swire Coke Defendants.  The *only way* the

Hisense Defendants, COFCO Coke, or the Swire Coke Defendants could have

produced the supercoolers and inverted nucleation devices in partnership with Coke

is through Coke wrongfully disclosing SuperCooler's confidential information and

trade secrets to the Hisense Defendants, COFCO Coke, and the Swire Coke

Defendants in or around 2020 without SuperCooler's permission in violation of

Coke's contractual and fiduciary obligations.

176.  Coke took steps to conceal its breaches and fraudulent actions by lulling

SuperCooler into believing that Coke otherwise was complying with its contractual

obligations and duties as a partner.  For example, Coke purported to engage in

mediation in good faith pursuant to the MSA while Coke simultaneously continued

secretly to obtain patents concerning SuperCooler's technologies and also continued

to work with partners in China to manufacture and distribute machines that rely on

SuperCooler's technologies.

177.  Additionally, as late as 2023, Coke has concealed its extensive and

ongoing commercialization efforts by attempting to downplay the market

opportunity and commercial viability of SuperCooler's technologies.    Coke's
attempts to diminish the value of SuperCooler's technologies are contradicted by its
continued and aggressive efforts to develop, manufacture, and market machines that
embody SuperCooler's technologies, as alleged in this Complaint.

178.   Because of Coke's deliberate concealment and continued assertions
that no misappropriations have occurred (which persist to this day), SuperCooler's
discovery of Coke's misappropriations was delayed, and SuperCooler could not
have discovered the misappropriation earlier with the exercise of due diligence.

179.   Coke's   misappropriation,   misuse,   and   intentional   sharing   of
SuperCooler's trade secret information continues to the present day, and Coke has
continued to breach its non-arbitrable contractual obligations and legal duties, all
within the relevant limitations periods.

## COUNT I
## BREACH OF CONTRACT (MSA)
### (COKE)

180.   SuperCooler incorporates the allegations set forth at Paragraphs 1
through 179 as if fully set forth herein.

181.   SuperCooler and Coke entered into the MSA.

182.   Article XV of the MSA states that the agreement is governed by New
York law.

183.   Article III of the MSA permitted Coke to disclose and use
SuperCooler's confidential information only "for the purposes of this Agreement."

In reliance on this use restriction, SuperCooler disclosed valuable confidential information and trade secrets to Coke related to Rapid Chill, Super Chill, and the Nucleator.

184.   Article XVIII of the MSA forbids Coke personnel from disclosing nonpublic information to anyone outside Coke and requires Coke personnel to respect the nonpublic information of other companies.

185.   Article XV of the MSA provides that, notwithstanding anything contrary in the agreement, the parties always may apply to a court of competent jurisdiction for "legal or equitable relief in regards to a violation of the confidentiality, intellectual property license, or limited use provisions" of the MSA.

186.   SuperCooler performed its obligations under the MSA.

187.   Coke materially breached its confidentiality obligations in Article III and Article XVIII of the MSA by including some of SuperCooler's trade secret information in Coke's own patent applications, which Coke hid from SuperCooler and filed without SuperCooler's knowledge or permission.

188.   Coke materially breached its duty of good faith and fair dealing implied in the MSA by hiding its patent applications from SuperCooler.

189.   Coke also breached Article III and Article XVIII of the MSA by disclosing SuperCooler's confidential and trade secret information to unauthorized entities, including the following:

a. Coke breached Article III and Article XVIII when it disclosed SuperCooler's trade secret information to MetalFrio to exploit SuperCooler's technology in a manner beyond the permitted scope of use in the MSA;

b. Coke breached Article III and Article XVIII when it disclosed SuperCooler's trade secret information to the Hisense Defendants to exploit SuperCooler's technology in a manner beyond the permitted scope of use in the MSA;

c. Coke breached Article III and Article XVIII when it disclosed SuperCooler's trade secret information to COFCO Coke to exploit SuperCooler's technology in a manner beyond the permitted scope of use in the MSA;

d. Coke breached Article III and Article XVIII when it disclosed SuperCooler's trade secret information to the Swire Coke Defendants to exploit SuperCooler's technology in a manner beyond the permitted scope of use in the MSA; and

e. Coke breached Article III and Article XVIII when it disclosed SuperCooler's trade secret information to the Coke China Entities to exploit SuperCooler's technology in a manner beyond the permitted scope of use in the MSA.

190.    Coke further breached its confidentiality obligations by continuing to use SuperCooler's confidential and trade secret information after the mediation concluded in December 2020, when it was no longer possible to use that information for the MSA's "sole purpose" of "us[ing] the information to determine whether they will work together and to actually work together for any fully executed SOWs." The claims arising as a result of Coke's breaches are not subject to mandatory arbitration.

191.    Coke also materially breached the intellectual property license and limited use provisions in Article VII of the MSA by including SuperCooler's Background IP in Coke's own patent applications, which it filed without SuperCooler's knowledge or permission.

192.    Coke also breached Article VII by disclosing the Background IP to unauthorized entities, including the following:

a.    Coke breached Article VII when it disclosed SuperCooler's Background IP to MetalFrio to exploit SuperCooler's Background IP in a manner beyond the permitted scope of use in the MSA;

b.    Coke breached Article VII when it disclosed SuperCooler's Background IP to the Hisense Defendants to exploit SuperCooler's Background IP in a manner beyond the permitted scope of use in the MSA;

c. Coke breached Article VII when it disclosed SuperCooler's Background IP to COFCO Coke to exploit SuperCooler's Background IP in a manner beyond the permitted scope of use in the MSA;

d. Coke breached Article VII when it disclosed SuperCooler's Background IP to the Swire Coke Defendants to exploit SuperCooler's Background IP in a manner beyond the permitted scope of use in the MSA; and

e. Coke breached Article VII when it disclosed SuperCooler's Background IP to the Coke China Entities to exploit SuperCooler's Background IP in a manner beyond the permitted scope of use in the MSA.

193. Coke's apparent ultimate goal was to cut SuperCooler out of the manufacturing process in favor of entities such as MetalFrio, the Hisense Defendants, COFCO Coke, the Swire Coke Defendants, and Sanmina.

194. As a direct and proximate result of Coke's material breaches, SuperCooler has sustained actual damages in an amount to be proven at trial.

## COUNT II
## BREACH OF CONTRACT (FIRST MSA AMENDMENT) (COKE)

195. SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

196. SuperCooler and Coke entered into the First MSA Amendment.

197.    Item 2 of the First MSA Amendment granted Coke certain exclusive and non-exclusive license rights to SuperCooler's Background IP, subject to certain conditions.

198.    One condition stated that if Coke enlisted a third party to manufacture commercial supercoolers or nucleators under the licenses granted in the First MSA Amendment, then Coke and SuperCooler "will negotiate in good faith for a royalty payment in order to extend such rights to the [SuperCooler] Background IP."

199.    The First MSA Amendment states that these rights "shall survive expiration or termination of the MSA for any reason."

200.    Coke materially breached the First MSA Amendment.    Without SuperCooler's knowledge and without attempting to negotiate appropriate royalty payments as required by the First MSA Amendment, Coke has enlisted third parties, such as MetalFrio and the Hisense Defendants, to manufacture commercial supercoolers and nucleators.

201.    As a direct and proximate result of Coke's material breaches, SuperCooler has sustained actual damages in an amount to be proven at trial.

<u>COUNT III</u>
<u>BREACH OF CONTRACT (2018 LICENSING AGREEMENT)</u>
<u>(COKE)</u>

202.    SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

203.    SuperCooler and Coke entered into the 2018 Licensing Agreement.

204.   Page 4 of the 2018 Licensing Agreement states that Georgia law applies.

205.   The 2018 Licensing Agreement required Coke to pay a $55 licensing fee for up to 1,000 Nucleators, a $55 licensing fee for each bundle of smart-controller boards and their corresponding software, and an additional fee between $45 and $70 per smart-controller board.

206.   Coke materially breached the 2018 Licensing Agreement by accepting the Nucleators and controller board/software bundles without paying the agreed-upon fees.   Coke also breached the 2018 Licensing Agreement by cutting SuperCooler out of the manufacturing process, despite the 2018 Licensing Agreement stating that SuperCooler would partner with Coca-Cola North America Technical Innovation & Stewardship to help manufacture the Super Chill with MetalFrio.

207.   As a direct and proximate result of Coke's material breaches, SuperCooler has sustained actual damages in an amount to be proven at trial.  Coke acted in bad faith and SuperCooler is entitled to attorneys' fees.

**COUNT IV**
**BREACH OF CONTRACT**
**(NOTE AND NOTE PURCHASE AGREEMENT)**
**(COKE)**

208.   SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

209.   The Note is Exhibit A to the Note Purchase Agreement.  Schedule A of the February 2017 Note states that "upon agreement by the parties, in order to achieve the milestones, the [Super Chill] coolers and Nucleators may be supplied by SCTI or an alternate source **with support by SCTI to apply SCTI IP**."  (Emphasis added.)

210.   Under the Note and Note Purchase Agreement, Coke agreed to loan SuperCooler an aggregate of $3 million to perform more work for Coke under the MSA.  SuperCooler accepted the loan with the understanding that Coke would use SuperCooler as the primary manufacturer of the Super Chill or, as Schedule A provides, use "support" from SuperCooler "to apply [SuperCooler] IP."

211.   SuperCooler performed its obligations under the Note and the Note Purchase Agreement.

212.   Coke breached the Note and the Note Purchase Agreement by completely cutting out SuperCooler as a supplier of Super Chill units or Nucleators and not using SuperCooler's support to apply SuperCooler's IP.

213.   As a direct and proximate result of Coke's material breaches, SuperCooler has sustained actual damages in an amount to be proven at trial.  Coke acted in bad faith and SuperCooler is entitled to attorneys' fees.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (COKE)

214.   SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

215.   Coke owed SuperCooler a fiduciary duty.  The duty arose from Coke and SuperCooler's course of dealings over several years, Coke's representations, confidentiality promises and obligations, and the circumstances surrounding the parties' dealings.

216.   SuperCooler and Coke entered into exclusive license agreements for the Super Chill, Rapid Chill, and Nucleator, memorialized by the "stop shop" provisions in the SOWs and the First MSA Amendment.

217.   Coke, as the exclusive licensee of SuperCooler's Nucleator, Super Chill, and Rapid Chill technologies, owed a fiduciary duty to SuperCooler as a matter of law and was obligated to use diligent efforts to exploit the subject matter of the license.

218.   In addition, Coke's confidentiality promises and obligations also created a fiduciary relationship.  SuperCooler provided Coke with confidential business information pursuant to Coke's promises and obligations to keep the information confidential.

219.   Coke's course of dealing also created a fiduciary relationship.  Coke personnel repeatedly led SuperCooler to believe that the parties were engaged in an exclusive partnership to commercialize SuperCooler's trade secrets.

220.   SuperCooler—a small business operating without the assistance of counsel—depended on Coke—a large, multinational corporation with greater sophistication and bargaining power—to protect its trade secrets and to offer SuperCooler crucial assistance in commercializing its technology.  SuperCooler placed its trust and confidence in Coke to safeguard SuperCooler's interests, and Coke knowingly accepted and encouraged SuperCooler's trust and confidence.

221.   Coke recognized and accepted its fiduciary duties to SuperCooler by holding itself out to SuperCooler as a partner and by holding itself out to the public as SuperCooler's partner.

222.   As a fiduciary, Coke owed SuperCooler duties of loyalty, care, and candor.  Coke knowingly breached its fiduciary duties to SuperCooler by (i) failing, as the exclusive licensee, to use diligent efforts to work with SuperCooler to commercialize SuperCooler's technologies; (ii) sharing SuperCooler's trade secrets with unauthorized entities; (iii) making secret arrangements with other entities such as MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants to develop and commercialize SuperCooler's technologies; (iv) fraudulently inducing SuperCooler to enter into contracts with promises of a lucrative manufacturing contract; and (v) presenting business opportunities that

naturally should have been presented to SuperCooler, pursuant to the fiduciary relationship between Coke and SuperCooler, to unauthorized entities such as MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants instead. All of these breaches occurred within the relevant statutes of limitations and were part of an overarching fraudulent scheme to misappropriate SuperCooler's technology.

223. Coke has acted with the specific intent to profit from the abuse of its fiduciary duties and did so knowingly, unlawfully, and with malice. SuperCooler is therefore entitled to punitive damages.

224. As a direct and proximate result of Coke's actions, SuperCooler has sustained actual damages in an amount to be proven at trial and punitive damages. Coke acted in bad faith and SuperCooler is entitled to attorneys' fees.

**COUNT VI**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND**
**TRADE SECRETS ACT (18 U.S.C. §§ 1836–39)**
**(COKE)**

225. SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

226. SuperCooler's technical information, designs, and other know-how related to its Super Chill, Nucleator, and Rapid Chill technologies constitute trade secrets under the Defend Trade Secrets Act (18 U.S.C. §§ 1836–39). SuperCooler owns and possesses certain trade secret information, as alleged above. The

following is a non-exhaustive list of SuperCooler's trade secrets that were shared with and knowingly, willfully, and maliciously misappropriated by Coke, with others to be revealed through discovery:

a. _Super Chill-Related Technology_: (i) optimal temperature sensor placement; (ii) supercooling temperature and metastable state information; (iii) methods of optimal fan control and airflow; (iv) methods of power management for the compressor and door heating element; ranges of on/off compressor cycles; (v) methods of overnight control to adjust compressor cycles; (vi) ready light design features; (vii) pulldown (beverage chilling) temperature testing data; (viii) methods of remote data access particularly useful for supercooling fridge systems; (ix) door opening data; (x) design of door temperature control; (xi) defrost condition requirements for supercooling refrigeration design; (xii) beverage support rack design considerations; and (xiii) other operational requirements for use of Super Chill.

b. _Nucleator-Related Technology_: (i) operational water requirements; (ii) bowl design requirements; (iii) waterless nucleator design; (iv) operational requirements for use of the nucleator; (v) nucleator backlighting requirements; (vi) ultrasonic transducer/transmitter design; (vii) test development data for ultrasonic

transducer/transmitter; (viii) inverted nucleation design considerations; and (ix) optimal power settings.

    c. *Rapid Chill-Related Technology*: (i) air drying system; (ii) the integrated nucleation system; (iii) the supercooling temperatures and metastable states; and (iv) spin profiles.

227.    Under confidentiality agreements, SuperCooler provided the above and other trade secrets to Coke through emails, presentations, in-person meetings, technology demonstrations, and other routine interactions as part of the partnership, from at least the time period spanning late 2014 through 2018.  The following abbreviated list provides examples of communications in which SuperCooler shared trade secrets with Coke in confidence:

    a. January through February 2015: Demonstrations, discussions, and modifications to prototypes in Coke's Engineering Center;

    b. February 4, 2015: Rapid Chill prototype demonstration;

    c. April 8, 2015: Slideshow presentation featuring Super Chill and Rapid Chill;

    d. May 20, 2015: E-mail from Doug Shuntich to Kirk Dahlberg sending SuperCooler's unpublished patent applications and expressly noting this disclosure to be included "under the 2-way NDA . . . as part of the SOW #1 Agreement;"

e. <u>June 25, 2015:</u> Coke asks to borrow a Rapid Chill prototype and asks
for a "training demo" for Coke personnel Tom Howell and Kirk
Dahlberg.   The Rapid Chill prototype is demonstrated by Coke
personnel on July 16, 2015, August 26, 2015 (Coke's "Innovation
Day"), and October 15, 2015 (presented to Coke's Board of Directors).

228.   None of these trade secrets is disclosed in any published SuperCooler
patents or patent applications.  SuperCooler's asserted trade secrets are different
from SuperCooler's patent rights.  For example, SuperCooler's nucleator patents
(the '487 and '446 patents) describe generally the methods, processes, apparatuses,
devices, kits, and systems for crystallizing liquid to form slush inside bottles and
cans of various supercooled liquids.  *See, e.g.*, '487 patent at 15:63-16:23 (Claim 1).
SuperCooler's trade secrets relating to operational water requirements, bowl design
requirements, waterless nucleator design, operational requirements for use of the
nucleator, nucleator backlighting, ultrasonic transducer design, test development
data for the ultrasonic transducer, inverted nucleation design considerations, and
optimal power settings are not disclosed in those patents.

229.   Similarly, SuperCooler's precision supercooling refrigeration device
patent (the '354 patent) broadly describes the Super Chill device for supercooling a
target liquid, housing a slush activation, and preventing the unwanted occurrence of
frozen, ruptured containers of supercooled liquid.  *See, e.g.*, '354 patent at 16:61–
17:34 (Claim 1).  The '354 patent does not disclose any of SuperCooler's Super Chill

trade secrets, including, for example: (i) trade secrets relating to methods of optimal fan and air stream control; (ii) chilling temperature testing data; (iii) methods of power management; (iv) pulldown (beverage chilling) temperature testing data; (v) door opening testing data; and (vi) defrost condition requirements for the refrigeration design of the Super Chill machine, among others.

230.   Likewise, SuperCooler's Rapid Chill patents (the '988 patent and the '427 patent) describe the general system and operational parameters to rapidly chill a beverage using high-RPM, alternating rotations along a vertical axis of a container while the container is in a vertical position. *See, e.g.*, '988 patent at 12:49-65 (Claim 1). SuperCooler's trade secrets relating to Rapid Chill, however, include: (i) internal motor testing data; (ii) computational fluid dynamics simulations; (iii) cooling times for a variety of beverages and container types and shapes; (iv) spin characteristics other than merely RPM and reversing directions; (v) energy efficiency data when compared with alternative cooling methods (such as traditional refrigeration); and (vi) design characteristics incorporating other proprietary technologies of SuperCooler (such as the Nucleator and various aqueous solutions). Those pieces of information were not disclosed in any SuperCooler patents.

231.   SuperCooler has undertaken reasonable measures to keep such information secret and confidential. These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including

Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

232.   SuperCooler's confidential and proprietary trade secret information is not available for others in the beverage industry, the refrigeration equipment industry, or any other industry to use through any legitimate means.

233.   SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.  The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

   a.  Coke's willingness to loan SuperCooler millions of dollars so that SuperCooler could commercialize the technology for Coke while under an exclusive license agreement and ultimately provide Coke with a competitive advantage;

   b.  The significantly increased product sales generated by the Arctic Coke machines in Coke's field testing; and

   c.  The multibillion-dollar market for commercial refrigeration equipment, which would be disrupted by widespread adoption of SuperCooler's trade secrets.

234.   Coke    knowingly,    willfully,    and    maliciously    misappropriated SuperCooler's trade secrets by improperly using and disclosing them as alleged

herein.   Multiple SuperCooler trade secrets were misappropriated by Coke, as reflected in the following physical components and programming of Coke's Arctic Coke glass door cooler and nucleator:

  a. Various aspects of the Arctic Coke glass door cooler, including the Go/No-Go ready light on the glass door, and the specifications for temperature settings in the coolers to create acceptable slush levels during nucleation with minimal premature freezing.

  b. Various aspects of Coke's programming for the Arctic Coke glass door cooler, including the code that operates the Go/No-Go ready light, the code that operates the timing algorithms for resetting the Go/No-Go ready light, and the code that turns off the internal fans when the cooler door is open.

235.   Coke knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets in the improper and unlawful manner as alleged herein as well as in other ways to be revealed through discovery.  Coke either acquired the trade secrets through the misrepresentations and breaches of confidentiality described herein or had reason to know that the trade secrets were acquired through those same misrepresentations and breaches of duty.

236.   Since at least the end of 2020, Coke has knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using them in machines manufactured at the direction of and promoted by Coke.

237.   Coke's knowing, willful, and malicious misappropriation remains ongoing through Coke's continued disclosure and use of SuperCooler's confidential and proprietary trade secret information without the consent of SuperCooler as well as in other ways to be revealed through discovery.  SuperCooler believed through the end of 2020 that dispute resolution through mediation would permit Coke to continue using SuperCooler's Background IP and know-how, with proper compensation to SuperCooler.  This hope evaporated after mediation concluded without resolution.

238.   Coke's continuing knowing, willful, and malicious misappropriation is exemplified in (i) Coke's ongoing pursuit of patents covering SuperCooler technology, which had been described to Coke in strict confidence, all without any attribution of the fundamental bases of these purported inventions to SuperCooler; (ii) Coke's September 2020 partnership with the Hisense Defendants to commercialize the technology; and (iii) Coke's arrangements with COFCO Coke and the Swire Coke Defendants to market, sell, and distribute the technology.

239.  Coke also knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by disclosing them to unauthorized entities, including the following:

   a. Coke knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by disclosing them to MetalFrio even though Coke had acquired the trade secrets under circumstances (*e.g.*,

Coke's confidential relationship with SuperCooler) that gave rise to a
duty for Coke to maintain the secrecy of the trade secret or limit the use
of the trade secret;

b. Coke knowingly, willfully, and maliciously misappropriated
SuperCooler's trade secrets by disclosing them to the Hisense
Defendants even though Coke had acquired the trade secrets under
circumstances (*e.g.*, Coke's confidential relationship with
SuperCooler) that gave rise to a duty for Coke to maintain the secrecy
of the trade secret or limit the use of the trade secret;

c. Coke knowingly, willfully, and maliciously misappropriated
SuperCooler's trade secrets by disclosing them to COFCO Coke even
though Coke had acquired the trade secrets under circumstances (*e.g.*,
Coke's confidential relationship with SuperCooler) that gave rise to a
duty for Coke to maintain the secrecy of the trade secret or limit the use
of the trade secret;

d. Coke knowingly, willfully, and maliciously misappropriated
SuperCooler's trade secrets by disclosing them to the Swire Coke
Defendants even though Coke had acquired the trade secrets under
circumstances (*e.g.*, Coke's confidential relationship with
SuperCooler) that gave rise to a duty for Coke to maintain the secrecy
of the trade secret or limit the use of the trade secret; and

     e. Coke knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by disclosing them to the Coke China Entities even though Coke had acquired the trade secrets under circumstances (*e.g.*, Coke's confidential relationship with SuperCooler) that gave rise to a duty for Coke to maintain the secrecy of the trade secret or limit the use of the trade secret.

240. Coke also knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using them in the marketing of goods that embodied trade secrets, employing the trade secrets in manufacturing and production, and relying on the trade secrets to assist or accelerate Coke's research and development.

241. SuperCooler's trade secret information relates to products and services used in, or intended for use in, interstate or foreign commerce.

242. As a direct and proximate result of Coke's knowing, willful, and malicious misappropriation, SuperCooler has incurred, and will continue to incur, losses, competitive harm, irreparable injury, and significant actual damages in an amount to be proven at trial. Also as a result of the knowing, willful, and malicious misappropriation, Coke was, and will continue to be, unjustly enriched in an amount to be proven at trial.

243. The aforementioned acts of Coke were willful and malicious. SuperCooler is therefore entitled to exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C).

244.    Coke's continued use and disclosure of SuperCooler's trade secret information to other entities—such as MetalFrio, the Hisense Defendants, COFCO Coke, the Swire Coke Defendants, the Coke China Entities, and Sanmina—is destroying the value of SuperCooler's trade secrets, damaging the goodwill associated with SuperCooler's business, and causing damages that cannot be quantified adequately and for which SuperCooler cannot adequately be compensated.    This conduct caused SuperCooler monetary harm as well as irreparable and extensive harm resulting from the adulteration of its trade secrets. Furthermore, unless enjoined by order of this Court, Coke will gain an irreversible competitive advantage by being the first to commercialize SuperCooler's trade secret information and reap the profits.  These actions will irreparably diminish the value of the trade secret information to SuperCooler and prevent SuperCooler from developing its technology with other partners.  SuperCooler is entitled to an order of injunction that: (i) enjoins Coke from misappropriating SuperCooler's trade secrets; (ii) enjoins Coke from manufacturing the devices described herein for an equitable period of time and thereafter only under equitable conditions; and (iii) directs Coke to identify and return all trade secret information to SuperCooler.

**COUNT VII**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE FLORIDA**
**UNIFORM TRADE SECRETS ACT**
**(FLA. STATUTES § 688.001 *et seq.*)**
**(COKE)**

245.    SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

246.    SuperCooler's technical information, designs, and other "know-how" related to its Super Chill, Nucleator, and Rapid Chill technologies constitute trade secrets under Florida's Uniform Trade Secrets Act (§ 688.001 *et seq.*).  SuperCooler owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  Multiple SuperCooler trade secrets are reflected in Coke's patent applications, the physical components of the Arctic Coke glass door cooler, and the programming of the Arctic Coke glass door cooler.  Examples of these trade secrets include, with other to be revealed through discovery:

    a.    *Super Chill-Related Technology*: (i) optimal temperature sensor placement; (ii) supercooling temperature and metastable state information; (iii) methods of optimal fan control and airflow; (iv) methods of power management for the compressor and door heating element; ranges of on/off compressor cycles; (v) methods of overnight control to adjust compressor cycles; (vi) ready light design features; (vii) pulldown (beverage chilling) temperature testing data; (viii) methods of remote data access particularly useful for supercooling

fridge systems; (ix) door opening data; (x) design of door temperature control; (xi) defrost condition requirements for supercooling refrigeration design; (xii) beverage support rack design considerations; and (xiii) other operational requirements for use of Super Chill.

b. *Nucleator-Related Technology*: (i) operational water requirements; (ii) bowl design requirements; (iii) waterless nucleator design; (iv) operational requirements for use of the nucleator; (v) nucleator backlighting requirements; (vi) ultrasonic transducer/transmitter design; (vii) test development data for ultrasonic transducer/transmitter; (viii) inverted nucleation design considerations; and (ix) optimal power settings.

c. *Rapid Chill-Related Technology*: (i) air drying system; (ii) the integrated nucleation system; (iii) the supercooling temperatures and metastable states; and (iv) spin profiles.

247. Under confidentiality agreements, SuperCooler provided the above and other trade secrets to Coke through emails, presentations, in-person meetings, technology demonstrations, and other routine interactions as part of the partnership, from at least the time period spanning late 2014 through 2018. The following abbreviated list provides examples of communications in which trade secrets were shared with Coke in confidence:

a. <u>January through February 2015:</u> Demonstrations, discussions, and modifications to prototypes in Coke's Engineering Center;

b. <u>February 4, 2015:</u> Rapid Chill prototype demonstration;

c. <u>April 8, 2015:</u> Slideshow presentation featuring Super Chill and Rapid Chill;

d. <u>May 20, 2015:</u> E-mail from Doug Shuntich to Kirk Dahlberg sending SuperCooler's unpublished patent applications expressly noting this disclosure to be included "under the 2-way NDA . . . as part of the SOW #1 Agreement;" and

e. <u>June 25, 2015:</u> Coke asks to borrow Rapid Chill prototype and asks for a "training demo" for Coke personnel Tom Howell and Kirk Dahlberg, which is demonstrated by Coke personnel on July 16, 2015, August 26, 2015 (Coke's "Innovation Day"), and October 15, 2015 (presented to Coke's Board of Directors).

248.   None of these trade secrets is disclosed in any published SuperCooler patents or patent applications.   SuperCooler's asserted trade secrets are different from SuperCooler's patent rights.   For example, SuperCooler's nucleator patents (the '487 and '446 patents) describe generally the methods, processes, apparatuses, devices, kits, and systems for crystallizing liquid to form slush inside bottles and cans of various supercooled liquids. *See, e.g.*, '487 patent at 15:63–16:23 (Claim 1). SuperCooler's trade secrets relating to operational water requirements, bowl design

requirements, waterless nucleator design, operational requirements for use of the nucleator, nucleator backlighting, ultrasonic transducer design, test development data for the ultrasonic transducer, inverted nucleation design considerations, and optimal power settings are not disclosed in those patents.

249.    Similarly, SuperCooler's precision supercooling refrigeration device patent (the '354 patent) broadly describes the Super Chill device for supercooling a target liquid, housing a slush activation, and preventing the unwanted occurrence of frozen, ruptured containers of supercooled liquid.  *See, e.g.*, '354 patent at 16:61–17:34 (Claim 1).  The '354 patent does not disclose any of SuperCooler's Super Chill trade secrets, including, for example: (i) trade secrets relating to methods of optimal fan and air stream control; (ii) chilling temperature testing data; (iii) methods of power management; (iv) pulldown (beverage chilling) temperature testing data; (v) door opening testing data; and (vi) defrost condition requirements for the refrigeration design of the Super Chill machine, among others.

250.    Likewise, SuperCooler's Rapid Chill patents (the '988 patent and the '427 patent) describe the general system and operational parameters to rapidly chill a beverage using high-RPM, alternating rotations along a vertical axis of a container while the container is in a vertical position.  *See, e.g.*, '988 patent at 12:49–65 (Claim 1).  SuperCooler's trade secrets relating to Rapid Chill, however, include:  (i) internal motor testing data; (ii) computational fluid dynamics simulations; (iii) cooling times for a variety of beverages and container types and shapes; (iv) spin characteristics

other than merely RPM and reversing directions; (v) energy efficiency data when compared with alternative cooling methods (such as traditional refrigeration); and (vi) design characteristics incorporating other proprietary technologies of SuperCooler (such as the Nucleator and various aqueous solutions). Those pieces of information were not disclosed in any SuperCooler patents.

251.    SuperCooler has undertaken reasonable measures to keep such information secret and confidential. These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

252.    SuperCooler's confidential and proprietary trade secret information is not available for others in the beverage industry, the refrigeration equipment industry, or any other industry to use through any legitimate means.

253.    SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information. The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

      a.  Coke's willingness to loan SuperCooler millions of dollars so that SuperCooler could commercialize the technology for Coke while under

an exclusive license agreement and ultimately provide Coke with a competitive advantage;

b. The significantly increased product sales generated by the Arctic Coke machines in Coke's field testing; and

c. The multibillion-dollar market for commercial refrigeration equipment, which would be disrupted by widespread adoption of SuperCooler's trade secrets.

254. Coke knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by improperly using and disclosing them as alleged herein. Multiple SuperCooler trade secrets were misappropriated by Coke, as reflected in the following physical components and programming of Coke's Arctic Coke glass door cooler and nucleator:

a. Various aspects of the Arctic Coke glass door cooler, including the Go/No-Go ready light on the glass door, and the specifications for temperature settings in the coolers to create acceptable slush levels during nucleation with minimal premature freezing.

b. Various aspects of Coke's programming for the Arctic Coke glass door cooler, including the code that operates the Go/No-Go ready light, the code that operates the timing algorithms for resetting the Go/No-Go ready light, and the code that turns off the internal fans when the cooler door is open.

255. Coke knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets in the improper and unlawful manner as alleged herein as well as in other ways to be revealed through discovery. Coke either acquired the trade secrets through the misrepresentations and breaches of confidentiality described herein or had reason to know that the trade secrets were acquired through those same misrepresentations and breaches of duty.

256. Since at least the end of 2020, Coke knowingly, willfully, and maliciously has misappropriated SuperCooler's trade secrets by using them in machines manufactured and promoted by Coke. Coke's knowing, willful, and malicious misappropriation remains ongoing through Coke's continued disclosure and use of SuperCooler's confidential and proprietary trade secret information without the consent of SuperCooler as well as in other ways to be revealed through discovery. SuperCooler believed through the end of 2020 that dispute resolution through mediation would permit Coke to continue using SuperCooler's Background IP and know-how, with proper compensation to SuperCooler. This hope evaporated after mediation concluded without resolution.

257. Coke's continuing knowing, willful, and malicious misappropriation is exemplified in (i) Coke's ongoing pursuit of patents covering SuperCooler technology, described to Coke in strict confidence, all without any attribution of the fundamental bases of these purported inventions to SuperCooler; (ii) Coke's September 2020 partnership with the Hisense Defendants to commercialize the

technology; and (iii) Coke's arrangements with COFCO Coke and the Swire Coke

Defendants to market, sell, and distribute the technology.

258.    Coke also knowingly, willfully, and maliciously misappropriated

SuperCooler's trade secrets by disclosing them to unauthorized entities, including

the following:

a. Coke knowingly, willfully, and maliciously misappropriated
SuperCooler's trade secrets by disclosing them to MetalFrio even
though Coke had acquired the trade secrets under circumstances (*e.g.*,
Coke's confidential relationship with SuperCooler) that gave rise to a
duty for Coke to maintain the secrecy of the trade secret or limit the use
of the trade secret;

b. Coke knowingly, willfully, and maliciously misappropriated
SuperCooler's trade secrets by disclosing them to the Hisense
Defendants even though Coke had acquired the trade secrets under
circumstances (*e.g.*, Coke's confidential relationship with
SuperCooler) that gave rise to a duty for Coke to maintain the secrecy
of the trade secret or limit the use of the trade secret;

c. Coke knowingly, willfully, and maliciously misappropriated
SuperCooler's trade secrets by disclosing them to COFCO Coke even
though Coke had acquired the trade secrets under circumstances (*e.g.*,
Coke's confidential relationship with SuperCooler) that gave rise to a

duty for Coke to maintain the secrecy of the trade secret or limit the use of the trade secret;

d.  Coke knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by disclosing them to the Swire Coke Defendants even though Coke had acquired the trade secrets under circumstances (*e.g.*, Coke's confidential relationship with SuperCooler) that gave rise to a duty for Coke to maintain the secrecy of the trade secret or limit the use of the trade secret; and

e.  Coke knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by disclosing them to the Coke China Entities even though Coke had acquired the trade secrets under circumstances (*e.g.*, Coke's confidential relationship with SuperCooler) that gave rise to a duty for Coke to maintain the secrecy of the trade secret or limit the use of the trade secret.

259.  Coke also knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using them in the marketing of goods that embodied trade secrets, employing the trade secrets in manufacturing and production, and relying on the trade secrets to assist or accelerate Coke's research and development.

260.  As a direct and proximate result of Coke's knowing, willful, and malicious misappropriation, SuperCooler has incurred, and will continue to incur, losses, competitive harm, irreparable injury, and significant actual damages in an

amount to be proven at trial. Also as a result of the knowing, willful, and malicious misappropriation, Coke was, and will continue to be, unjustly enriched in an amount to be proven at trial.

261. As a direct and proximate result of Coke's knowing, willful, and malicious misappropriation, SuperCooler has incurred, and will continue to incur, actual damages in an amount to be proven at trial. Also as a result of the knowing, willful, and malicious misappropriation, Coke was, and will continue to be, unjustly enriched in an amount to be proven at trial.

262. The aforementioned acts of Coke were intentional, willful, and malicious. SuperCooler is therefore entitled to exemplary damages under Florida Statute § 688.004(2) and an award of attorneys' fees under Florida Statute § 688.005.

263. Coke's continued use and disclosure of SuperCooler's trade secret information to other entities—such as MetalFrio, the Hisense Defendants, COFCO Coke, the Swire Coke Defendants, the Coke China Entities, and Sanmina—is destroying the value of SuperCooler's trade secrets, damaging the goodwill associated with SuperCooler's business, and causing damages that cannot be quantified adequately and for which SuperCooler cannot adequately be compensated. This conduct caused SuperCooler monetary harm as well as irreparable and extensive harm resulting from the adulteration of its trade secrets. Furthermore, unless enjoined by order of this Court, Coke will gain an irreversible competitive advantage by being the first to commercialize SuperCooler's trade

secret information and reap the profits.  These actions irreparably will diminish the

value of the trade secret information to SuperCooler and prevent SuperCooler from

developing its technology with other partners.  Pursuant to Florida Statute § 688.003,

SuperCooler is entitled to an order of injunction that: (i) enjoins Coke from

misappropriating SuperCooler's trade secrets; (ii) enjoins Coke from manufacturing

the devices described herein for an equitable period of time and thereafter only under

equitable conditions; and (iii) directs Coke to identify and return all trade secret

information to SuperCooler.

## <u>COUNT VIII</u>
## <u>CORRECTION OF INVENTORSHIP UNDER 35 U.S.C. § 256</u>
### (COKE)

264.  SuperCooler incorporates the allegations set forth at Paragraphs 1

through 179 as if fully set forth herein.

265.  There is a real and substantial controversy between the parties

regarding the inventorship of the '214 patent which is real and concrete and touches

on the legal relations of SuperCooler and Coke.

266.  The '214 patent is assigned inappropriately to The Coca-Cola

Company.  The '214 patent generally relates to a "cooler with shelf plenum" that

can be used to supercool beverages without freezing them by controlling and

distributing airflow through a series of air channels (plenums) underneath the

beverage-supporting shelves.

- 114 -

267.    Mr. Shuntich conceived of this refrigeration design and he contributed novel concepts and work to the inventions claimed in the '214 patent that are not insignificant in quality, when those contributions are measured against the dimension of the full invention.  These contributions include the plenum structure with a plurality of openings, the supply duct running along the back of the machine, the enclosed return duct at the top of the machine, and the control mechanisms for limiting airflow through the plenums.  These contributions did more than merely explain well-known concepts or the current state of the art in refrigeration technology.  Mr. Shuntich provided these contributions in late 2014 and early 2015, before the earliest possible effective date of the '214 patent—November 30, 2016, the filing date of the earliest provisional to which the '214 patent claims priority.

268.    Mr. Hawkins was employed in Coke's Engineering Center at the time Mr. Shuntich was completing the modifications to the B-25 prototypes. Accordingly, Mr. Hawkins had access to the confidential prototypes created by Mr. Shuntich and he received confidential information from SuperCooler personnel, including Jeff Persing, in their discussions regarding the prototypes.  Mr. Hawkins could not have conceived, and did not conceive, of the claimed plenum structure for the coolers described in the '214 patent without reliance on Mr. Shuntich's prior conceptions and contributions.  SuperCooler will provide Mr. Hawkins notice of this action via Federal Express such that he will have the opportunity to be heard, should he desire.

269.    Mr. Shuntich did not assign his inventorship rights to Coke relating to

his work on the B-25s.  In fact, SuperCooler retains all right, title, and interest in Mr.

Shuntich's intellectual property, including any interest in the '214 patent.

Accordingly, there is a dispute as to both the correct naming of inventors on the '214

patent as well as a dispute as to the correct ownership of this patent.  The '214 patent

must be corrected under 35 U.S.C. § 256 or it is otherwise invalid.

270.    SuperCooler seeks a judgment that Mr. Shuntich is an inventor of the

'214 patent and an order instructing the Patent Office to correct the '214 patent to

properly include Mr. Shuntich as an inventor and SuperCooler Technologies, Inc. as

owner.  SuperCooler is entitled to its reasonable attorneys' fees, costs, and interest

and other expenses as allowed by 35 U.S.C. § 285 or any other applicable provisions

or statutes.

## COUNT IX
## CORRECTION OF INVENTORSHIP UNDER 35 U.S.C. § 256
### (COKE)

271.    SuperCooler incorporates the allegations set forth at Paragraphs 1

through 179 as if fully set forth herein.

272.    There is a real and substantial controversy between the parties

regarding the inventorship of U.S. Patent No. 11,690,388 ("the '388 patent"), which

is real and concrete and touches on the legal relations of SuperCooler and Coke.

273.    The '388 patent inappropriately is assigned to The Coca-Cola

Company.  The '388 patent generally relates to a "waterless ice crystal nucleator for

supercooled beverages."  At its core, the '388 patent is based on the concept of inverted nucleation through ultrasonic energy transmitted through a beverage cap while the bottle is inverted.



'388 patent at Fig. 1.

274.  Mr. Shuntich conceived of this inverted nucleation design and he contributed novel concepts and work to the inventions claimed in the '388 patent that are not insignificant in quality, when those contributions are measured against the dimension of the full invention.  These contributions include a description of the benefits of such a design to Coke; knowledge that the relatively-flat geometry of the top of the beverage lid provided a superior point of contact to the more complex geometries of the bottoms of beverage containers for an ultrasonic nucleator; the importance of moving the excess air bubble in the empty space of the container through the supercooled liquid, something that would occur naturally in an inverted nucleation design; and that a lower power setting could be used with such an inverted design, reducing energy consumption.  These contributions did more than merely explain well-known concepts or the current state of the art beverage nucleation

technology (a nascent technology at that time).   Mr. Shuntich provided these contributions in late 2014 and early 2015, before the earliest possible effective date of the '388 patent—February 28, 2017, the filing date of the earliest provisional to which the '388 patent claims priority.

275.   Ms. Sekita, who is listed as the first named inventor on the '388 patent, and Mr. Howell (who worked closely with Ms. Sekita) were employed by Coke during the time when SuperCooler disclosed this design to Coke.  Both Ms. Sekita and Mr. Howell asked extensive questions to Mr. Shuntich about the SuperCooler nucleator and potential design options, which Mr. Shuntich answered under the confidentiality and limited use provisions of the agreements between SuperCooler and Coke.  Accordingly, Ms. Sekita and Mr. Howell had access to the confidential prototypes created by Mr. Shuntich and SuperCooler, and received confidential information from Mr. Shuntich in their discussions regarding the SuperCooler Nucleator.  Ms. Sekita could not have, and did not conceive of the claimed inverted nucleator design where the ultrasonic transducer transmits energy through direct contact on the container's closure, as described in the '388 patent, without reliance on Mr. Shuntich's prior conceptions and contributions.  SuperCooler will provide Ms. Sekita notice of this action via Federal Express such that she will have the opportunity to be heard, should she desire.

276.   Mr. Shuntich did not assign his inventorship rights to Coke relating to his design of inverted nucleation.  In fact, SuperCooler retains all right, title, and

interest in Mr. Shuntich's intellectual property, including any interest in the '388 patent. Accordingly, there is a dispute as to both the correct naming of inventors on the '388 patent as well as a dispute as to the correct ownership of this patent. The '388 patent must be corrected under 35 U.S.C. § 256 or it is otherwise invalid.

277.    SuperCooler seeks a judgment that Mr. Shuntich is an inventor of the '388 patent and an order instructing the Patent Office to correct the patent to properly include Mr. Shuntich as an inventor and SuperCooler Technologies, Inc. as owner. SuperCooler is entitled to its reasonable attorneys' fees, costs, and interest and other expenses as allowed by 35 U.S.C. § 285 or any other applicable provisions or statutes.

## COUNT X
## FRAUD IN THE INDUCEMENT
### (COKE)

278.    SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

279.    As set forth more particularly above, Coke intentionally made material misrepresentations, misstatements, and omissions with the intention of leading SuperCooler to believe that SuperCooler would be the exclusive manufacturer of Nucleators and supercoolers for Coke, unless, and only to the extent, SuperCooler agreed otherwise. Coke repeatedly represented to SuperCooler and the public that Coke and SuperCooler were partners in the development and manufacture of Nucleators, supercoolers, and other technologies.

280.   More specifically, Coke's representations fraudulently induced SuperCooler to enter into the February 2, 2017 transaction consisting of the Note, Note Purchase Agreement, and First MSA Amendment (the "2017 Transaction"). SuperCooler has performed the Note Purchase Agreement, and the only executory contracts are the Note and the First MSA Amendment.

281.   Coke made statements that intentionally led SuperCooler to believe that SuperCooler would be the exclusive manufacturer of Nucleators and supercoolers for Coke, unless, and only to the extent, SuperCooler agreed otherwise.   Coke instructed SuperCooler to prepare for mass manufacturing and rollout of SuperCooler's Nucleators and supercoolers, represented to SuperCooler in negotiations that SuperCooler would be the "end-to-end" supplier of Nucleators, and listed SuperCooler as the manufacturer on internal Coke documents.  Coke also told SuperCooler that it would be "tough" for SuperCooler to be the "cooler supplier" for the 1,000 units, but Coke remained "open" to partnering with SuperCooler beyond the first 1,000 units.

282.   After February 2017, SuperCooler learned that Coke decided to have another party produce all the supercoolers and all the Nucleators except the Nucleator "smart board" controllers, which SuperCooler would supply.

283.   Coke fraudulently failed to disclose material information before SuperCooler entered into the 2017 Transaction.  For example, Coke failed to disclose that Coke planned to use MetalFrio from at least as early as 2016.

284.   Coke also fraudulently failed to disclose that Coke secretly was applying for patents on technologies that SuperCooler invented and that SuperCooler had disclosed to Coke in confidence.   By entering into the 2017 Transaction, SuperCooler incurred $3,000,000 in debt with the understanding that it could monetize its valuable trade secrets and intellectual property to repay the debt. During the negotiations of the 2017 Transaction, Coke did not disclose to SuperCooler that Coke secretly was applying for patents on SuperCooler's technologies, which patents would, when disclosed to the public, destroy the value of SuperCooler's trade secrets and deny SuperCooler the ability to monetize its technologies to repay the Note.   Coke's failure to disclose this information was a material omission in furtherance of fraudulently inducing SuperCooler to enter into the 2017 Transaction.

285.   At the time Coke made such statements and omitted such information, Coke knew that its statements were false and that its omissions were misleading and intentional.   Coke made such statements and omitted such information with the intent to induce SuperCooler to enter into the Note and Note Purchase Agreement with Coke so that Coke could obtain favorable terms and use other entities to manufacture Nucleators and other critical components.

286.   SuperCooler justifiably relied upon Coke's statements and omissions in deciding to enter into the 2017 Transaction and in incurring debt and the costs of preparing to be the exclusive or primary manufacturer of Rapid Chill, Super Chill,

and the Nucleators, unless, and only to the extent, SuperCooler agreed otherwise. The ability to monetize its technologies and the prospect of being Coke's sole or primary supplier were material to SuperCooler's decision to enter into the 2017 Transaction with Coke.   SuperCooler would not have entered into the 2017 Transaction on the terms reflected in the transaction documents if SuperCooler had known the information that Coke failed to disclose.  SuperCooler placed its trust and confidence in Coke as a long-term exclusive partner based on the parties' contractual arrangement and other representations made by Coke.  The claim accrued when SuperCooler suffered damages as a result of the fraudulent inducement.

287.   As the direct and proximate result of Coke's fraud in the inducement, SuperCooler has sustained actual damages in an amount to be proven at trial.

288.   The aforementioned acts were intentional, egregious, fraudulent, willful, malicious, deliberately oppressive, and part of a pattern of conduct directed at the public in general.  SuperCooler is therefore entitled to punitive damages.  Coke acted in bad faith and SuperCooler is entitled to attorneys' fees.

## COUNT XI
## UNJUST ENRICHMENT
### (COKE)

289.   SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

290.   Separate from contractual agreements, SuperCooler directly conferred several highly valuable benefits to Coke in the course of the parties' partnership and

following the partnership, including: (i) loaning Coke equipment and demonstration models; (ii) training Coke personnel to use various equipment; (iii) providing on-site consultation services to Coke; (iv) providing engineering adjustments to Coke equipment; (v) developing and providing training manuals for Coke equipment; (vi) assisting with problems Coke encountered with MetalFrio-manufactured equipment; and (v) giving Coke the ability to market itself to the public as an innovator and the first-to-market with an operating device for supercooling and nucleating beverages.

291.    SuperCooler's conferral of these benefits was induced by Coke's promises that SuperCooler would be the exclusive manufacturer of Nucleators and supercoolers for Coke, unless, and only to the extent, SuperCooler agreed otherwise.

292.    In addition, Coke has profited from the revenue of the Arctic Coke machines currently in service around the world.

293.    Coke voluntarily and knowingly accepted the benefits that SuperCooler conferred and continues to retain them at SuperCooler's expense and without adequately compensating SuperCooler.

294.    The circumstances are such that it would be inequitable and unjust for Coke to retain the benefits conferred by SuperCooler without paying SuperCooler the reasonable market value of those benefits, which will be proven at trial.

295.    The benefits described above that SuperCooler conferred and that Coke received are not covered by the MSA.

## COUNT XII
## PROMISSORY ESTOPPEL
### (COKE)

296.    SuperCooler incorporates the allegations set forth at Paragraphs 1
through 179 as if fully set forth herein.

297.    Coke clearly and unambiguously promised SuperCooler that
SuperCooler would be the exclusive manufacturer of Nucleators and supercoolers
for Coke, unless, and only to the extent, SuperCooler agreed otherwise.    Coke
instructed SuperCooler to prepare for mass manufacturing and rollout of
SuperCooler's Nucleators and supercoolers, represented to SuperCooler in
negotiations that SuperCooler would be the "end-to-end" supplier of Nucleators, and
listed SuperCooler as the manufacturer on internal documents.

298.    Coke reasonably should have known or expected these promises to
induce action, reliance, or forbearance by SuperCooler.

299.    SuperCooler did, in fact, reasonably and foreseeably take action due to
its reliance on Coke's promises.   SuperCooler expended its limited capital to ramp
up for anticipated production of thousands of supercoolers and made arrangements
with multiple factories.    Coke's promises left SuperCooler on the hook for
prepayments for parts, production, molds, supplies, and multiple certifications (*e.g.*,
ISO 9001, CCC, UL, and ETL) for complete assemblies that Coke had no intention
of ever buying from SuperCooler.

300.   Coke's promises also induced reasonable and foreseeable forbearance by SuperCooler.  Due to Coke's promises, SuperCooler believed that it had a reliable partner in Coke and therefore refrained from seeking out another business partner to help commercialize its technology.

301.   Injustice can be avoided only by enforcement of Coke's promises because, as a result of its reliance on Coke's promises, SuperCooler changed its position to its detriment by surrendering, forgoing, or rendering a valuable right.

302.   SuperCooler is entitled to recover the amount necessary to restore it to the position it would have occupied if Coke's promises had not been made, and that amount will be proven at trial.

## COUNT XIII
## DECLARATORY RELIEF (28 U.S.C. § 2201)
## (COKE, METALFRIO, THE HISENSE DEFENDANTS, COFCO COKE, THE SWIRE COKE DEFENDANTS)

303.   SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

304.   "[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

305. A real, substantial, and continuing controversy exists between SuperCooler and Coke; between SuperCooler and MetalFrio; between SuperCooler

and the Hisense Defendants; between SuperCooler and COFCO Coke; and between SuperCooler and the Swire Coke Defendants regarding: (i) whether SuperCooler was in possession of trade secrets, which it disclosed to Coke in trust and confidence; (ii) whether those trade secrets were Background IP under the terms of the MSA; (iii) whether Coke breached the terms of the MSA and its fiduciary duties to SuperCooler by misappropriating SuperCooler's trade secrets and attempting to reverse engineer SuperCooler's technology; (iv) whether MetalFrio, the Hisense Defendants, COFCO Coke, or the Swire Coke Defendants accepted SuperCooler's trade secrets from Coke with the knowledge or reason to know that Coke misappropriated them from SuperCooler; (v) whether Coke, MetalFrio, the Hisense Defendants, COFCO Coke, or the Swire Coke Defendants have continued to use, market, and develop machines and equipment embodying SuperCooler's trade secrets; and (vi) Coke ultimately claiming SuperCooler's technology as its own.

306.   This controversy is definite and concrete and touches on the legal relations of SuperCooler and Coke—namely, the parties' contractual and fiduciary relationships and the ownership of the Super Chill, Rapid Chill, and Nucleator technology.  The definite and concrete controversy also touches on the legal relations of SuperCooler and Coke, MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants—namely, the misappropriation of SuperCooler's trade secrets by Coke, MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants.

307.  The harm caused by Coke's, MetalFrio's, the Hisense Defendants',
COFCO Coke's, and the Swire Coke Defendants' misappropriation and/or assertion
of ownership over SuperCooler's technology is ongoing and will continue into the
foreseeable future.

## COUNT XIV
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## (FLA. STATUTES § 501.201 *et seq.*)
## (COKE)

308.  SuperCooler incorporates the allegations set forth at Paragraphs 1
through 179 as if fully set forth herein.

309.  Coke engaged in a deceptive or unfair act or practice in the conduct of
its trade or commerce.  As more fully alleged herein, Coke engaged in deceptive and
unfair practices in connection with the Note and Note Purchase Agreement and the
2018 Licensing Agreement when Coke made promises to SuperCooler that Coke
had no intention of keeping.

310.  Coke also engaged in deceptive or unfair acts or practices when it
breached its confidentiality obligations to SuperCooler by intentionally disclosing
SuperCooler's confidential information, trade secrets, and background intellectual
property to SuperCooler's competitors such as MetalFrio, the Hisense Defendants,
COFCO Coke, the Swire Coke Defendants, and the Coke China Entities for purposes
of commercializing SuperCooler's technologies, which commercialization directly
competes with and injures SuperCooler.

311.   Coke also engaged in deceptive or unfair acts or practices when it reverse engineered—and enlisted others to reverse engineer—SuperCooler's technology despite the parties' confidential relationship, the parties' agreed implicit and explicit limitations on use of confidential information, and Coke's representations to SuperCooler that it would not reverse engineer SuperCooler's technology.   This reverse engineering directly competes with and injures SuperCooler.

312.   Coke also engaged in deceptive or unfair acts or practices when, contrary to the parties' agreement and understanding, Coke intentionally cut SuperCooler out of the production process in order to commercialize SuperCooler's technologies with SuperCooler's competitors such as MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants.   This commercialization directly competes with and injures SuperCooler.

313.   Coke also engaged in deceptive or unfair acts or practices when it intentionally misappropriated SuperCooler's trade secrets and wrongfully disclosed them to SuperCooler's competitors such as MetalFrio, the Hisense Defendants, COFCO Coke, the Swire Coke Defendants, and the Coke China Entities in order to commercialize SuperCooler's technologies.   This commercialization directly competes with and injures SuperCooler.

314. Coke's    actions    constitute    unfair    methods    of    competition, unconscionable acts or practices, and unfair and deceptive acts or practices in the

conduct of trade or commerce as proscribed by Florida Statutes §501.204(1). Moreover, Coke's actions offend established public policy and are otherwise immoral, unethical, oppressive, unscrupulous, and substantially injurious to SuperCooler.

315.   As the direct and proximate result of Coke's deceptive and unfair acts or practices, SuperCooler has sustained substantial actual damages in an amount to be proven at trial.  SuperCooler is entitled to attorneys' fees arising from Coke's violations of the Florida Deceptive and Unfair Trade Practices Act.

## COUNT XV
## LANHAM ACT (15 U.S.C § 1125)
### (COKE)

316.   SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

317.   Coke continues to produce the Arctic Coke, which is an inferior embodiment of SuperCooler's trade secret technology concerning the Super Chill.

318.   Coke continues to represent to the public that it developed the technologies embodied in the supercoolers and nucleators after conducting independent research spanning 20 years, even though SuperCooler was the company that originally developed the underlying technologies.  These confusing representations appear in Coke advertising, including statements made with Coke's knowledge by Coke's manufacturing and distribution affiliates, and on

manufacturing labels affixed to the physical supercoolers, which do not contain any

attribution to SuperCooler.

319.   Coke's continued representations are likely to mislead a substantial

segment of the market for the Super Chill and cause consumer confusion as to the

origin of the technology.  This is evidenced by the continued exposure of the Arctic

Coke on social media, which continues to this day.

320.   Coke's continued representations concerning the Arctic Coke are in the

stream of interstate commerce.

321.   As a direct and proximate result of Coke acts, SuperCooler has

sustained actual damages in an amount to be proven at trial.

**COUNT XVI**
**VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. §§ 1836–39)**
**(METALFRIO)**

322.   SuperCooler incorporates the allegations set forth at Paragraphs 1

through 179 as if fully set forth herein.

323.   SuperCooler's technical information, designs, and other "know-how"

related to its Super Chill and Rapid Chill technologies constitute trade secrets under

the Defend Trade Secrets Act (18 U.S.C. §§ 1836–39).  SuperCooler owns and

possesses certain trade secret information, as alleged above.  Multiple SuperCooler

trade secrets are reflected in the physical components of the Arctic Coke glass door

cooler and the programming of the Arctic Coke glass door cooler that MetalFrio

manufactured and continues to manufacture for Coke.  Examples of these trade

secrets include, with others to be revealed through discovery:

    a.  *Super Chill-Related Technology*: (i) optimal temperature sensor
    placement; (ii) supercooling temperature and metastable state
    information; (iii) methods of optimal fan control and airflow; (iv)
    methods of power management for the compressor and door heating
    element; ranges of on/off compressor cycles; (v) methods of overnight
    control to adjust compressor cycles; (vi) ready light design features;
    (vii) pulldown (beverage chilling) temperature testing data; (viii)
    methods of remote data access particularly useful for supercooling
    fridge systems; (ix) door opening data; (x) design of door temperature
    control; (xi) defrost condition requirements for supercooling
    refrigeration design; and (xii) other operational requirements for use of
    Super Chill.

    b.  *Nucleator-Related Technology*: (i) operational water requirements; (ii)
    bowl design requirements; (iii) waterless nucleator design; (iv)
    operational requirements for use of the nucleator; (v) nucleator
    backlighting requirements; (vi) ultrasonic transducer/transmitter
    design; (vii) test development data for ultrasonic
    transducer/transmitter; and (viii) optimal power settings.

324.   None of these trade secrets is disclosed in SuperCooler's patents or patent applications.

325.   SuperCooler has undertaken reasonable measures to keep such information secret and confidential.  These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

326.   SuperCooler's confidential and proprietary trade secret information is not available for others in the beverage industry, the refrigeration equipment industry, or any other industry to use through any legitimate means.

327.   SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.  The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

  a.   Coke's willingness to loan SuperCooler millions of dollars so that SuperCooler could commercialize the technology for Coke while under an exclusive license agreement and ultimately provide Coke with a competitive advantage;

b. The significantly increased product sales generated by the Arctic Coke machines in Coke's field testing; and

c. The multibillion-dollar market for commercial refrigeration equipment, which would be disrupted by widespread adoption of SuperCooler's trade secrets.

328.   In or around December 2017, MetalFrio knew or had reason to know that Coke obtained trade secrets from SuperCooler subject to confidentiality and use restrictions, explicit and implied.

329.   Since at least the end of 2020, MetalFrio knowingly, willfully, and maliciously has misappropriated SuperCooler's trade secrets by using them in machines manufactured and promoted by Coke and MetalFrio.  Coke and MetalFrio continue to knowingly, willfully, and maliciously misappropriate SuperCooler's trade secrets.

330.   MetalFrio knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using them in various ways: (i) MetalFrio used SuperCooler's trade secrets to manufacture or produce supercoolers for Coke that employ SuperCooler's trade secrets; (ii) MetalFrio used SuperCooler's trade secrets by relying on SuperCooler's trade secrets to assist or accelerate MetalFrio's own research and development; and (iii) MetalFrio used SuperCooler's trade secrets by marketing supercoolers to Coke that embodied SuperCooler's trade secrets. MetalFrio's knowing, willful, and malicious misappropriation remains ongoing

through its continued manufacture, maintenance, and/or research and development of the Arctic Coke machines.

331.   As a direct and proximate result of MetalFrio's knowing, willful, and malicious misappropriation, SuperCooler has incurred, and will continue to incur, losses, competitive harm, irreparable injury, and significant actual damages in an amount to be proven at trial.  Also as a result of the knowing, willful, and malicious misappropriation, MetalFrio was, and will continue to be, unjustly enriched in an amount to be proven at trial.

332.   SuperCooler's trade secret information relates to products and services used in, or intended for use in, interstate or foreign commerce.

333.   The aforementioned acts of MetalFrio were willful and malicious. SuperCooler is therefore entitled to exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C).

334.   As a direct and proximate result of MetalFrio's knowing, willful, and malicious misappropriation, SuperCooler will suffer injuries of a continuing nature for which SuperCooler has no adequate remedy at law.  Unless enjoined by order of this Court, MetalFrio will gain an irreversible competitive advantage by being the first to commercialize SuperCooler's trade secret information and reap the profits. These actions will irreparably diminish the value of the trade secret information to SuperCooler and prevent SuperCooler from developing its technology with other partners.  SuperCooler is entitled to an order of injunction that: (i) enjoins MetalFrio

from misappropriating SuperCooler's trade secrets; (ii) enjoins MetalFrio from manufacturing the devices described herein for an equitable period of time and thereafter only under equitable conditions; and (iii) directs MetalFrio to identify and return all trade secret information to SuperCooler.

## COUNT XVII
## VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT
## (FLA. STATUTES § 688.001 *et seq.*)
## (METALFRIO)

335.    SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

336.    SuperCooler's technical information, designs, and other "know-how" related to its Super Chill and Rapid Chill technologies constitute trade secrets under the Florida Uniform Trade Secrets Act (§ 688.001 *et seq.*).  SuperCooler owns and possesses certain trade secret information, as alleged above.  Multiple SuperCooler trade secrets are reflected in the physical components of the Arctic Coke glass door cooler and the programming of the Arctic Coke glass door cooler that MetalFrio manufactured for Coke.  Examples of these trade secrets include, with others to be revealed through discovery:

   a.  *Super Chill-Related Technology*: (i) optimal temperature sensor placement; (ii) supercooling temperature and metastable state information; (iii) methods of optimal fan control and airflow; (iv) methods of power management for the compressor and door heating

element; ranges of on/off compressor cycles; (v) methods of overnight control to adjust compressor cycles; (vi) ready light design features; (vii) pulldown (beverage chilling) temperature testing data; (viii) methods of remote data access particularly useful for supercooling fridge systems; (ix) door opening data; (x) design of door temperature control; (xi) defrost condition requirements for supercooling refrigeration design; and (xii) other operational requirements for use of Super Chill.

b. *Nucleator-Related Technology*: (i) operational water requirements; (ii) bowl design requirements; (iii) waterless nucleator design; (iv) operational requirements for use of the nucleator; (v) nucleator backlighting requirements; (vi) ultrasonic transducer/transmitter design; (vii) test development data for ultrasonic transducer/transmitter; and (viii) optimal power settings.

337. None of these trade secrets is disclosed in SuperCooler's patents or patent applications.

338. SuperCooler has undertaken reasonable measures to keep such information secret and confidential. These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including

Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

339.   SuperCooler's confidential and proprietary trade secret information is not available for others in the beverage industry, the refrigeration equipment industry, or any other industry to use through any legitimate means.

340.   SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.  The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

    a.  Coke's willingness to loan SuperCooler millions of dollars so that SuperCooler could commercialize the technology for Coke while under an exclusive license agreement and ultimately provide Coke with a competitive advantage;

    b.  The significantly increased product sales generated by the Arctic Coke machines in Coke's field testing; and

    c.  The multibillion-dollar market for commercial refrigeration equipment, which would be disrupted by widespread adoption of SuperCooler's trade secrets.

341.  In or around December 2017, MetalFrio knew or had reason to know that Coke obtained trade secrets from SuperCooler subject to confidentiality and use restrictions, explicit and implied.

342.  Since at least the end of 2020, MetalFrio has knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using them in machines manufactured and promoted by Coke and MetalFrio.  Coke and MetalFrio continue to knowingly, willfully, and maliciously misappropriate SuperCooler's trade secrets.

343.  MetalFrio knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using them in various ways:  (i) MetalFrio used SuperCooler's trade secrets to manufacture or produce supercoolers for Coke that employ SuperCooler's trade secrets; (ii) MetalFrio used SuperCooler's trade secrets by relying on SuperCooler's trade secrets to assist or accelerate MetalFrio's own research and development; and (iii) MetalFrio used SuperCooler's trade secrets by marketing supercoolers to Coke that embodied SuperCooler's trade secrets. MetalFrio's knowing, willful, and malicious misappropriation remains ongoing through its continued manufacture, maintenance, and/or research and development of the Arctic Coke machines.

344.  As a direct and proximate result of MetalFrio's knowing, willful, and malicious misappropriation, SuperCooler has incurred, and will continue to incur, losses, competitive harm, irreparable injury, and significant actual damages in an amount to be proven at trial.  Also as a result of the knowing, willful, and malicious

misappropriation, MetalFrio was, and will continue to be, unjustly enriched in an amount to be proven at trial.

345.   The aforementioned acts of MetalFrio were willful and malicious. SuperCooler is therefore entitled to exemplary damages under Florida Statute § 688.004(2) and an award of attorneys' fees under Florida Statute § 688.005.

346.   As a direct and proximate result of MetalFrio's knowing, willful, and malicious misappropriation, SuperCooler will suffer injuries of a continuing nature for which SuperCooler has no adequate remedy at law.  Unless enjoined by order of this Court, MetalFrio will gain an irreversible competitive advantage by being the first to commercialize SuperCooler's trade secret information and reap the profits. These actions irreparably diminish the value of the trade secret information to SuperCooler and prevent SuperCooler from developing its technology with other partners.  Pursuant to Florida Statute § 688.003, SuperCooler is entitled to an order of injunction that: (i) enjoins MetalFrio from misappropriating SuperCooler's trade secrets; (ii) enjoins MetalFrio from manufacturing the devices described herein for an equitable period of time and thereafter only under equitable conditions; and (iii) directs MetalFrio to identify and return all trade secret information to SuperCooler.

## COUNT XVIII
## VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. §§ 1836–39)
### (THE HISENSE DEFENDANTS)

347.   SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

348.    The Hisense Defendants are the manufacturing partner of Coke responsible for producing the supercooling refrigerator and inverted nucleator combination machine that Coke currently is rolling out throughout Asia.

349.    SuperCooler's technical information, designs, and other "know-how" related to its Super Chill and Rapid Chill technologies constitute trade secrets under the Defend Trade Secrets Act (18 U.S.C. §§ 1836–39).    SuperCooler owns and possesses certain trade secret information, as alleged above.    Multiple SuperCooler trade secrets are reflected in the physical components of the glass door cooler and the programming of the glass door cooler that the Hisense Defendants manufactured and manufacture for Coke.    Examples of these trade secrets include, with others to be revealed through discovery:

    a. *Super Chill-Related Technology:* (i) optimal temperature sensor placement; (ii) supercooling temperature and metastable state information; (iii) methods of optimal fan control and airflow; (iv) methods of power management for the compressor and door heating element; ranges of on/off compressor cycles; (v) methods of overnight control to adjust compressor cycles; (vi) ready light design features; (vii) pulldown (beverage chilling) temperature testing data; (viii) methods of remote data access particularly useful for supercooling fridge systems; (ix) door opening data; (x) design of door temperature control; (xi) defrost condition requirements for supercooling

refrigeration design; (xii) beverage support rack considerations; and

(xiii) other operational requirements for use of Super Chill.

b. _Nucleator-Related Technology_: (i) waterless nucleator design; (ii)

operational requirements for use of the nucleator; (iii) nucleator

backlighting requirements; (iv) ultrasonic transducer/transmitter

design; (v) test development data for ultrasonic transducer/transmitter;

(vi) optimal power settings; and (vii) inverted nucleation design

considerations.

350.   None of these trade secrets is disclosed in SuperCooler's patents or

patent applications.

351.   SuperCooler has undertaken reasonable measures to keep such

information secret and confidential.  These efforts include, but are not limited to, the

use of secure computer and networks systems and the use of confidentiality

agreements and non-disclosure agreements to require vendors, partners (including

Coke), contractors, and employees to maintain the secrecy of SuperCooler's

confidential information.

352.   SuperCooler's confidential and proprietary trade secret information is

not available for others in the beverage industry, the refrigeration equipment

industry, or any other industry to use through any legitimate means.

353.   SuperCooler's trade secret information derives independent economic

value from not being generally known to, and not being readily ascertainable through

proper means by, another person who could obtain economic value from the disclosure or use of the information. The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

a. Coke's willingness to loan SuperCooler millions of dollars so that SuperCooler could commercialize the technology for Coke while under an exclusive license agreement and ultimately provide Coke with a competitive advantage;

b. The significantly increased product sales generated by the machines in Coke's field testing; and

c. The multibillion-dollar market for commercial refrigeration equipment, which would be disrupted by widespread adoption of SuperCooler's trade secrets.

354. Since at least the end of 2020, Coke and the Hisense Defendants have knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using them in machines manufactured and promoted by Coke and the Hisense Defendants. Coke and the Hisense Defendants continue to knowingly, willfully, and maliciously misappropriate SuperCooler's trade secrets.

355. In or around February 2023, the Hisense Defendants knew or had reason to know that Coke obtained trade secrets from SuperCooler subject to confidentiality and use restrictions, explicit and implied. The Hisense Defendants knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets

by using them in various ways:  (i) the Hisense Defendants used SuperCooler's trade secrets to manufacture or produce supercoolers for Coke that employ SuperCooler's trade secrets; (ii) the Hisense Defendants used SuperCooler's trade secrets by relying on SuperCooler's trade secrets to assist or accelerate the Hisense Defendants' own research and development; and (iii) the Hisense Defendants used SuperCooler's trade secrets by marketing supercoolers to Coke that embodied SuperCooler's trade secrets.  The Hisense Defendants' knowing, willful, and malicious misappropriation remains ongoing through its continued manufacture, maintenance, and/or research and development of the machines.

356.   As a direct and proximate result of the Hisense Defendants' knowing, willful, and malicious misappropriation, SuperCooler has incurred, and will continue to incur, losses, competitive harm, irreparable injury, and significant actual damages in an amount to be proven at trial.  Also as a result of the knowing, willful, and malicious misappropriation, the Hisense Defendants were, and will continue to be, unjustly enriched in an amount to be proven at trial.

357.   SuperCooler's trade secret information relates to products and services used in, or intended for use in, interstate or foreign commerce.

358.   The aforementioned acts of the Hisense Defendants were willful and malicious.  SuperCooler is therefore entitled to exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C).

359.    As a direct and proximate result of the Hisense Defendants' knowing, willful, and malicious misappropriation, SuperCooler will suffer injuries of a continuing nature for which SuperCooler has no adequate remedy at law.  Unless enjoined by order of this Court, the Hisense Defendants will gain an irreversible competitive advantage by being the first to commercialize SuperCooler's trade secret information and reap the profits.  These actions will irreparably diminish the value of the trade secret information to SuperCooler and prevent SuperCooler from developing its technology with other partners.  SuperCooler is entitled to an order of injunction that: (i) enjoins the Hisense Defendants from misappropriating SuperCooler's trade secrets; (ii) enjoins the Hisense Defendants from manufacturing the devices described herein for an equitable period of time and thereafter only under equitable conditions; and (iii) directs the Hisense Defendants to identify and return all trade secret information to SuperCooler.

### COUNT XIX
### VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT
### (FLA. STATUTES § 688.001 *et seq.*)
### (THE HISENSE DEFENDANTS)

360.    SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

361.    The Hisense Defendants are the manufacturing partner of Coke responsible for producing the supercooling refrigerator and inverted nucleator combination machine that Coke currently is rolling out throughout Asia.

362.    SuperCooler's technical information, designs, and other "know-how" related to its Super Chill and Rapid Chill technologies constitute trade secrets under the Florida Uniform Trade Secrets Act (§ 688.001 *et seq*.).  SuperCooler owns and possesses certain trade secret information, as alleged above.  Multiple SuperCooler trade secrets are reflected in the physical components of the glass door cooler and the programming of the glass door cooler that the Hisense Defendants manufactured and manufacture for Coke.  Examples of these trade secrets include, with others to be revealed through discovery:

a.   <u>*Super Chill-Related Technology*</u>: (i) optimal temperature sensor placement; (ii) supercooling temperature and metastable state information; (iii) methods of optimal fan control and airflow; (iv) methods of power management for the compressor and door heating element; ranges of on/off compressor cycles; (v) methods of overnight control to adjust compressor cycles; (vi) ready light design features; (vii) pulldown (beverage chilling) temperature testing data; (viii) methods of remote data access particularly useful for supercooling fridge systems; (ix) door opening data; (x) design of door temperature control; (xi) defrost condition requirements for supercooling refrigeration design; (xii) beverage support racks; and (xiii) other operational requirements for use of Super Chill.

b. _Nucleator-Related Technology_: (i) waterless nucleator design; (ii) operational requirements for use of the nucleator; (iii) nucleator backlighting requirements; (iv) ultrasonic transducer/transmitter design; (v) test development data for ultrasonic transducer/transmitter; (vi) optimal power settings; and (vii) inverted nucleation design considerations.

363.  None of these trade secrets is disclosed in SuperCooler's patents or patent applications.

364.  SuperCooler has undertaken reasonable measures to keep such information secret and confidential.  These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

365.  SuperCooler's confidential and proprietary trade secret information is not available for others in the beverage industry, the refrigeration equipment industry, or any other industry to use through any legitimate means.

366.  SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the

disclosure or use of the information.  The economic value of keeping SuperCooler's

trade secret information confidential is demonstrated by, among other things:

    a.  Coke's willingness to loan SuperCooler millions of dollars so that
SuperCooler could commercialize the technology for Coke while under
an exclusive license agreement and ultimately provide Coke with a
competitive advantage;

    b.  The significantly increased product sales generated by the machines in
Coke's field testing; and

    c.  The multibillion-dollar market for commercial refrigeration equipment,
which would be disrupted by widespread adoption of SuperCooler's
trade secrets.

367.   Since at least the end of 2020, Coke and the Hisense Defendants have

knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets

by using them in machines manufactured and promoted by Coke and Hisense.  Coke

and the Hisense Defendants continue to knowingly, willfully, and maliciously

misappropriate SuperCooler's trade secrets.

368.   As of February 2023, the Hisense Defendants knew or had reason to

know that Coke obtained trade secrets from SuperCooler subject to confidentiality

and use restrictions, explicit and implied.  The Hisense Defendants knowingly,

willfully, and maliciously misappropriated SuperCooler's trade secrets by using

them in various ways:  (i) the Hisense Defendants used SuperCooler's trade secrets

to manufacture or produce supercoolers for Coke that employ SuperCooler's trade secrets; (ii) the Hisense Defendants used SuperCooler's trade secrets by relying on SuperCooler's trade secrets to assist or accelerate Hisense's own research and development; and (iii) the Hisense Defendants used SuperCooler's trade secrets by marketing supercoolers to Coke that embodied SuperCooler's trade secrets. The Hisense Defendants' knowing, willful, and malicious misappropriation remains ongoing through its continued manufacture, maintenance, and/or research and development of the machines.

369.    As a direct and proximate result of the Hisense Defendants' knowing, willful, and malicious misappropriation, SuperCooler has incurred, and will continue to incur, losses, competitive harm, irreparable injury, and significant actual damages in an amount to be proven at trial. Also as a result of the knowing, willful, and malicious misappropriation, the Hisense Defendants were, and will continue to be, unjustly enriched in an amount to be proven at trial.

370.    The aforementioned acts of the Hisense Defendants were willful and malicious. SuperCooler is therefore entitled to exemplary damages under Florida Statute § 688.004(2) and an award of attorneys' fees under Florida Statute § 688.005.

371.    As a direct and proximate result of the Hisense Defendants' knowing, willful, and malicious misappropriation, SuperCooler will suffer injuries of a continuing nature for which SuperCooler has no adequate remedy at law. Unless enjoined by order of this Court, the Hisense Defendants will gain an irreversible

competitive advantage by being the first to commercialize SuperCooler's trade

secret information and reap the profits.  These actions irreparably diminish the value

of the trade secret information to SuperCooler and prevent SuperCooler from

developing its technology with other partners.  Pursuant to Florida Statute § 688.003,

SuperCooler is entitled to an order of injunction that: (i) enjoins the Hisense

Defendants from misappropriating SuperCooler's trade secrets; (ii) enjoins the

Hisense Defendants from manufacturing the devices described herein for an

equitable period of time and thereafter only under equitable conditions; and (iii)

directs the Hisense Defendants to identify and return all trade secret information to

SuperCooler.

## COUNT XX
## VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. §§ 1836–39)
## (COFCO COKE)

372.    SuperCooler incorporates the allegations set forth at Paragraphs 1

through 179 as if fully set forth herein.

373.    COFCO Coke is a marketing, sales, and distribution affiliate of Coke

responsible for advertising and distributing the Hisense Defendants' supercooling

refrigerator and inverted nucleator combination machine that Coke currently is

rolling out throughout Asia.

374.    SuperCooler's technical information, designs, and other "know-how"

related to its Super Chill and Rapid Chill technologies constitute trade secrets under

the Defend Trade Secrets Act (18 U.S.C. §§ 1836–39).  SuperCooler owns and

possesses certain trade secret information, as alleged above.  Multiple SuperCooler

trade secrets are reflected in the physical components of the glass door cooler and

the programming of the glass door cooler that COFCO Coke markets, sells, and

distributes for Coke.  Examples of these trade secrets include, with others to be

revealed through discovery:

a. *Super Chill-Related Technology*: (i) optimal temperature sensor
placement; (ii) supercooling temperature and metastable state
information; (iii) methods of optimal fan control and airflow; (iv)
methods of power management for the compressor and door heating
element; ranges of on/off compressor cycles; (v) methods of overnight
control to adjust compressor cycles; (vi) ready light design features;
(vii) pulldown (beverage chilling) temperature testing data; (viii)
methods of remote data access particularly useful for supercooling
fridge systems; (ix) door opening data; (x) design of door temperature
control; (xi) defrost condition requirements for supercooling
refrigeration design; (xii) beverage support rack considerations; and
(xiii) other operational requirements for use of Super Chill.

b. *Nucleator-Related Technology*: (i) waterless nucleator design; (ii)
operational requirements for use of the nucleator; (iii) nucleator
backlighting requirements; (iv) ultrasonic transducer/transmitter
design; (v) test development data for ultrasonic transducer/transmitter;

(vi) optimal power settings; and (vii) inverted nucleation design considerations.

375.   None of these trade secrets is disclosed in SuperCooler's patents or patent applications.

376.   SuperCooler has undertaken reasonable measures to keep such information secret and confidential.  These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

377.   SuperCooler's confidential and proprietary trade secret information is not available for others in the beverage industry, the refrigeration equipment industry, or any other industry to use through any legitimate means.

378.   SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.  The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

> a.  Coke's willingness to loan SuperCooler millions of dollars so that SuperCooler could commercialize the technology for Coke while under

an exclusive license agreement and ultimately provide Coke with a competitive advantage;

b. The significantly increased product sales generated by the machines in Coke's field testing; and

c. The multibillion-dollar market for commercial refrigeration equipment, which would be disrupted by widespread adoption of SuperCooler's trade secrets.

379. Since at least the end of 2020, COFCO Coke knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using them in machines that were marketed, distributed, and promoted by COFCO Coke. COFCO Coke continues to knowingly, willfully, and maliciously misappropriate SuperCooler's trade secrets.

380. In or around February 2023, COFCO Coke knew or had reason to know that Coke obtained trade secrets from SuperCooler subject to confidentiality and use restrictions, explicit and implied. COFCO Coke knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using SuperCooler's trade secrets in its marketing, distribution, and promotion of the Hisense Defendants' supercoolers that employ SuperCooler's trade secrets. COFCO Coke's knowing, willful, and malicious misappropriation remains ongoing through its continued marketing, sales, and distribution of the Hisense Defendants' machines.

381.   As a direct and proximate result of COFCO Coke's knowing, willful, and malicious misappropriation, SuperCooler has incurred, and will continue to incur, losses, competitive harm, irreparable injury, and significant actual damages in an amount to be proven at trial.   Also as a result of the knowing, willful, and malicious misappropriation, COFCO Coke was, and will continue to be, unjustly enriched in an amount to be proven at trial.

382.   SuperCooler's trade secret information relates to products and services used in, or intended for use in, interstate or foreign commerce.

383.   The aforementioned acts of COFCO Coke were willful and malicious. SuperCooler is therefore entitled to exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C).

384.   As a direct and proximate result of COFCO Coke's knowing, willful, and malicious misappropriation, SuperCooler will suffer injuries of a continuing nature for which SuperCooler has no adequate remedy at law.   Unless enjoined by order of this Court, COFCO Coke will gain an irreversible competitive advantage by being the first to commercialize SuperCooler's trade secret information and reap the profits.   These actions will irreparably diminish the value of the trade secret information to SuperCooler and prevent SuperCooler from developing its technology with other partners.   SuperCooler is entitled to an order of injunction that: (i) enjoins COFCO Coke from misappropriating SuperCooler's trade secrets; (ii) enjoins COFCO Coke from the marketing, sales, and distribution of the devices

described herein for an equitable period of time and thereafter only under equitable

conditions; and (iii) directs COFCO Coke to identify and return all trade secret

information to SuperCooler.

## COUNT XXI
## VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT
### (FLA. STATUTES § 688.001 *et seq.*)
### (COFCO COKE)

385.   SuperCooler incorporates the allegations set forth in Paragraphs 1

through 179 as if fully set forth herein.

386.   COFCO Coke is a marketing, sales, and distribution affiliate of Coke

responsible for advertising and distributing the Hisense Defendants' supercooling

refrigerator and inverted nucleator combination machine that Coke currently is

rolling out throughout Asia.

387.   SuperCooler's technical information, designs, and other "know-how"

related to its Super Chill and Rapid Chill technologies constitute trade secrets under

the Florida Uniform Trade Secrets Act (§ 688.001 *et seq.*).  SuperCooler owns and

possesses certain trade secret information, as alleged above.  Multiple SuperCooler

trade secrets are reflected in the physical components of the glass door cooler and

the programming of the glass door cooler that COFCO Coke markets, sells, and

distributes for Coke.  Examples of these trade secrets include, with others to be

revealed through discovery:

a. _Super Chill-Related Technology_: (i) optimal temperature sensor placement; (ii) supercooling temperature and metastable state information; (iii) methods of optimal fan control and airflow; (iv) methods of power management for the compressor and door heating element; ranges of on/off compressor cycles; (v) methods of overnight control to adjust compressor cycles; (vi) ready light design features; (vii) pulldown (beverage chilling) temperature testing data; (viii) methods of remote data access particularly useful for supercooling fridge systems; (ix) door opening data; (x) design of door temperature control; (xi) defrost condition requirements for supercooling refrigeration design; (xii) beverage support racks; and (xiii) other operational requirements for use of Super Chill.

b. _Nucleator-Related Technology_: (i) waterless nucleator design; (ii) operational requirements for use of the nucleator; (iii) nucleator backlighting requirements; (iv) ultrasonic transducer/transmitter design; (v) test development data for ultrasonic transducer/transmitter; (vi) optimal power settings; and (vii) inverted nucleation design considerations.

388. None of these trade secrets is disclosed in SuperCooler's patents or patent applications.

389.    SuperCooler has undertaken reasonable measures to keep such information secret and confidential.  These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

390.    SuperCooler's confidential and proprietary trade secret information is not available for others in the beverage industry, the refrigeration equipment industry, or any other industry to use through any legitimate means.

391.    SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.  The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

    a.  Coke's willingness to loan SuperCooler millions of dollars so that SuperCooler could commercialize the technology for Coke while under an exclusive license agreement and ultimately provide Coke with a competitive advantage;

    b.  The significantly increased product sales generated by the machines in Coke's field testing; and

c. The multibillion-dollar market for commercial refrigeration equipment,
which would be disrupted by widespread adoption of SuperCooler's
trade secrets.

392.    Since at least the end of 2020, COFCO Coke has knowingly, willfully,
and maliciously misappropriated SuperCooler's trade secrets by using them in
machines that were marketed, distributed, and promoted by COFCO Coke.  COFCO
Coke continues to knowingly, willfully, and maliciously misappropriate
SuperCooler's trade secrets.

393.    As of February 2023, COFCO Coke knew or had reason to know that
Coke obtained trade secrets from SuperCooler subject to confidentiality and use
restrictions, explicit and implied.    COFCO Coke knowingly, willfully, and
maliciously misappropriated SuperCooler's trade secrets by using SuperCooler's
trade secrets in its marketing, distribution, and promotion of the Hisense Defendants'
supercoolers that employ SuperCooler's trade secrets.  COFCO Coke's knowing,
willful, and malicious misappropriation remains ongoing through its continued
marketing, sales, and distribution of the Hisense Defendants' machines.

394.    As a direct and proximate result of COFCO Coke's knowing, willful,
and malicious misappropriation, SuperCooler has incurred, and will continue to
incur, losses, competitive harm, irreparable injury, and significant actual damages in
an amount to be proven at trial.    Also as a result of the knowing, willful, and

malicious misappropriation, COFCO Coke was, and will continue to be, unjustly

enriched in an amount to be proven at trial.

395.    The aforementioned acts of COFCO Coke were willful and malicious.

SuperCooler is therefore entitled to exemplary damages under Florida Statute

§ 688.004(2) and an award of attorneys' fees under Florida Statute § 688.005.

396.    As a direct and proximate result of COFCO Coke's knowing, willful,

and malicious misappropriation, SuperCooler will suffer injuries of a continuing

nature for which SuperCooler has no adequate remedy at law.  Unless enjoined by

order of this Court, COFCO Coke will gain an irreversible competitive advantage

by being the first to commercialize SuperCooler's trade secret information and reap

the profits.    These actions irreparably diminish the value of the trade secret

information to SuperCooler and prevent SuperCooler from developing its

technology with other partners.  Pursuant to Florida Statute § 688.003, SuperCooler

is entitled to an order of injunction that: (i) enjoins COFCO Coke from

misappropriating SuperCooler's trade secrets; (ii) enjoins COFCO Coke from the

marketing, distribution, and promotion of the devices described herein for an

equitable period of time and thereafter only under equitable conditions; and (iii)

directs COFCO Coke to identify and return all trade secret information to

SuperCooler.

## COUNT XXII
## VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. §§ 1836–39)
### (THE SWIRE COKE DEFENDANTS)

397.   SuperCooler incorporates the allegations set forth at Paragraphs 1 through 179 as if fully set forth herein.

398.   The Swire Coke Defendants are a marketing, sales, and distribution partner of Coke responsible for advertising and distributing the Hisense Defendants' supercooling refrigerator and inverted nucleator combination machine that Coke currently is rolling out throughout Asia.

399.   SuperCooler's technical information, designs, and other "know-how" related to its Super Chill and Rapid Chill technologies constitute trade secrets under the Defend Trade Secrets Act (18 U.S.C. §§ 1836–39).   SuperCooler owns and possesses certain trade secret information, as alleged above.   Multiple SuperCooler trade secrets are reflected in the physical components of the glass door cooler and the programming of the glass door cooler that the Swire Coke Defendants market, distribute, and promote for Coke.   Examples of these trade secrets include, with others to be revealed through discovery:

   a. *Super Chill-Related Technology*: (i) optimal temperature sensor placement; (ii) supercooling temperature and metastable state information; (iii) methods of optimal fan control and airflow; (iv) methods of power management for the compressor and door heating element; ranges of on/off compressor cycles; (v) methods of overnight

control to adjust compressor cycles; (vi) ready light design features; (vii) pulldown (beverage chilling) temperature testing data; (viii) methods of remote data access particularly useful for supercooling fridge systems; (ix) door opening data; (x) design of door temperature control; (xi) defrost condition requirements for supercooling refrigeration design; (xii) beverage support rack considerations; and (xiii) other operational requirements for use of Super Chill.

b. *Nucleator-Related Technology:* (i) waterless nucleator design; (ii) operational requirements for use of the nucleator; (iii) nucleator backlighting requirements; (iv) ultrasonic transducer/transmitter design; (v) test development data for ultrasonic transducer/transmitter; (vi) optimal power settings; and (vii) inverted nucleation design considerations.

400. None of these trade secrets is disclosed in SuperCooler's patents or patent applications.

401. SuperCooler has undertaken reasonable measures to keep such information secret and confidential. These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including Coke), contractors, and employees to maintain the secrecy of SuperCooler's confidential information.

402.    SuperCooler's confidential and proprietary trade secret information is not available for others in the beverage industry, the refrigeration equipment industry, or any other industry to use through any legitimate means.

403.    SuperCooler's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.  The economic value of keeping SuperCooler's trade secret information confidential is demonstrated by, among other things:

   a.  Coke's willingness to loan SuperCooler millions of dollars so that SuperCooler could commercialize the technology for Coke while under an exclusive license agreement and ultimately provide Coke with a competitive advantage;

   b.  The significantly increased product sales generated by the machines in Coke's field testing; and

   c.  The multibillion-dollar market for commercial refrigeration equipment, which would be disrupted by widespread adoption of SuperCooler's trade secrets.

404.    Since at least the end of 2020, Coke and the Swire Coke Defendants have knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using them in machines that were marketed, distributed, and promoted by Coke and the Swire Coke Defendants.  Coke and the Swire Coke Defendants

continue to knowingly, willfully, and maliciously misappropriate SuperCooler's
trade secrets.

405. In or around February 2023, the Swire Coke Defendants knew or had
reason to know that Coke obtained trade secrets from SuperCooler subject to
confidentiality and use restrictions, explicit and implied. The Swire Coke
Defendants knowingly, willfully, and maliciously misappropriated SuperCooler's
trade secrets by using SuperCooler's trade secrets in its marketing, distribution, and
promotion of the Hisense Defendants' supercoolers that employ SuperCooler's trade
secrets. The Swire Coke Defendants' knowing, willful, and malicious
misappropriation remains ongoing through its continued marketing, sales, and
distribution of the Hisense Defendants' machines.

406. As a direct and proximate result of the Swire Coke Defendants'
knowing, willful, and malicious misappropriation, SuperCooler has incurred, and
will continue to incur, losses, competitive harm, irreparable injury, and significant
actual damages in an amount to be proven at trial. Also as a result of the knowing,
willful, and malicious misappropriation, the Swire Coke Defendants were, and will
continue to be, unjustly enriched in an amount to be proven at trial.

407. SuperCooler's trade secret information relates to products and services
used in, or intended for use in, interstate or foreign commerce.

408.   The aforementioned acts of the Swire Coke Defendants were willful and malicious.   SuperCooler is therefore entitled to exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C).

409.   As a direct and proximate result of the Swire Coke Defendants' knowing, willful, and malicious misappropriation, SuperCooler will suffer injuries of a continuing nature for which SuperCooler has no adequate remedy at law.  Unless enjoined by order of this Court, the Swire Coke Defendants will gain an irreversible competitive advantage by being the first to commercialize SuperCooler's trade secret information and reap the profits.  These actions will irreparably diminish the value of the trade secret information to SuperCooler and prevent SuperCooler from developing its technology with other partners.  SuperCooler is entitled to an order of injunction that: (i) enjoins the Swire Coke Defendants from misappropriating SuperCooler's trade secrets; (ii) enjoins the Swire Coke Defendants from the marketing, distribution, and promotion of the devices described herein for an equitable period of time and thereafter only under equitable conditions; and (iii) directs the Swire Coke Defendants to identify and return all trade secret information to SuperCooler.

## COUNT XXIII
## VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT
### (FLA. STATUTES § 688.001 *et seq.*)
### (THE SWIRE COKE DEFENDANTS)

410.   SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

411.   The Swire Coke Defendants are a marketing, sales, and distribution partner of Coke responsible for advertising and distributing the Hisense Defendants' supercooling refrigerator and inverted nucleator combination machine that Coke currently is rolling out throughout Asia.

412.   SuperCooler's technical information, designs, and other "know-how" related to its Super Chill and Rapid Chill technologies constitute trade secrets under the Florida Uniform Trade Secrets Act (§ 688.001 *et seq.*).  SuperCooler owns and possesses certain trade secret information, as alleged above.  Multiple SuperCooler trade secrets are reflected in the physical components of the glass door cooler and the programming of the glass door cooler that the Swire Coke Defendants market, distribute, and promote for Coke.  Examples of these trade secrets include, with others to be revealed through discovery:

   a. *Super Chill-Related Technology*: (i) optimal temperature sensor placement; (ii) supercooling temperature and metastable state information; (iii) methods of optimal fan control and airflow; (iv) methods of power management for the compressor and door heating

- 164 -

element; ranges of on/off compressor cycles; (v) methods of overnight control to adjust compressor cycles; (vi) ready light design features; (vii) pulldown (beverage chilling) temperature testing data; (viii) methods of remote data access particularly useful for supercooling fridge systems; (ix) door opening data; (x) design of door temperature control; (xi) defrost condition requirements for supercooling refrigeration design; (xii) beverage support racks; and (xiii) other operational requirements for use of Super Chill.

b. _Nucleator-Related Technology_: (i) waterless nucleator design; (ii) operational requirements for use of the nucleator; (iii) nucleator backlighting requirements; (iv) ultrasonic transducer/transmitter design; (v) test development data for ultrasonic transducer/transmitter; (vi) optimal power settings; and (vii) inverted nucleation design considerations.

413.   None of these trade secrets is disclosed in SuperCooler's patents or patent applications.

414.   SuperCooler has undertaken reasonable measures to keep such information secret and confidential.  These efforts include, but are not limited to, the use of secure computer and networks systems and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners (including

Coke), contractors, and employees to maintain the secrecy of SuperCooler's
confidential information.

415.   SuperCooler's confidential and proprietary trade secret information is
not available for others in the beverage industry, the refrigeration equipment
industry, or any other industry to use through any legitimate means.

416.   SuperCooler's trade secret information derives independent economic
value from not being generally known to, and not being readily ascertainable through
proper means by, another person who could obtain economic value from the
disclosure or use of the information.  The economic value of keeping SuperCooler's
trade secret information confidential is demonstrated by, among other things:

    a.  Coke's willingness to loan SuperCooler millions of dollars so that
        SuperCooler could commercialize the technology for Coke while under
        an exclusive license agreement and ultimately provide Coke with a
        competitive advantage;

    b.  The significantly increased product sales generated by the machines in
        Coke's field testing; and

    c.  The multibillion-dollar market for commercial refrigeration equipment,
        which would be disrupted by widespread adoption of SuperCooler's
        trade secrets.

417.   Since at least the end of 2020, Coke and the Swire Coke Defendants
have knowingly, willfully, and maliciously misappropriated SuperCooler's trade

secrets by using them in machines that were marketed, distributed, and promoted by Coke and the Swire Coke Defendants. Coke and the Swire Coke Defendants continue to knowingly, willfully, and maliciously misappropriate SuperCooler's trade secrets.

418. As of February 2023, the Swire Coke Defendants knew or had reason to know that Coke obtained trade secrets from SuperCooler subject to confidentiality and use restrictions, explicit and implied. The Swire Coke Defendants knowingly, willfully, and maliciously misappropriated SuperCooler's trade secrets by using SuperCooler's trade secrets in its marketing, distribution, and promotion of the Hisense Defendants' supercoolers that employ SuperCooler's trade secrets. The Swire Coke Defendants' knowing, willful, and malicious misappropriation remains ongoing through its continued marketing, sales, and distribution of the Hisense Defendants' machines.

419. As a direct and proximate result of the Swire Coke Defendants' knowing, willful, and malicious misappropriation, SuperCooler has incurred, and will continue to incur, losses, competitive harm, irreparable injury, and significant actual damages in an amount to be proven at trial. Also as a result of the knowing, willful, and malicious misappropriation, the Swire Coke Defendants were, and will continue to be, unjustly enriched in an amount to be proven at trial.

420. The aforementioned acts of the Swire Coke Defendants were willful and malicious. SuperCooler is therefore entitled to exemplary damages under

Florida Statute § 688.004(2) and an award of attorneys' fees under Florida Statute §

688.005.

421.  As a direct and proximate result of the Swire Coke Defendants'

knowing, willful, and malicious misappropriation, SuperCooler will suffer injuries

of a continuing nature for which SuperCooler has no adequate remedy at law.  Unless

enjoined by order of this Court, the Swire Coke Defendants will gain an irreversible

competitive advantage by being the first to commercialize SuperCooler's trade

secret information and reap the profits.  These actions irreparably diminish the value

of the trade secret information to SuperCooler and prevent SuperCooler from

developing its technology with other partners.  Pursuant to Florida Statute § 688.003,

SuperCooler is entitled to an order of injunction that: (i) enjoins the Swire Coke

Defendants from misappropriating SuperCooler's trade secrets; (ii) enjoins the

Swire Coke Defendants from the marketing, distribution, and promotion of the

devices described herein for an equitable period of time and thereafter only under

equitable conditions; and (iii) directs the Swire Coke Defendants to identify and

return all trade secret information to SuperCooler.

## COUNT XXIV
## CIVIL CONSPIRACY
## (COKE AND METALFRIO)

422.  SuperCooler incorporates the allegations set forth in Paragraphs 1

through 179 as if fully set forth herein.

423.   Beginning in at least 2017 and continuing to the present, Coke and MetalFrio entered into an explicit or implicit mutual understanding to commit the following unlawful acts against SuperCooler: breach of contract; breach of fiduciary duty; and misappropriation of trade secrets under DTSA and FUTSA.

424.   The purpose of Coke and MetalFrio's conspiracy was to: (a) unlawfully acquire SuperCooler's trade secrets; (b) misappropriate those trade secrets by disclosing them to unauthorized parties and by disclosing them in copycat patents with Coke personnel listed as inventors; and (c) use those trade secrets to manufacture and commercialize products based on SuperCooler's Background IP but without SuperCooler's involvement or input.

425.   The existence of Coke and MetalFrio's explicit or implicit mutual understanding is evidenced by, among other things:

a. MetalFrio's internal sell sheet from 2017 clearly describing the same product as SuperCooler's sell sheet from 2015;

b. MetalFrio's December 2017 presentation referencing field testing of SuperCooler's machines in Indianapolis as if it were testing of MetalFrio's own Arctic Coke machines; and

c. Coke's resistance to attaching a 1-inch by 1-inch sticker of the SuperCooler logo on Arctic Coke machines built by MetalFrio, despite those machines embodying SuperCooler's trade secrets.

426.    Coke and MetalFrio took the following overt actions, among others, in furtherance of their mutual understanding:

a.  Coke obtained SuperCooler's trade secrets subject to obligations regarding confidentiality, intellectual property license, limited use restrictions, a fiduciary duty to SuperCooler.

b.  Coke published SuperCooler's trade secrets in patents and listed Coke employees as the inventors of SuperCooler's trade secret technology.

c.  Coke and MetalFrio entered into an agreement—explicit or implied— for MetalFrio to manufacture supercoolers and nucleators that incorporate SuperCooler's technologies.

d.  Coke disclosed SuperCooler's trade secrets to MetalFrio so that MetalFrio could manufacture supercoolers and nucleators that incorporate SuperCooler's technologies.

e.  Coke and MetalFrio agreed—explicitly or implicitly—that MetalFrio would manufacture supercoolers and nucleators incorporating SuperCooler's trade secrets in a quantity that was above and beyond simply manufacturing "white box" coolers until SuperCooler could scale up to meet Coke's demand.

f.  MetalFrio knew or had reason to know that SuperCooler owned the trade secrets that MetalFrio was incorporating into the supercoolers and nucleators MetalFrio manufactured and continues to manufacture.

g.  Coke and MetalFrio continue to manufacture, distribute, and promote

supercoolers and nucleators that incorporate SuperCooler's trade

secrets without SuperCooler's involvement.

h.  Coke continues to sell parts for the Arctic Coke and identifying

MetalFrio as the manufacturer to the present day.

427.  Coke and MetalFrio pursued and participated in the above-described

conspiracy intentionally, knowingly, and in bad faith.

428.  As a direct and proximate result of Coke and MetalFrio's acts,

SuperCooler has sustained actual damages in an amount to be proven at trial.

## COUNT XXV
## CIVIL CONSPIRACY
## (COKE AND THE HISENSE DEFENDANTS)

429.  SuperCooler incorporates the allegations set forth in Paragraphs 1

through 179 as if fully set forth herein.

430.  Beginning in at least 2020 and continuing to the present, Coke and the

Hisense Defendants entered into an explicit or implicit mutual understanding to

commit the following unlawful acts against SuperCooler: breach of contract; breach

of fiduciary duty; and misappropriation of trade secrets under DTSA and FUTSA.

431.  The purpose of Coke and the Hisense Defendants' conspiracy was to:

(a) unlawfully acquire SuperCooler's trade secrets; (b) misappropriate those trade

secrets by disclosing them to unauthorized parties and by disclosing them in copycat

patents with Coke personnel and the Hisense Defendants listed as inventors; and (c)

use those trade secrets to manufacture and commercialize products based on SuperCooler's Background IP but without SuperCooler's involvement or input.

432.    The existence of Coke and the Hisense Defendants' explicit or implicit mutual understanding is evidenced by, among other things:

    a.  The Hisense Defendants' September 2020 press release announcing cooperation with Coke to manufacture supercoolers and nucleators that embody SuperCooler's trade secrets; and

    b.  The Hisense Defendants' name on the manufacturing label of Coke-branded supercoolers and nucleators that incorporate SuperCooler's trade secrets.

433.    Coke and the Hisense Defendants took the following overt actions, among others, in furtherance of their mutual understanding:

    a.  Coke obtained SuperCooler's trade secrets subject to obligations regarding confidentiality, intellectual property license, limited use restrictions, and a fiduciary duty to SuperCooler.

    b.  Coke published SuperCooler's trade secrets in patents and listed Coke employees as the inventors of SuperCooler's trade secret technology.

    c.  Coke and the Hisense Defendants entered into an agreement for Hisense to manufacture supercoolers and nucleators that incorporate SuperCooler's technologies.

    d.  Coke disclosed SuperCooler's trade secrets to the Hisense Defendants so that the Hisense Defendants could manufacture supercoolers and nucleators that incorporate SuperCooler's technologies.

    e.  The Hisense Defendants sought and obtained patents that claim inventorship and ownership of technologies SuperCooler invented.

    f.  The Hisense Defendants knew or had reason to know that SuperCooler owned the trade secrets that the Hisense Defendants were incorporating into the supercoolers and nucleators the Hisense Defendants manufactured and continue to manufacture.

    g.  Coke and the Hisense Defendants continue to manufacture, distribute, and promote supercoolers and nucleators that incorporate SuperCooler's trade secrets without SuperCooler's involvement.

434. Coke and the Hisense Defendants pursued and participated in the above-described conspiracy intentionally, knowingly, and in bad faith.

435. As a direct and proximate result of Coke and the Hisense Defendants' acts, SuperCooler has sustained actual damages in an amount to be proven at trial.

## COUNT XXVI
## CIVIL CONSPIRACY
### (COKE, THE HISENSE DEFENDANTS, AND COFCO COKE)

436. SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

437.    Beginning in at least 2020 and continuing to the present, Coke, the Hisense Defendants, and COFCO Coke entered into an explicit or implicit mutual understanding to commit the following unlawful acts against SuperCooler: breach of contract; breach of fiduciary duty; and misappropriation of trade secrets under DTSA and FUTSA.

438.    The purpose of Coke, the Hisense Defendants, and COFCO Coke's conspiracy was to: (a) unlawfully acquire SuperCooler's trade secrets; (b) misappropriate those trade secrets by disclosing them to unauthorized parties and by disclosing them in copycat patents with Coke personnel and Hisense listed as inventors; and (c) use those trade secrets to manufacture and commercialize products based on SuperCooler's Background IP but without SuperCooler's involvement or input.

439.    The existence of Coke, the Hisense Defendants, and COFCO Coke's explicit or implicit mutual understanding is evidenced by, among other things:

    a.  The COFCO Coke joint venture to manufacture, distribute, and promote Coke products;

    b.  The Hisense Defendants' September 2020 press release announcing cooperation with Coke to manufacture supercoolers and nucleators that embody SuperCooler's trade secrets; and

    c.  The Hisense Defendants' and COFCO Coke's names on the manufacturing label of Coke-branded supercoolers and nucleators that embody SuperCooler's trade secrets.

440.  Coke, the Hisense Defendants, and COFCO Coke took the following overt actions, among others, in furtherance of their mutual understanding:

    a.  Coke obtained SuperCooler's trade secrets subject to obligations regarding confidentiality, intellectual property license, limited use restrictions, and a fiduciary duty to SuperCooler.

    b.  Coke published SuperCooler's trade secrets in patents and listed Coke employees as the inventors of SuperCooler's trade secret technology.

    c.  Coke and the Hisense Defendants entered into an agreement for the Hisense Defendants to manufacture supercoolers and nucleators that incorporate SuperCooler's technologies.

    d.  Coke and COFCO Coke made arrangements to market, distribute, and promote Coke products.

    e.  Coke disclosed SuperCooler's trade secrets to the Hisense Defendants so that the Hisense Defendants could manufacture, distribute, and promote supercoolers and nucleators that incorporate SuperCooler's technologies.

f. Coke disclosed SuperCooler's trade secrets to COFCO Coke so that COFCO Coke could market, distribute and promote supercoolers and nucleators that incorporate SuperCooler's technologies.

g. The Hisense Defendants sought and obtained patents that claim inventorship and ownership of technologies SuperCooler invented.

h. The Hisense Defendants knew or had reason to know that SuperCooler owned the trade secrets that the Hisense Defendants were incorporating into the supercoolers and nucleators the Hisense Defendants manufactured, distributed, and promoted and continue to manufacture, distribute, and promote.

i. COFCO Coke knew or had reason to know that SuperCooler owned the trade secrets that COFCO Coke was incorporating into the supercoolers and nucleators COFCO Coke markets, distributes, and promotes and continues to market, distribute, and promote.

j. Coke, the Hisense Defendants, and COFCO Coke continue to manufacture, market, distribute, and promote supercoolers and nucleators that incorporate SuperCooler's trade secrets without SuperCooler's involvement.

441. Coke, the Hisense Defendants, and COFCO Coke pursued and participated in the above-described conspiracy intentionally, knowingly, and in bad faith.

442.   As a direct and proximate result of Coke, the Hisense Defendants, and COFCO Coke's acts, SuperCooler has sustained actual damages in an amount to be proven at trial.

## COUNT XXVII
## CIVIL CONSPIRACY
## (COKE, THE HISENSE DEFENDANTS, AND THE SWIRE COKE DEFENDANTS)

443.   SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

444.   Beginning in at least 2020 and continuing to the present, Coke, the Hisense Defendants, and the Swire Coke Defendants entered into an explicit or implicit mutual understanding to commit the following unlawful acts against SuperCooler: breach of contract; breach of fiduciary duty; and misappropriation of trade secrets under DTSA and FUTSA.

445.   The purpose of Coke, the Hisense Defendants, and the Swire Coke Defendants' conspiracy was to: (a) unlawfully acquire SuperCooler's trade secrets; (b) misappropriate those trade secrets by disclosing them to unauthorized parties and by disclosing them in copycat patents with Coke personnel and the Hisense Defendants listed as inventors; and (c) use those trade secrets to manufacture and commercialize products based on SuperCooler's Background IP but without SuperCooler's involvement or input.

446.    The existence of Coke, the Hisense Defendants, and the Swire Coke Defendants' explicit or implicit mutual understanding is evidenced by, among other things:

   a.   An agreement between the Swire Coke Defendants and Coke for the Swire Coke Defendants to distribute and promote Coke products;

   b.   The Hisense Defendants' September 2020 press release announcing cooperation with Coke to manufacture supercoolers and nucleators that embody SuperCooler's trade secrets; and

   c.   The Swire Coke Defendants' promotion of supercoolers and nucleators manufactured by the Hisense Defendants that embody SuperCooler's trade secrets.

447.    Coke, the Hisense Defendants, and the Swire Coke Defendants took the following overt actions, among others, in furtherance of their mutual understanding:

   a.   Coke obtained SuperCooler's trade secrets subject to obligations regarding confidentiality, intellectual property license, limited use restrictions, and a fiduciary duty to SuperCooler.

   b.   Coke published SuperCooler's trade secrets in patents and listed Coke employees as the inventors of SuperCooler's trade secret technology.

   c.   Coke and the Hisense Defendants entered into an agreement for the Hisense Defendants to manufacture supercoolers and nucleators that incorporate SuperCooler's technologies.

d.  Coke and the Swire Coke Defendants maintain an agreement for the Swire Coke Defendants to market, distribute, and promote Coke products.

e.  Coke disclosed SuperCooler's trade secrets to the Hisense Defendants so that the Hisense Defendants could manufacture, distribute, and promote supercoolers and nucleators that incorporate SuperCooler's technologies.

f.  Coke disclosed SuperCooler's trade secrets to the Swire Coke Defendants so that the Swire Coke Defendants could market, distribute, and promote supercoolers and nucleators that incorporate SuperCooler's technologies.

g.  The Hisense Defendants sought and obtained patents that claim inventorship and ownership of technologies SuperCooler invented.

h.  The Hisense Defendants knew or had reason to know that SuperCooler owned the trade secrets that the Hisense Defendants were incorporating into the supercoolers and nucleators the Hisense Defendants manufactured and continue to manufacture.

i.  The Swire Coke Defendants knew or had reason to know that SuperCooler owned the trade secrets in the supercoolers and nucleators that the Swire Coke Defendants were marketing, distributing, and promoting.

- 179 -

j.  Coke and the Hisense Defendants continue to manufacture, market, distribute, and promote supercoolers and nucleators that incorporate SuperCooler's trade secrets without SuperCooler's involvement.

k.  Coke and the Swire Coke Defendants continue to market, distribute, and promote supercoolers and nucleators that incorporate SuperCooler's trade secrets without SuperCooler's involvement.

448.  Coke, the Hisense Defendants, and the Swire Coke Defendants pursued and participated in the above-described conspiracy intentionally, knowingly, and in bad faith.

449.  As a direct and proximate result of Coke, the Hisense Defendants, and the Swire Coke Defendants' acts, SuperCooler has sustained actual damages in an amount to be proven at trial.

## COUNT XXVIII
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## (FLA. STATUTES § 501.201 *et seq.*)
## (METALFRIO)

450.  SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

451.  MetalFrio engaged in a deceptive or unfair act or practice in the conduct of its trade or commerce when it reverse engineered SuperCooler's technology even though it knew or should have known that SuperCooler's technology was subject to confidentiality and limited use agreements between Coke and SuperCooler.

452.   MetalFrio also engaged in deceptive and unfair acts or practices when it knowingly disregarded Coke's and SuperCooler's confidentiality agreement and limited use agreements to commercialize the Arctic Coke machines and Nucleator in direct competition with SuperCooler.   MetalFrio's commercialization of the Arctic Coke machines and Nucleator injures SuperCooler.

453.   MetalFrio also engaged in deceptive or unfair acts or practices when it misappropriated SuperCooler's trade secrets and claimed credit for SuperCooler's inventions to commercialize the Arctic Coke machines and Nucleator.   This commercialization directly competes with and injures SuperCooler.

454.   MetalFrio's actions constitute unfair methods of competition, unconscionable acts or practices, and unfair and deceptive acts or practices in the conduct of trade or commerce as proscribed by Florida Statutes §501.204(1). Moreover, MetalFrio's actions offend established public policy and are otherwise immoral, unethical, oppressive, unscrupulous, and substantially injurious to SuperCooler.

455.   As the direct and proximate result of Coke's deceptive and unfair acts or practices, SuperCooler has sustained substantial actual damages in an amount to be proven at trial.  SuperCooler is entitled to attorneys' fees arising from MetalFrio's violations of the Florida Deceptive and Unfair Trade Practices Act.

## COUNT XXIX
## TORTIOUS INTERFERENCE
## (METALFRIO)

456.   SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

457.   From 2014 through at least 2020, Coke and SuperCooler maintained a business relationship memorialized by several contracts, including the MSA, Note Purchase Agreement, and various licensing agreements and SOWs.

458.   MetalFrio knew of the business relationship between Coke and SuperCooler and, specifically, of Coke's obligations to SuperCooler.

459.   MetalFrio intentionally, unjustly, and illegally interfered in Coke and SuperCooler's business relationship and induced or otherwise caused Coke to violate the terms of its contractual obligations to SuperCooler.   MetalFrio's actions constituted intentional and malicious misconduct.

460.   As a direct and proximate result of MetalFrio's acts, SuperCooler has sustained actual damages in an amount to be proven at trial and punitive damages. MetalFrio acted in bad faith and SuperCooler is entitled to attorneys' fees.

## COUNT XXX
## LANHAM ACT (15 U.S.C § 1125)
## (METALFRIO)

461.   SuperCooler incorporates the allegations set forth in Paragraphs 1 through 179 as if fully set forth herein.

462.   MetalFrio continues to produce the Arctic Coke, which is an inferior embodiment of SuperCooler's trade secret technology concerning the Super Chill. At least a portion of the Arctic Coke machines produced by MetalFrio are destined for and imported into the United States.

463.   MetalFrio continues to represent that it "led the global development" of the Arctic Coke, even though SuperCooler was the company that originally developed the technology.

464.   MetalFrio's continued promotion of the Arctic Coke is likely to mislead a substantial segment of the market for the Super Chill and cause consumer confusion in the United States as to the origin of the technology. This confusion is evidenced by the continued exposure of the MetalFrio-manufactured Arctic Coke machines in the United States on social media, which continues to this day.

465.   MetalFrio's continued advertisement of the Arctic Coke entered the stream of interstate commerce.

466.   As a direct and proximate result of Coke and MetalFrio's acts, SuperCooler has sustained actual damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons set forth herein, SuperCooler respectfully requests the Court enter judgment in their favor and against Coke, MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants as follows:

a.  Award SuperCooler actual damages and attorneys' fees resulting from
Coke's breach of contract and direct specific performance for Coke to
discharge its contractual obligations;

b.  Award SuperCooler actual damages, punitive damages, attorneys' fees,
and equitable relief (including disgorgement and restitution) arising
from Coke's breach of fiduciary duty;

c.  Award SuperCooler damages, including for actual loss, unjust
enrichment, damages as measured by other methods, exemplary
damages, and attorneys' fees arising from Coke's, MetalFrio's, the
Hisense Defendants', COFCO Coke's, and the Swire Coke Defendants'
violations of the federal Defend Trade Secrets Act;

d.  Award SuperCooler damages, including for actual loss, unjust
enrichment, damages as measured by other methods, exemplary
damages, and attorneys' fees arising from Coke's, MetalFrio's, the
Hisense Defendants', COFCO Coke's, and the Swire Coke Defendants'
violations of the Florida Uniform Trade Secrets Act;

e.  Award SuperCooler its reasonable attorneys' fees, costs, and interest
and other expenses as allowed by 35 U.S.C. § 285 or any other
applicable provisions or statutes;

f.  Award SuperCooler actual damages, punitive damages, and attorneys'
fees resulting from Coke's fraud in the inducement;

g.  Award SuperCooler the reasonable market value of the benefit from which Coke was unjustly enriched;

h.  In the alternative, award SuperCooler damages based on its detrimental reliance on Coke's promises under the doctrine of promissory estoppel;

i.  Award SuperCooler actual damages and attorneys' fees arising from Coke's and MetalFrio's violations of the Florida Deceptive and Unfair Trade Practices Act;

j.  Award SuperCooler actual damages, disgorgement of profits, and costs of the action arising from Coke's and MetalFrio's violations of the Lanham Act;

k.  Award SuperCooler actual damages, punitive damages, and attorneys' fees arising from MetalFrio's tortious interference;

l.  Enter a declaratory judgment declaring that SuperCooler is the rightful owner and inventor of Super Chill, Rapid Chill, Nucleator, and related intellectual property and technologies and assigning title to SuperCooler of that related intellectual property and those technologies and ordering correction of U.S. patents assigned to Coke that improperly omit SuperCooler personnel as inventors;

m.  Enter an injunction order that: (i) enjoins Coke, MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke Defendants from misappropriating SuperCooler's trade secrets; (ii) enjoins Coke,

MetalFrio, the Hisense Defendants, COFCO Coke, and the Swire Coke

Defendants from manufacturing the devices described herein for an

equitable period of time and thereafter only under equitable conditions;

and (iii) directs Coke, MetalFrio, the Hisense Defendants, COFCO

Coke, and the Swire Coke Defendants to identify and return all trade

secret information to SuperCooler;

n.  Award pre- and post-judgment interest to SuperCooler to the maximum

extent permitted by law; and

o.  Grant any such other and further relief as the Court deems just and

proper.

## <u>JURY DEMAND</u>

Plaintiff SuperCooler demands a trial by jury as to all issues so triable.

Dated:  July 7, 2023

/s/ Bradley J. Bondi
Bradley J. Bondi (FBN 162396)
Jeffrey A. Pade (*Pro hac vice*)
Michael D. Wheatley (*Pro hac vice*)
Vitaliy Kats (FBN 118748)
**PAUL HASTINGS LLP**
2050 M Street NW
Washington, DC 20036
Telephone:  202.551.1700
bradbondi@paulhastings.com
jeffpade@paulhastings.com
michaelwheatley@paulhastings.com
vitaliykats@paulhastings.com

Paul Thanasides (FBN 103039)
**MCINTYRE THANASIDES BRINGGOLD ELLIOTT
GRIMALDI GUITO & MATTHEWS, P.A.**

500 E. Kennedy Blvd., Suite 200
Tampa, FL 33602
Telephone:  813.223.0000
paul@mcintyrefirm.com

*Attorneys for Plaintiff*
*SuperCooler Technologies, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 7, 2023, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice

of electronic filing to all counsel of record.

/s/ Bradley J. Bondi
Attorney