# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

SUPERCOOLER
TECHNOLOGIES, INC.,

      Plaintiff,

      v.

THE COCA COLA COMPANY;
METALFRIO SOLUTIONS, INC.;
METALFRIO SOLUTIONS, S.A.;
COFCO COCA-COLA BEVERAGES
(BEIJING) LTD.; HISENSE CO.
LTD.; QINGDAO HISENSE
COMMERCIAL COLD CHAIN CO.
LTD.; HISENSE RONGSHENG
(GUANGDONG) FREEZER CO.
LTD.; HISENSE RONGSHENG
(GUANGDONG) REFRIGERATOR
CO. LTD.; HISENSE USA
CORPORATION; SWIRE COCA-
COLA LTD.; SWIRE COCA-COLA
HK LTD.; SWIRE PACIFIC
HOLDINGS, INC.; and SWIRE
PACIFIC HOLDINGS, INC.,

      Defendants.

Case No. 6:23-cv-187-CEM-RMN

## <u>ORDER</u>

This cause comes before the Court for consideration on Defendant's, The

Coca Cola Company ("Coca-Cola"), Motion to Disqualify The Paul Hastings

Law Firm, Dkt. 39, filed on April 12, 2023. Paul Hastings responded in

opposition, not Plaintiff SuperCooler Technologies, Inc., ("SuperCooler"), Dkt. 56. I held an evidentiary hearing and oral argument on May 31, 2023. Dkts. 75 (Hearing minutes), 77 (Hearing transcript).[1] At my direction, Coca-Cola and Paul Hastings submitted supplemental briefs. *See* Dkts. 81, 82. Having considered the applicable law, the parties' filings, and all evidence presented, I conclude that Defendant's Motion should be denied.

## I.  INTRODUCTION

Coca-Cola's motion and Paul Hastings' opposition frame a particular conflict that is more likely to occur as law firms get bigger. Larger law firms aggregate more work and more clients. And as firms take on more clients, it is more likely that a law firm's advocacy for one client will rub up against the firm's duty of loyalty to another. In some cases, as here, the client and law firm find themselves on opposite sides in litigation.

Common sense may lead one to believe that a lawyer cannot sue a client on another client's behalf.[2] But that is not so. The ethical rules governing the

---

[1] This Order uses "Hrg. Tr. XX:XX–XX" or "Hrg. Tr. XX:XX to XX:XX" to cite the page(s) and lines of the transcript lodged at docket number 77.

[2] An older legal treatise explains it this way: "Something seems radically out of place if a lawyer sues one of the lawyer's own present clients on behalf of another client." Wolfram, *Modern Legal Ethics* (1986 ed.) § 7.3.2, p. 350. This is so, according to the treatise, "[e]ven if the representations have nothing to do with each other" and "no confidential information is apparently jeopardized," because "the client who is sued can obviously claim that the lawyer's sense of loyalty is askew." *Id.*

practice of law sometimes allow a lawyer to sue a client if the lawyer obtains informed consent from all involved. Here, Paul Hasting believed it obtained a waiver from Coca-Cola of any future litigation conflicts that might arise in an engagement letter endorsed by Coca-Cola's legal representative. And because it obtained informed consent from SuperCooler too, the law firm sees nothing wrong with hiring attorneys who have appeared in this case on SuperCooler's behalf. Coca-Cola has a different view and moves for the disqualification of SuperCooler's counsel and Paul Hastings.

## II.   BACKGROUND[3]

### A.   Coca-Cola's Relationship With Paul Hastings

In 2021, Coca-Cola engaged Jonathan C. Drimmer ("Drimmer"), a partner at Paul Hastings, in connection with international human rights work in the Democratic Republic of Congo. Dkt. 56-3 at ¶ 3; Hrg. Tr. 118:4–19. Coca-Cola and Paul Hastings memorialized the terms of the engagement in a letter agreement, which was signed by Drimmer and one of Coca-Cola's in-house lawyers. Dkt. 56-3 at 2; Hrg. Tr. 118:4 to 119:1. The letter contains a provision titled "Waiver of Prospective Conflicts" that states:

> Because we represent a large number of clients in a wide variety
> of legal matters, it is possible that we will be asked to represent a

---

[3] The background section of this Order and portions of my analysis contain my findings of fact. My findings are based on all evidence presented, including my assessment of the credibility of the witnesses who testified at the May 31, 2023 hearing.

client whose interests are actually or potentially adverse to your interests in matters that may include, without limitation, mergers, acquisitions, financing, restructuring, bankruptcy, litigation, or administrative, rulemaking or regulatory proceedings. We may also be asked to serve a subpoena or take other discovery of you on behalf of another client. In particular, the Firm has established relationships with clients engaged in a business in your industry or a related industry and may have represented such clients in connection with various aspects of their business, including, without limitation, mergers, acquisitions, financing, restructuring, bankruptcy, litigation, or administrative, rulemaking or regulatory proceedings.

In any of these circumstances, we agree that we will not undertake any such representation if it is substantially related to a matter in which we have represented you. If the other representation is not substantially related to a matter in which we have represented you, however, then you agree to our accepting such representation and you waive any resulting actual or potential conflicts of interest that may arise, provided that (1) our effective representation of you and the discharge of our professional responsibilities to you are not prejudiced by our undertaking the other representation; (2) we protect your confidential information and implement ethical walls as necessary to screen the lawyers working on the other representation from involvement in your matters, and vice versa; and (3) the other client has consented to and waived potential and actual conflicts of interest.

Dkt. 89-3 at 5–6. The first paragraph of this provision informs Coca-Cola of types of conflicts that may arise in the future if the company agrees to engage Paul Hastings as counsel. *Id*. at 5. The second paragraph sets forth the terms of the agreed waiver and encourages Coca-Cola to "seek advice from independent counsel." *Id*. at 6.

After the engagement letter was executed, Drimmer worked for Coca-Cola on other matters, but never executed another engagement letter or

- 4 -

modified the original letter in writing.[4] Dkt. 56-4 at ¶ 4; Hrg. Tr. 38:17 to 39:8, 41:15–24, 62:22 to 63:17, 68:17–23, 119:22 to 120:5, 121:8–10.

### B.   Bondi, Wheatley, And Kats' Relationships With SuperCooler And Paul Hastings

In the summer of 2022, SuperCooler retained Bradley Bondi, Michael Weiss, Michael Wheatley, and Vitaliy Kats of Cahill Gordon & Reindel, LLP, to develop legal strategies and claims against Coca-Cola. Dkt. 56-1 at ¶ 4; Hrg. Tr. 145:2–9, 146:20 to 147:4, 148:7–12. After months of pre-litigation work on behalf of SuperCooler, the Cahill Gordon team, spearheaded by Bondi, filed a complaint on February 1, 2023. Dkt. 1; Dkt. 56-1 at ¶ 7; Hrg. Tr. 145:10–24.

About this time, Paul Hastings approached Bondi about potentially joining the firm. Hr. Tr. 156:18 to 157:6. Those discussions progressed through late February or March 2023, when Paul Hastings asked Bondi to join it as a partner. Hrg. Tr. 157:11–12. Although Bondi accepted shortly after the offer was extended, he remained at Cahill Gordon throughout most of March. Hrg. Tr. 157:16–22. During this time, Bondi disclosed his intention to join Paul

---

[4] Coca-Cola argues that the engagement letter it executed was superseded by its guidelines for outside counsel, which state that Coca-Cola does not grant advance waivers of conflicts. Dkts. 56 at 12, 81 at 8. Notwithstanding Coca-Cola's general policy, I find that Coca-Cola knowingly executed an engagement letter with Paul Hastings that included a waiver of future conflicts. I also find that the engagement letter was not later modified by Paul Hastings' use of Coca-Cola's billing system because Coca-Cola agreed that the engagement letter could be modified only by a subsequent written agreement between it and Paul Hastings. *See* Dkt. 89-3 at 10.

Hasting to SuperCooler. Hrg. Tr. 149:20 to 150:15. The Company decided to keep this matter with Bondi as he changed firms. Hrg. Tr. 150:16–22.

Wheatley and Katz joined Paul Hastings on March 21, 2023. Dkt. 56-1 at ¶ 10; Hrg. Tr. 166:14–17. They notified Coca-Cola's counsel via email on March 27 that they had changed law firm affiliations and filed a notice to that effect with the Court. *See* Dkt. 28; Dkt. 39 at 56; Hrg. Tr. 166:18 to 167:13. On the evening of March 27, counsel for Coca-Cola responded via email and explained that they were not authorized to consent to Paul Hastings' representation of SuperCooler. Dkt. 39 at 58; *see also* Hrg. Tr. 56:21 to 57:3.

The next day, Jessica Lewis, in-house counsel for Coca-Cola, contacted Drimmer to discuss the conflicts issue with SuperCooler. *Id.* at 23–24; Hrg. Tr. 56:13 to 58:20. In a series of calls, Drimmer eventually communicated Paul Hastings' General Counsel's view that the firm could represent SuperCooler in this matter based on the waiver in the firm's engagement letter. *Id.* at 23–35; Hrg. Tr. 56:13 to 58:20; *see also* Hrg. Tr. 91:14 to 92:15.

Bondi joined Paul Hastings on April 3 and filed a notice with the Court on April 5. Dkt. 65-1, at ¶ 11; Dkt. 35.

### C.    Procedural History

SuperCooler launched this lawsuit against Coca-Cola in February 2023 and filed a Second Amended Complaint on July 7, 2023. Dkts. 1, 87.[5] The 187-page Second Amended Complaint asserts claims against Coca-Cola[6] for breaches of contracts (Dkt. 87 at 83–90), breach of fiduciary duty (*Id.* at 93–103), misappropriation of trade secrets under Florida law (*Id.* at 104–114), "correction of inventorship" pursuant to 35 U.S.C. § 256 (*Id.* at 114–119); fraud in the inducement (*Id.* at 119–122), unjust enrichment (*Id.* at 122–123), promissory estoppel (*Id.* at 124–125), a claim for declaratory relief (*Id.* at 125–127), a violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (*Id.* at 127–129), and a Lanham Act violation (*Id.* at 129–130).

Coca-Cola moved to disqualify SuperCooler's counsel and Paul Hastings on April 12, 2023. Dkt. 39 at 1.

---

[5] Relevant to the pending motion to disqualify, the original Complaint was signed and filed by Bondi, Weiss, Wheatley, and Kats while they were at Cahill Gordon & Reindel, as well as co-counsel Paul Thanasides. Dkt. 1 at 1, 48. The Amended Complaint—filed *after* the disqualification motion—was signed and filed by Bondi, Wheatley, Kats, and Jeffrey Pade of Paul Hastings, as well as co-counsel Thanasides. Dkt. 52 at 1, 114. With the Court's leave, SuperCooler also filed a Second Amended Complaint, which was signed by the same counsel. *See* Dkt. 87 at 186–87.

[6] The Amended Complaint and Second Amended Complaint assert additional claims against other defendants. For purposes of this Order, the undersigned will only discuss the relevant claims against Coca-Cola. *See* Dkts. 52, 87.

### III.   LEGAL STANDARDS

The disqualification of counsel is an extraordinary remedy. *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 144 F. Supp. 2d 1334, 1337 (S.D. Fla. 2001) (citations omitted). Although "it is true that there is a constitutionally based right to counsel of choice, it is also well established that the right is not absolute." *In re BellSouth Corp.*, 334 F.3d 941, 955 (11th Cir. 2003). Once a party becomes aware of "issues of conflict of interest or breach of ethical duties" of counsel who have appeared in a lawsuit, a "motion to disqualify counsel is the proper method" to raise the issue with a court. *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir. 1980).[7]

Disqualification "is a harsh sanction" that "should be resorted to sparingly." *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982). When considering a motion to disqualify counsel, a court must "be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel." *Armor Screen Corp. v. Storm Catcher, Inc.*, 709 F. Supp. 2d 1309,

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

1317 (S.D. Fla. 2010) (quoting *Woods v. Covington Cnty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976)).

The moving party bears the burden of proof. *In re BellSouth Corp.*, 334 F.3d at 961. "[T]he court may not simply rely on a general inherent power to admit and suspend attorneys," but must identify an ethical rule and find that counsel violated it. *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997). Because a litigant is presumptively entitled to counsel of its choosing, only a compelling reason will justify disqualification. *In re BellSouth Corp.*, 334 F.3d at 961. And because a disqualification motion may be used to harass or for a tactical advantage, it should be viewed with caution. *Hermann v. GutterGuard, Inc.*, 199 F. App'x 745, 752 (11th Cir. 2006).[8]

## IV.  ANALYSIS

This Order first addresses the sources of authority that govern the ethical issues raised in Coca-Cola's motion. It then discusses whether there is a conflict of interest under the applicable law and whether any such conflict has been waived with informed consent.

---

[8] Although *Hermann* is not published and therefore not binding on the Court, I find the guidance provided in the panel's reasoning to be persuasive. *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

## A.   The Florida Rules Of Professional Conduct And Federal Common Law Apply.

The Court must first address what jurisdiction's ethical rules govern Coca-Cola's request. Motions to disqualify are governed by two sources of authority. *Hermann*, 199 F. App'x at 752. The first is the local rules adopted by the district court. *See id*. This Court's Local Rule 2.01(e) requires all members of the Court's bar and all attorneys granted special admission to appear to be familiar with and be bound by the Florida Rules of Professional Conduct (which modify and adopt the Model Rules of Professional Conduct of the American Bar Association). *See* Local Rule 2.01(e); *see also Clements v. Apac Partners LLP*, No. 2:20-cv-310, 2021 WL 1341389, at *2 (M.D. Fla. Jan. 13, 2021) (citing *Keane v. Jacksonville Police Fire & Pension Fund Bd. Of Trustees*, No. 3:13-CV-1595, 2017 WL 4102302, at *5 (M.D. Fla. Sept. 15, 2017)).

The second source of authority is federal common law. *Hermann*, 199 F. App'x at 752 (citing *Fed. Deposit Ins. Corp. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995), and *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1383 (10th Cir. 1994)). This is so because requests to disqualify counsel are substantive in nature. *Id*. Federal common law includes the body of precedent from the Fifth Circuit that applies the ethical cannons promulgated by the American Bar Association ("ABA"). *See In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir.

1992) (recognizing that the former Fifth Circuit has looked to the "cannons of ethics developed by the American Bar Association" as "national standards of attorney conduct" when deciding disqualification motions).

Notwithstanding the Eleventh Circuit's clear articulation of the sources of authority that the Court should apply to disqualification motions, Coca-Cola argues for the first time in its supplemental brief that the Court should apply Georgia's ethical rules. *See* Dkt. 81 at 8–10. There are at least four problems with that argument. *First*, Coca-Cola waited far too long make it. Making an argument in a final brief is troublesome—late-submitted arguments create thorny problems such as denying opposing parties an opportunity to respond. Coca-Cola's tardiness is particularly problematic here because the parties were told at the evidentiary hearing that the supplemental briefs would be the last filings on the disqualification motion and that the Florida Rules of Professional Conduct govern the issue before the Court. *See* Hrg. Tr. at 199:7–17. If Coca-Cola believed the Georgia rules controlled, then it should have made that point at the hearing or in its motion. But it didn't. *See, e.g.*, *United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir.1999) (arguments raised for the first time in a reply brief are waived).

*Second*, Coca-Cola effectively elevates the Georgia rules above all others, arguing that Georgia's rules govern the disqualification issue.[9] Dkt. 81 at 8–9. Coca-Cola is mistaken. When ethical issues arise in litigation in federal court, courts look to their local rules and federal common law for the applicable standards, not state law. *Hermann*, 199 F. App'x at 752. This has long been the true. *See, e.g.*, *In re Finkelstein*, 901 F.2d 1560, 1564 (11th Cir. 1990) ("The state codes of professional responsibility do not by their own terms apply to sanctions in the federal courts and any standards imposed are a *matter of*

---

[9] Somewhat circuitously, Coca-Cola reasons that Georgia's rules control because the engagement contract was executed in Georgia and, under Florida's choice-of-law rules, Georgia supplies the substantive law for the contract. Dkt. 81 at 8–9. Coca-Cola cites *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092 (11th Cir. 2004), in support. *Id.* at 9. That decision, however, sheds no light on what jurisdiction's ethical rules apply to counsel who appear before a tribunal. Rather, the case considers whether a party could recover attorney's fees under a Florida statute based on an insurance contract executed in Georgia. *Prime Ins. Syndicate*, 363 F.3d at 1092. The court found that the Florida statute did not abrogate the common law approach to determining what jurisdiction's law governs a party's substantive rights under an insurance contract. *Id.* By contrast, the Court's Local Rules govern here, and those rules unequivocally apply the Florida Rules. Thus, Coca-Cola's reliance on choice-of-law principles for contracts is misplaced.

Additionally, the Court is aware of no case from the former Fifth Circuit or the Eleventh Circuit that applied another jurisdiction's ethical rules based on the law that applies to an engagement letter rather than the ethical rules adopted by the district court in which a matter was litigated, even where it is clear the engagement letter was executed in another state. *See, e.g.*, *Am. Can Co. v. Citrus Feed Co.*, 436 F.2d 1125, 1129 (5th Cir. 1971) (applying Florida's ethical rules to an attorney-client relationship formed by an out-of-state litigant with an out-of-state law firm).

*federal law*." (emphasis added)); *see also In re Am. Airlines*, 972 F.2d 605, 610 (5th Cir. 1992).

*Third*, if the Georgia rules apply at all, it is only because those rules reflect "national standards of attorney conduct." *In re Dresser Indus.*, 972 F.2d at 543. Coca-Cola does not grasp this, reasoning instead that Georgia "unequivocally rejects the enforcement of these types of advance waivers." Dkt. 81 at 9; *see also* Hrg. Tr. 185:14–21 (arguing that Georgia law is "more adverse" than Florida law). Coca-Cola's reasoning thus turns on the assumption that Georgia's rules are not the same as (and, indeed, are more restrictive than) national norms. If that is so, then all cases applying the Georgia rules are distinguishable. *See Hermann*, 199 F. App'x at 752 (federal common law incorporates "national standards of attorney conduct").

*Fourth*, the Court cannot rely on Coca-Cola's counsel's bare assertions about where the engagement letter was signed and executed. *See Lehrfield v. Liberty Mut. Fire Ins. Co.*, 396 F. Supp. 3d 1178, 1183 (S.D. Fla. 2019) ("First of all, attorney argument is not evidence.") Coca-Cola cites no evidence in support of the assertion that the agreement was executed in Georgia, *see* Dkt. 81 at 8, and it presented no testimony about where the contract was executed. The Court is not inclined to fill in this evidentiary gap, especially where Coca-Cola has the burden. And indeed, even the case cited in Coca-Cola's brief explains the "determination of where a contract was executed is [a]

fact-intensive" inquiry that "requires a determination of 'where the last act necessary to complete the contract [wa]s done.'" *Prime Ins. Syndicate, Inc.*, 363 F.3d at 1092–93. The Court declines to engage in such determination on this record.

In sum, the motion is governed by the Court's Local Rules, which incorporate the Florida Rules, and federal common law.

**B.    Paul Hastings' Representation Of Supercooler Here Is A Conflict Of Interest Under Florida Rule 4-1.7(a).**

Next, the Court considers whether Paul Hastings' representation of SuperCooler in this case is a conflict of interest under the Florida Rules of Professional Conduct. Florida Rule 4-1.7 "concerns conflicts of interests with current clients." *Young v. Acenbauch*, 136 S. 3d 575, 581 (Fla. 2014). Subsection (a) of that rule prohibits a lawyer from representing a client if the representation of one client will be directly adverse to another client or if there is a substantial risk that the representation of one client will be materially limited by the lawyer's responsibilities to another client. Fla. Rule 4-1.7(a)(1)–(2). The comments to the Florida Rule summarize the prohibition in broad terms: "a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated." Fla. Rule 4-1.7, Cmt. ("Loyalty to a client").

Rule 4-1.7 is based on two principles. "First, a client is entitled to his lawyer's undivided loyalty as his advocate and champion." *Hilton v. Barnett Banks, Inc.*, No. 94-1036-CIV, 1994 WL 776971, at *3 (M.D. Fla. Dec. 30, 1994) (internal quotation marks omitted); *see also* Fla. Rule 4-1.7, Cmt. ("Loyalty to a client") ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."). "Second, a lawyer should never place himself in a position where a conflicting interest may, even inadvertently, affect the obligations of an ongoing professional relationship." *Hilton*, 1994 WL 776971, at *3. So the Rule and the principles animating it reflect the commonsense notion that a lawyer should not sue a client on another client's behalf.

Coca-Cola argues that Rule 4-1.7 is unambiguous, and that Paul Hastings cannot represent SuperCooler in this matter because its interests are directly adverse to Coca-Cola—another Paul Hastings client. Dkt. 39 at 11. Coca-Cola points out that the Florida Rule is meant to "protect clients from lawyers seeking to benefit by playing both sides of the field for monetary or personal reasons." *Id.* (citing Rule 4-1.7 cmt. ("The lawyer's own interests should not be permitted to have adverse effect on representation of a client.")). In response, Paul Hastings contends that it has not violated any Florida Rule and, among other arguments discussed below, that it can provide "competent

and diligent representation" to both Coca-Cola and SuperCooler in their respective unrelated matters. Dkt. 56, at 9–11.

Coca-Cola is more persuasive here. Before the Court can determine whether Paul Hastings violated the Florida Rules, it must determine whether there is a conflict. Because it is undisputed that Coca-Cola is a current client of Paul Hastings, the Court finds that the firm's representation of SuperCooler here would violate Rule 4-1.7, if there is no effective and applicable waiver of future conflicts with informed consent.

## C.     Coca-Cola Waived This Specific Conflict Of Interest With Informed Consent.

Although Coca-Cola has shown there is a conflict of interest under Florida Rule 4-1.7(a), that conflict may be waived. First, this Order will review the guidance provided by the Florida Rules and the ABA on informed consent and waivers of future conflicts. Then, it will determine whether Coca-Cola gave informed consent when it agreed to waive future conflicts in the 2021 engagement letter.

### i.     Informed Consent And Waivers of Future Conflicts

Subsection (b) of Florida Rule 4.1-7 allows an attorney to represent a client even where there is an actual conflict of interest if: (1) counsel reasonably believe that they will be able to provide competent and diligent representation to each client; (2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a position adverse to another client when the lawyer represents both clients in the same proceeding before a tribunal; and (4) each client gives informed consent. Fla. Rule 4.1-7(b); *see also* ABA Model Rules Of Prof'l Conduct R. 1.7(b) (same).

The Florida Rules and ABA standards define informed consent as "denote[ing] the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Fla. R. Preamble, Terminology; ABA Model Rules Of Prof'l Conduct R. 1.0(e). Under both the Florida Rules and the ABA standards, a client's waiver of future conflicts is valid when the client gives informed consent. Fla. R. 4-1.7(b); ABA Model Rules Of Prof'l Conduct R. 1.0(e). These authorities and the comments associated with each outline several factors to consider in determining whether a client has given informed consent to waive future conflicts of interest.[10]

The ABA standards expressly recognize that a lawyer may properly request a client to waive future conflicts, subject to the four-part test in Rule 1.7(b). ABA Model Rules Of Prof'l Conduct R. 1.7, cmt. 22. The ABA notes

---

[10] Both the Florida Rules and the ABA standards recognize that comments associated with their respective rules serve as interpretative guides. *See* Fla. R. Preamble; ABA Model Rules Of Prof'l Conduct R. Preamble, cmt. 21.

that the "effectiveness of such waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails." *Id*. The ABA explains that the more detail given about the types of future representations and the "actual and reasonably foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the requisite understanding." *Id*. If the client is familiar with a particular type of conflict, according to the ABA, "then the consent ordinarily will be effective with regard to that type of conflict." *Id*. Although "general and open-ended" consent "ordinarily will be ineffective, because it is not reasonably likely that the client will have understood the material risks involved," such "consent is more likely to be effective" if the client is "an experienced user of legal services" and "reasonably informed regarding the risk that a conflict may arise." *Id*. This is particularly so, in the ABA's view, if the client is independently represented by counsel when it provides consent. *Id*.

Although Florida Rule 4-1.7(b) is identical to the ABA rule, the comments to the Florida Rule do not expressly recognize that a client may consent to a future conflict. Yet Florida incorporates the ABA's explanation and guidance for informed consent. *Compare* Fla. R. Preamble, cmts. ("Informed Consent") *with* ABA Model Rules Of Prof'l Conduct R. 1.0, cmt. 6 (same). The comments to the preamble of the Florida Rules explain that the process of obtaining informed consent varies depending on the rule and the

- 18 -

circumstances. Fla. R. Preamble, cmts. Ordinarily, this requires communication that includes a disclosure of the facts giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives. *Id*.; ABA Model Rules Of Prof'l Conduct R. 1.0, cmt. 6 (same). The more experienced the client is "in legal matters generally and in making decisions of the type involved," the less information and explanation is needed for consent to be informed. Fla. R. Preamble, cmts.; ABA Model Rules Of Prof'l Conduct R. 1.0, cmt. 6 (same). And if a client is independently represented by other counsel, generally the client "should be assumed to have given informed consent." Fla. R. Preamble, cmts.; ABA Model Rules Of Prof'l Conduct R. 1.0 (same), cmt. 6.

Thus, the relevant authorities underscore the fact-intensive nature of the informed consent inquiry. The effectiveness of a request to a client to waive future conflicts depends on what disclosure is needed to ensure that the client has reasonably adequate information to make an informed decision in view of the sophistication of the client and whether the client is represented by an independent lawyer.

### ii.    Did Coca-Cola Gave Informed Consent?

Coca-Cola and Paul Hastings hotly dispute the effectiveness of the waiver of future conflicts found in the 2021 engagement letter. This dispute turns on whether Paul Hastings provided reasonably adequate information for Coca-Cola to understand the material risks of waiving future conflicts of interest. *See* Fla. R. Preamble, cmts.; ABA Model Rules Of Prof'l Conduct R. 1.0 (same), cmt. 6. There are two parts of this inquiry. One, what information was provided, and two, was that information reasonably adequate for the client involved?

### 1.    What Was The Disclosure?

Paul Hastings' disclosure is memorialized in the engagement letter. Dkt. 89-3 at 5. The engagement letter discloses that Paul Hastings is a large law firm that represents many other clients, some of which may have interests that are actually or potentially adverse to Coca-Cola in a wide range of matters, including among others finance, litigation, mergers, and regulatory matters. *Id*. The letter also explains that Paul Hastings may represent those clients in matters directly adverse to Coca-Cola. *Id*. The firm explains, however, that it will not agree represent another client in a matter if that matter is substantially related to one in which Paul Hastings has agreed to represent Coca-Cola. *Id*. The letter also discloses to Coca-Cola the potential risks, including that the firm "could be less zealous" in representing Coca-Cola, "favor

the interests of another client," or "use [Coca-Cola's] confidential information in a manner adverse to [Coca-Cola's] interests." *Id*. at 6. The letter also advises Coca-Cola that it should seek advice of independent counsel before agreeing to the waiver. *Id*.

In short, the engagement letter includes a provision that gives Paul Hastings the freedom to represent a wide range of other clients in a wide range of matters, including litigation, that might conflict with the firm's duty of loyalty to Coca-Cola. Despite this, the letter contains an outer boundary—Paul Hastings will not represent other clients in matters substantially related to those in which it represents Coca-Cola or where the firm concludes any such representation would pose a "material risk."

Coca-Cola argues that the waiver provision is open-ended boilerplate that cannot be enforced. Dkt. 39 at 12–14. *First*, open-ended waivers are not per se unenforceable, as Coca-Cola suggests.[11] *See* ABA Model Rules Of Prof'l

---

[11] For this proposition, Coca-Cola relies in part on cases decided by California federal courts. Dkts. 39 at 13–14 (collecting cases), 81 at 6–7 (same). California is one of the few states that did not adopt the standards promulgated by the ABA. *See, e.g.*, *Walker v. Apple, Inc.*, 209 Cal. Rptr. 3d 319, 326 n.4 (Cal. App. 5th 2016) (quoting *City & Cty. of San Francisco v. Cobra Solutions, Inc.*, 135 P.3d 20, 29 (Cal. App. 4th 2006)). Although California courts sometimes rely on the ABA standards as persuasive authority, those standards do not apply if there is "on point California authority or a conflicting state public policy." *Id*. On the issue of advanced waivers, it appears that California has departed from the ABA standards, which reflect national norms and permit such waivers. *See* ABA Model Rules Of Prof'l Conduct R. 1.7(b); ABA Comm. on Ethics & Prof'l

---

Conduct R. 1.7, cmt. 22. *Second*, as determined above, the waiver provision is not open-ended. It is broad.[12] The provision delineates an outer boundary and discloses the types of other clients Paul Hastings might represent, including those in Coca-Cola's "industry or a related industry," like SuperCooler. Dkt. 89-3 at 5.

Pressing on, Coca-Cola argues that the waiver provision is not specific enough to be effective, either because Paul Hastings did not specifically identify its clients or that its other clients may accuse Coca-Cola of fraud. Dkt. 39 at 12–14; Dkt. 81 at 4–5. For the first argument, Coca-Cola relies on *Southern Visions, LLP v. Red Diamond, Inc.*, 370 F. Supp. 3d 1314 (N.D. Ala. 2019), and *Worldspan, L.P. v. Sabre Grp. Holdings, Inc.*, 5 F. Supp. 2d 1356

---

Responsibility, Formal Op. 05-436 (2005). The California cases cited by Coca-Cola are not on point.

Furthermore, as Paul Hastings points out, the comments to the ABA model rule do acknowledge the validity of open-ended waivers of future conflicts in some situations. *See* ABA Model Rules Of Prof'l Conduct R. 1.7, cmt. 22. And to leave no doubt about the validity of such waivers, the ABA withdrew an earlier, somewhat contrary ethics opinion because that opinion was "no longer consistent with the Model Rules." *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 05-436 (2005).

[12] Coca-Cola's associate general counsel testified that litigation, as that term was used in the engagement letter, is very broad. Hrg. Tr. 45:16–21, 46:3 to 47:3.

- 22 -

(N.D. Ga. 1998).[13] The court in *Southern Visions* held that broad, open-ended advanced waivers are per se unenforceable. 370 F. Supp. 3d at 1326. In that court's view, no client can waive a broad range of conflicts in advance because the ethical rule requires consent "after consultation." *Id.* at 1326–28. But this reasoning misses the forest for the trees.[14] More specificity in a disclosure is desirable, not because it is required for consultation, but because specificity makes a particular future conflict more foreseeable. *See* ABA Model Rules Of Prof'l Conduct R. 1.7, cmt. 18 ("Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client.").

The *Worldspan* court refused to credit a "standing consent" provision contained in a "standard" engagement letter. 5 F. Supp. 2d at 1358. There, the

---

[13] Although the Court discusses each distinguishable case in detail, such a back-and-forth is unnecessary given the fact specific inquiry that is required for disqualification motions. In truth, the factual circumstances of other cases are entirely unhelpful in this context. *See Lanard Toys Ltd. v. Dolgencorp LLC*, No. 3:15-cv-849, 2016 WL 7326855, at *10 (M.D. Fla. Dec. 16, 2016) (noting that motions to disqualify are inherently a fact intensive inquiry and stating that "[g]iven the fact-specific nature of the balancing, discussion of all of the [cited] cases is unwarranted").

[14] It also conflicts with the very authorities cited by that court. *See* Restatement (Third) of the Law Governing Lawyers § 122, cmt. d (2000) ("Informed consent that reasonably contemplates later, conflicted representation by the lawyer has been approved and enforced.").

law firm disclosed in its engagement letter the firm's past work for certain airlines and sought the client's consent to represent clients that may have adverse interests. *Id.* at 1359. The court found the waiver ambiguous, noting the language used did not put the client on notice that the firm could represent another client against the first in litigation. *Id.* at 1359–60. But Paul Hastings' engagement letter is unambiguous, and so *Worldspan* is distinguishable.

The reasoning from *Worldspan* is also unconvincing. That court, like the court in *Southern Visions*, relied in part on the language found in Section 122 of the Restatement (Third) of the Law Governing Lawyers.[15] *Worldspan*, 5 F. Supp. 2d at 1360 (referring to sections of a draft); *see also Southern Visions*, 370 F. Supp. 3d at 1326. The Reporter's Notes to that section, however, make clear that the standard promoted in the restatement is consistent with the decisions of some courts that had "approved and enforced" prospective waivers of conflicts. Restatement (Third) of the Law Governing Lawyers § 122, cmt. d (2000). So notwithstanding the text of the Restatement, courts have enforced advanced waivers of future conflicts, even in the context of litigation. *See id.* (citing *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F. Supp. 193,

---

[15] Both courts seem to understand Section 122(2) of the restatement to prohibit an attorney from suing a current client even with the client's informed consent. *See, e.g.*, *S. Visions*, 370 F. Supp. at 1326. Yet that section addresses circumstances in which a law firm represents opposing parties in the same litigation. *See* Restatement (Third) of the Law Governing Lawyers § 122(2).

204 (N.D. Ohio 1976), *aff'd sub nom. City of Cleveland v. Cleveland Elec. Illuminating*, 573 F.2d 1310 (6th Cir. 1977)). And, in any event, the comments to Florida Rule 4-1.7 expressly contemplate that, at least in Florida, an attorney may sometimes "act as an advocate against a client." Fla. R. 4-1.7, cmt. Thus, the *Worldspan* court's reasoning, even if sound, appears contrary to Florida's interpretation of its ethical rule.

Next, Coca-Cola contends that the disclosure was inadequate because it did not explain that one of Paul Hastings' other clients might sue Coca-Cola for fraud. Dkt. 39 at 15–16; Dkt. 81 at 4–6. This argument moves Coca-Cola closer to the mark but does not take it all the way. True, the comments to the Florida Rule and dicta in *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 144 F. Supp. 2d 1334, 1340–41 (S.D. Fla. 2001), indicate that allegations of fraud lobbed by one client against another can influence whether an advanced waiver is effective informed consent. *See* Fla. R. 4-1.7, cmt. ("The propriety of concurrent representation can depend on the nature of the litigation."). But the adequacy of a disclosure depends on the circumstances of each case. That SuperCooler has lodged allegations of unfair business practices against Coca-Cola is one factor to consider in the overall informed consent analysis, not a per se prohibition by itself.

### 2.    Was The Disclosure Reasonably Adequate?

The second part of the informed consent analysis asks if the disclosure provided by Paul Hastings is reasonably adequate for a client like Coca-Cola. For its part, Coca-Cola generally ignores this half of the analysis. Paul Hastings does not.

The law firm points out that Coca-Cola is a sophisticated consumer of legal services that was represented by independent counsel when it gave its consent to future conflicts in the engagement letter. Dkt. 56 at 12; Dkt. 82 at 3. Coca-Cola's associate general counsel testified that he considers Coca-Cola to be "a sophisticated consumer of legal services." Hrg. Tr. 34:4–6. Cola employs between 150 and 200 in-house lawyers, depending on the entities counted, and spends "many millions of dollars" on legal services each year just on its in-house legal team. Hrg. Tr. 34:14–22. And in the last five years, it has retained more than 50—perhaps even more than 100—outside law firms, spending tens of millions of dollars. Hrg. Tr. 34:23 to 35:15. And it is undisputed that Coca-Cola was represented by an independent attorney who executed the agreement on Coca-Cola's behalf. Hrg. Tr. 36:9 to 37:11. On this record, I find that Coca-Cola is an experienced, frequent, and sophisticated consumer of legal services.

The question then is, given the disclosure in the engagement letter, was it reasonably foreseeable for Coca-Cola to understand that Paul Hastings may

appear as counsel against it in litigation, considering Coca-Cola's experience with legal services and its familiarity with the conflicts that arise in litigation?

Think of it this way. A magician performing magic tricks is perceived differently by different people. A toddler in the audience might be surprised and delighted to see the magician pull a rabbit out of his hat. Teenagers and adults in the audience may respond differently based on the number and types of magic shows they have experienced. But the seasoned vaudeville actor lurking just off the stage won't be surprised.

Here, Coca-Cola is most like the jaundiced-eyed vaudeville actor. Coca-Cola knew what Paul Hastings is, what Paul Hastings does, and the types of clients Paul Hastings represents. Based on Coca-Cola's familiarity of the risks involved, its representation by independent counsel, and the disclosure provided, I find that Coca-Cola knowingly waived the specific conflict here— that is, it understood and consented to Paul Hastings serving as counsel to an opposing party in future litigation matters.

I also find that the requirements of Florida Rule 4.1-7(b) are satisfied and Paul Hastings' representation of SuperCooler does not violate Florida Rule 4-1.7.

## V.   CONCLUSION

For these reasons, and upon consideration of the applicable law, the parties' filings, and all evidence presented, Coca-Cola's Motion to Disqualify The Paul Hastings Law Firm (Dkt. 39) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on July 17, 2023.

_____
ROBERT M. NORWAY
*United States Magistrate Judge*

Copies to:

Counsel of Record